---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

**ANIMAL LEGAL DEFENSE FUND, CENTER FOR FOOD SAFETY, SHY 38, INC.**, and **HOPE SANCTUARY,**

               Plaintiffs,

               v.

**JEFFREY COLYER**, in his official capacity as Governor of Kansas, and **DEREK SCHMIDT**, in his official capacity as Attorney General of Kansas,

               Defendants.

CASE NO.

CIVIL RIGHTS COMPLAINT

---

## COMPLAINT

The non-profit organizations Animal Legal Defense Fund (ALDF), Center for Food Safety (CFS), Shy 38, Inc., and Hope Sanctuary (collectively, Plaintiffs), bring this Complaint for Declaratory and Injunctive Relief, and allege as follows:

## BACKGROUND

1.    This lawsuit challenges the constitutionality of Kansas's "Ag-Gag" law, section 47-1827 of the Kansas Statutes, as defined in section 47-1826 and enforced through sections 47-1828 and 21-6604. The law criminalizes undercover investigations and whistleblowing at animal facilities, including factory farms, slaughterhouses, and animal research laboratories. In recent history, such undercover investigations have reliably revealed truthful information about shocking animal cruelty, unsafe food safety practices, environmental hazards, and inhumane working conditions, all of which are matters of great concern to the public.

2.      In 2015, *USA Today* decreed Kansas to be the fifth most dangerous state for animals.[1] Kansas is the fifth largest animal agriculture producer in the United States.[2] Animal agriculture in Kansas is a nearly $17 billion industry, accounting for roughly 12.5% of the state's total economy (~$136 billion).[3] Kansas is among the country's largest producers of pigs—with approximately two million pigs raised for slaughter.[4] Kansas has the third most cows of any state in the United States (6.3 million).[5] There are approximately ninety-four slaughterhouses in Kansas.[6]

3.      Given Kansas's prominent role in animal agriculture, Plaintiff ALDF has a strong desire to conduct undercover investigations at facilities in the state for the purpose of acquiring truthful information about illegal and unethical practices that it can disseminate to a broad public audience. It has the capacity and current intention to conduct such investigations and would do so but for the recent climate in which many states are more explicitly trying to deter such investigations through the proliferation of Ag-Gag laws, including Kansas's.

4.      The other Plaintiffs in this matter have repeatedly relied on investigations like ALDF's to develop and pursue their advocacy. They share ALDF's interest in exposing the truth

---

[1] Thomas C. Frolich, *States Killing the Most Animals for Food*, USA TODAY (Apr. 15, 2015), https://www.usatoday.com/story/money/business/2015/04/15/247-wall-st-states-killing-animals/25807125/ (last visited Dec. 4, 2018).

[2] *Id.*

[3] *See* KANSAS DEPARTMENT OF AGRICULTURE, KANSAS AGRICULTURE ECONOMIC IMPACT 1–2 (2017), *available at* http://agriculture.ks.gov/docs/default-source/ag-marketing/ag-contribution-2017.pdf (hereinafter "Agriculture Economic Impact").

[4] *Top 10 U.S. States by Inventory of Hogs and Pigs in 2017*, STATISTA, https://www.statista.com/statistics/194371/top-10-us-states-by-number-of-hogs-and-pigs/ (last visited Dec. 4, 2018).

[5] Kansas Livestock Association, Industry Economics, https://www.kla.org/resources/industry-economics (last visited Dec. 4, 2018).

[6] Kansas Dep't Agriculture, Kansas Farm Facts, at 33, *available at* https://agriculture.ks.gov/docs/default-source/ag-marketing/kansas-farm-facts-2018-final.pdf?sfvrsn=937184c1_4 (last visited Dec. 4, 2018).

about Kansas's animal agriculture production, and have been denied that opportunity because Kansas seeks to suppress investigations and the public's ability to obtain information about animal agricultural operations.

5.      Kansas's Ag-Gag law, which has been on the books since 1990, has shielded the state's animal agriculture industry from public scrutiny for almost three decades. During this time, however, undercover investigations in Kansas's neighboring states have exposed horrific cruelty. For example, in 2016, Plaintiff ALDF conducted an investigation of a Nebraska pig breeding operation owned by The Maschhoffs, the nation's third-largest pig producer and a Hormel Foods supplier. The investigation revealed long-term neglect and lack of appropriate veterinary care. It revealed pigs suffering for days or weeks with grossly prolapsed rectums, intestinal ruptures, large open wounds, and bloody baseball-sized ruptured cysts. Pigs were denied food for long periods of time, and a botched "euthanasia" resulted in a mother pig slowly dying after being shot in the head multiple times over the course of several minutes. Hormel suspended the supplier after ALDF's release of the investigation.

6.      In Colorado, meanwhile, a 2015 undercover investigation of a Seaboard Foods facility and Walmart supplier conducted by the non-profit organization Mercy for Animals revealed horrific cruelty to pigs. The investigation uncovered workers punching and violently hitting pigs in their faces and bodies with boards and heavy cans. It also showed pigs crammed in barren concrete pens barely able to move without climbing over other animals. Another undercover investigation the group conducted in the state that same year, of Cactus Acres Holsteins, a Dairy Farmers of America cooperative farm in Fort Morgan, Colorado, showed workers viciously punching, kicking, beating, and stabbing cows.

7.      The effects of Kansas's Ag-Gag statute are best understood against the backdrop

of efforts to deter such investigations and suppress speech by lawmakers in Kansas and eight other states with large agricultural industries.[7]

8.      Ag-Gag laws typically employ one or more of a few strategies to deter investigations and suppress the speech they would generate. Some laws prohibit engaging in deception to gain access to agricultural facilities. This blocks investigators who apply for employment at such facilities or otherwise try to gain access without disclosing their political or journalistic affiliations. Other laws make it a crime for a person to take photographs or make audiovisual recordings even when they are otherwise lawfully on the premises. These types of activities, of course, are essential to a successful investigation. Recognizing the speech-suppressing effects of and motivations behind such laws, federal courts have repeatedly invalidated them because they violate the First Amendment.[8]

9.      Kansas's Ag-Gag law incorporates both of these features of other states' Ag-Gag laws. First, Kansas's law makes it a crime for anyone—current employees or undercover journalists—to take a picture or video at an animal facility without the owner's consent and with the intent to "damage the enterprise."  Kan. Stat. § 47-1827(c)(4). Kansas's law also makes it a crime for anyone to gain access to an animal facility "without the effective consent of the owner," with the "intent to damage the enterprise," and "to commit an act prohibited by this section," Kan. Stat. § 47-1827(c)(1), including the photography prohibition. Under both of these

---

[7] Ark. Code § 16-118-113; Kan. Stat. § 47-1825 *et seq.*; Mont. Code § 81-30-101 *et seq.*; N.D. Cent. Code § 12.1-21.1-01 *et seq.*; Idaho Code § 18-7042; Iowa Code § 717A.1 *et seq.*; Mo. Stat. § 578.013; Utah Code § 76-6-112; N.C. Gen. Stat. § 99A-2.

[8] *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193 (D. Utah 2017); *see also W. Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017) (holding that law prohibiting crossing of private land to collect resource data on public land regulated speech covered by First Amendment); *Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901 (S.D. Iowa 2018) (denying State's motion to dismiss complaint challenging constitutionality of Iowa Ag-Gag law).

provisions, consent is not effective if "induced by . . . deception." Kan. Stat. § 47-1826(e)(1).

10. Notably, both of these prohibitions apply even if the investigator's intent in committing these acts is to expose animal cruelty, unsafe working conditions, or food safety violations. (Which makes sense, as the purpose of the law is to prevent such exposés.)

11. Moreover, because the provisions only apply to investigations done without the owners' consent, Kansas's statute essentially "gags" only speech that is critical of animal agriculture, including speech that is of great public concern.

12. Typical investigations involve using deception to gain access to agricultural facilities and observe and record unlawful or unethical conduct. As a result, investigators would violate both of these provisions if they gained access to an agricultural facility by deception to commit another act prohibited by the law (e.g., taking photographs or making an audiovisual recording).

13. Furthermore, investigations of agricultural facilities are in part intended to expose misconduct, and the publicity directly resulting from such exposure could lead to lost business or even boycotts of such operations. Thus, the "intent to damage the enterprise" language applies to investigators who successfully carry out their objectives.

14. The Kansas Attorney General has underscored the statute's application to investigations. He issued an opinion clarifying that "intent to damage the enterprise" can include damage resulting from publication of materials acquired during an investigation.[9] Indeed, as the Attorney General Opinion explains, this reading of the law is confirmed by the statute's restitution and civil damages provisions. These provisions provide for compensation if the public is informed of and reacts to wrongdoing, resulting in impairment of an animal enterprise's

---

[9] *See* Op. Kan. Att'y Gen. No. 90-72 (1990) at 8–9 (attached as Exhibit A and incorporated by reference).

reputation and lost profits.[10]

15.     As detailed in paragraphs 41 to 53, *infra*, in light of the Attorney General's opinion, the Kansas Ag-Gag law is sufficiently broad to also prohibit a range of other conduct that investigators are likely to engage in, thereby violating Plaintiffs' First Amendment rights.

16.     Reading the statute as a whole, the legislature's intent to impede agricultural facility investigations and suppress truthful, but damaging, information is manifest.

17.     Accordingly, Plaintiffs ask this Court for declaratory and injunctive relief to preserve their right and the right of others to engage in expressive and communicative activity that is of the utmost public concern.

## JURISDICTION AND VENUE

18.      This action arises under the U.S. Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1988. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

19.     This Court has authority to grant the declaratory and injunctive relief herein requested pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

20.     Venue is proper in the U.S. District Court for the District of Kansas pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## THE PARTIES

### A.  Plaintiffs

21.      Plaintiff Animal Legal Defense Fund (ALDF) is a national non-profit animal protection organization that, since its founding in 1979, has used education, public outreach,

---

[10] *Id.* at 9.

investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those raised for food. ALDF's work is supported by more than 200,000 members and supporters across the country, including in Kansas. ALDF promotes the humane treatment of farmed animals. ALDF and its agents have conducted undercover investigations at animal facilities around the country, including locations that would meet the definition of an "animal facility" under Kansas Statutes section 47-1826(b). As alleged above, ALDF has engaged in the type of speech affected by the Kansas Ag-Gag law in other states. In the past, ALDF has wanted to—and currently has the desire to—conduct an investigation in Kansas and would contract with an investigator in the state to do so, but for the credible threat of criminal prosecution for violating Kansas Statutes section 47-1827.

22.     Plaintiff Center for Food Safety (CFS) is a 501(c)(3) non-profit environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impact of industrial agriculture. Through legal, scientific, and grassroots action, CFS protects and promotes the public's right to safe and environmentally sustainable food. CFS has over 950,000 members nationwide, including Kansans. CFS's industrial animal agriculture program uses regulatory action, citizen engagement, litigation, and legislation to promote transparency and accountability in the animal agriculture industry. Through this work, the program aims to reduce the harmful impacts of industrial animal facilities on animal welfare, the environment, and human health and to increase consumer awareness, availability, and accessibility of suitable alternatives by highlighting humane, organic, and pasture-based animal raising practices and producers. Since 2009, CFS's industrial animal agriculture program has developed expertise on, and multi-faceted strategies for, addressing the known impacts of intensive animal confinement on food safety and public health.

23.    Unconstitutional Ag-Gag laws such as Kansas's law frustrate CFS's mission to protect the earth from the harmful impact of industrial agriculture, in at least three ways. First, these laws prevent CFS from disseminating information about the conditions at animal production facilities to CFS's members. Second, these laws impede the transparency in agriculture that CFS promotes. Third, they encourage the continuation of the harmful, inhumane, industrial animal agricultural model. CFS has spent significant resources to stop unconstitutional Ag-Gag laws and promote transparency in animal agriculture. But for the unconstitutional Kansas Ag-Gag law, CFS would utilize its limited resources to promote alternatives to the industrial animal-raising system in Kansas.

24.    CFS also disseminates to government agencies, members of Congress, and the general public a wide array of informational materials addressing the harmful effects of industrial agriculture. These materials include news articles, policy reports, legal briefs, press releases, action alerts, and fact sheets. CFS relies on and uses videos and recordings obtained during undercover industrial agriculture investigations for its legal, policy, advocacy, and educational and outreach work, including materials like those produced through ALDF's prior investigations. The Kansas Ag-Gag law impedes CFS's ability to carry out its work because CFS cannot disseminate information concerning the animal agricultural industry in Kansas.

25.    Plaintiff Shy 38, Inc. is a 501(c)(3) non-profit organization, founded in February, 2015 and based in Leavenworth County, Kansas. Shy 38 works to change attitudes about industrialized farm animals by offering a compassionate public humane education program, promoting a cruelty-free, vegan lifestyle, and providing opportunities for the public to interact with its rescued farmed animal residents. Relying on information and materials gained through other organizations' undercover investigations of factory farms and slaughterhouses, Shy 38

advocates for the humane treatment of factory farmed animals and educates the public about the ill effects factory farms have on people, animals, communities, and the environment. Shy 38 pursues its advocacy through its website and social media channels including Facebook, Instagram, Twitter and Pinterest, often sharing videos and images of animal suffering gained from undercover investigations to its over 6,000 social media followers, many of whom are fellow Kansans. Shy 38 is also working towards breaking ground on a physical home for its farm sanctuary, which will house its two rescued animal ambassadors, Amy the pig and Barney the steer, and take in new farm animal rescues as the need arises and funding allows. At the center of Shy 38's advocacy and sanctuary work is a belief that humane education is the key to lasting change for a kinder future. The Kansas Ag-Gag law exacts a toll on Shy 38's work because the organization's efforts to educate the public about the treatment of animals in the factory farming industry are in large part dependent on the information and materials gained through undercover investigations, including information like that produced through ALDF's prior investigations— investigations the Kansas statute criminalizes. If not for Kansas's unconstitutional Ag-Gag law, Shy 38 would have a greater impact in its home state, and could inform its audiences in Kansas and beyond about how farmed animals are treated and mistreated in the state. The Kansas Ag-Gag law thus prevents Shy 38 from fully realizing its mission with regard to the farmed animals and its audiences in its home state.

26.     Plaintiff Hope Sanctuary is a non-profit corporation founded in 2018 and based in Kansas City, Missouri. With a growing number of followers in the Kansas region, Hope Sanctuary works to educate the public regarding the horrific abuse of farm animals that occurs behind closed doors. Through advocacy and education, and by sharing rescued animals' unique stories of resilience, desire, and will to live, Hope Sanctuary works to create a sustainable society

that invests in the integrity of our environment and our animals, guaranteeing fair and humane treatment for farmed animals worldwide. Hope Sanctuary currently works as a rescue network to find homes for farmed animals, and is building towards providing a permanent refuge to farm animals suffering from abuse and neglect as a direct result of our unsustainable food system.

27.     The Kansas Ag-Gag law impedes Hope Sanctuary's ability to fulfill its mission because the organization uses information and materials gained through undercover investigations in its advocacy and education work—including information like that produced through ALDF's prior investigations—to show what farmed animals endure and why they are so desperately in need of greater protection. If Kansas's Ag-Gag law were not on the books, Hope Sanctuary would use videos and other information from investigations in Kansas to educate its listeners about what farmed animals in the region suffer. The law thus foils Hope Sanctuary from fully carrying out its mission closest to home.

**B. Defendants**

28.     Defendant Jeffrey Colyer is the Governor of Kansas and as such, is the Chief Executive for the state, responsible for ensuring the enforcement of the State's criminal statutes. KAN. CONST. ART. I, § 3. The Governor is sued in his official capacity.

29.     Defendant Derek Schmidt is the Attorney General of Kansas and as such, oversees the enforcement of the State's criminal statutes. Kan. Stat. § 75-702. The Attorney General is sued in his official capacity.

**GENERAL ALLEGATIONS**

**A. Undercover investigations to acquire truthful information of public concern are a crucial form of free speech.**

30.     Employee whistleblowing and undercover investigations of the animal agriculture industry have a long and storied history in the United States, dating back to the early 1900s,

when Upton Sinclair's *The Jungle* exposed the unfair labor practices, cruelty to animals, and unsanitary conditions of meat processing plants. Sinclair's investigations led to the enactment of landmark federal food safety legislation, including the Federal Meat Inspection Act and the Pure Food and Drug Act.

31.     Contemporary journalists and animal protection advocates continue to follow in Sinclair's footsteps. In recent years, journalists and animal protection advocates have conducted more than eighty undercover investigations at factory farms and research laboratories in the United States. Without exception, each investigation has exposed horrific animal suffering and many have led to food safety recalls, citations for environmental and labor violations, evidence of health code violations, plant closures, criminal animal cruelty convictions, and civil litigation. Undercover investigations have resulted in thousands of news stories and have made invaluable contributions to national conversations on matters of significant public concern.

32.     Undercover investigations in the animal agriculture industry are typically employment-based: investigators apply for and obtain a job through the usual channels, then document activities in the facility through a hidden camera while performing the lawful tasks required of them as employees. Investigators have the experience and training to perform the duties required by jobs at agricultural facilities—and once employed carry out those duties in good faith—but in applying for such jobs they do not disclose their journalistic or political affiliations, thus engaging in a form of deception.

33.     Undercover recordings have and will continue to result in positive legal outcomes, provide insights into modern factory farming, and contribute immensely to public discourse about the political and ethical dimensions of our food choices.

34.     These exposés are an important part of the marketplace of ideas because they

influence public opinion and consumer demand. A 2012 consumer survey conducted by Purdue University's Departments of Agricultural Economics and Animal Sciences found that the public relies on the information gathered and presented by animal protection groups or investigative journalists more than the public relies on industry groups and the government, combined.

35.     With the exception of material generated by or created on behalf of the animal agriculture industry, investigations by journalists or activists and their subsequent coverage in the media provide the primary lens through which the workings of animal agricultural operations may be gleaned.

36.     Countless reporters and authors have sought access to factory farms and slaughterhouses by asking owners for tours so that they can better understand modern industrial agriculture. Owners and managers of these facilities rarely if ever give such consent.

37.     The acclaimed author Jonathan Safran Foer, who spent three years researching agriculture for his book EATING ANIMALS (now a major motion picture), wrote, "As it turns out, locked doors are the least of it. I never heard back from . . . any of the companies I wrote to . . . . Even research organizations with paid staffs find themselves consistently thwarted by industry secrecy. . . . The power brokers of factory farming know that their business model depends on consumers not being able to see (or hear about) what they do."[11]

38.     Of course, beyond the risks of prosecution and liability under Ag-Gag laws, workers also risk retaliation from co-workers or management for reporting food safety, labor, and animal welfare violations. This makes employment-based investigations by advocacy organizations or journalists the most viable means of exposing the truth.

39.     Acknowledging such investigations' critical free speech value to the nation's food

---

[11]  Jonathan Safran Foer, EATING ANIMALS 87 (2009).

system—an issue of vital public concern—courts have repeatedly recognized that Ag-Gag laws suppress speech and must meet stringent standards of constitutional review, which they have never withstood. The Ninth and Tenth Circuits and federal district courts in Utah, Idaho, Iowa, and Wyoming, have declared Ag-Gag laws substantially similar to Kansas's Ag-Gag law to be facially unconstitutional in violation of the First Amendment; declared that engaging in investigations is a forms of speech, the regulation of which is subject to heightened First Amendment scrutiny; or both.[12]

**B. Kansas's Ag-Gag law fundamentally restricts crucial public speech; it criminalizes the production of speech that is a matter of considerable public concern.**

40. On May 12, 1990, then-Governor Mike Hayden signed into law Senate Bill 776, codified at Kansas Statutes sections 47-1825 through 47-1828.

41. Kansas Statutes section 47-1825 *et seq*. criminalizes a number of activities that are central to the work of investigators and others who attempt to expose unsafe and inhumane conditions at Kansas agricultural facilities.

### i.      Prohibition of Photography and Video Recording

42. Section (c)(4) of the law makes it a crime for any person to "enter an animal facility to take pictures by photograph, video camera or by any other means" without "effective consent" of the owner and with the intent of "damaging the enterprise." Kan. Stat. § 47-1827(c)(4). Consent is rendered ineffective if "induced by . . . deception." Kan. Stat. § 47-1826(e)(1). Thus, no investigators would be able to obtain "effective consent" without revealing their identity as a journalist or activist.

43. Though the law does not directly define the meaning of "intent to damage the

---

[12] *Wasden*, 878 F.3d at 1199, 1205; *W. Watersheds Project*, 869 F.3d at 1195–96; *W. Watersheds Project v. Michael*, No. 15-CV-169-SWS, 2018 WL 5318261, at *10 (D. Wyo. Oct. 29, 2018); *Reynolds*, 297 F. Supp. 3d at 918; *Herbert*, 263 F. Supp. 3d at 1213; *Animal Legal Def. Fund v. Otter*, 44 F. Supp. 3d 1009 (D. Idaho 2014).

enterprise," the Kansas Attorney General has issued an official opinion indicating that such damage would include damage resulting from publication of materials acquired during an investigation, as confirmed by the law's restitution and civil damages provisions. *See* Exhibit A, Op. Kan. Att'y Gen. No. 90-72 at 8-–9 (1990). Thus, an investigator's intent to publish or report on unsafe food safety or labor practices in an animal facility could qualify as an "intent to damage" because the foreseeable public disclosure of an agricultural operation's inhumane practices could lead to reduced sales, boycotts, or other legitimate economic consequences resulting from the exposure of truthful information produced by an investigation. Because "intent to damage" is not otherwise defined and can be construed incredibly broadly (including simply the intent to report or publish findings from an undercover investigation), it is not an appropriate or meaningful limiting principle for the scope of the Ag-Gag law.

### ii. Prohibition of Deceptive Entry to Commit an Act Prohibited by Another Provision of the Law

44.     Section (c)(1) of the law makes it a crime for any person to "[e]nter an animal facility, not then open to the public, with intent to commit an act prohibited by this section" without "effective consent" of the owner and with the intent of "damaging the enterprise." Kan. Stat. § 47-1827(c)(1). Thus, if investigators shield their identity to gain access to an agricultural facility with the intent to commit a violation of section (c)(4), the photography prohibition, and with the same intent to use the results of their investigation to publicize the misconduct observed, they would violate section (c)(1) as well.

45.     Further, section (c)(3) of the law makes it a crime for any person to "enter an animal facility and commit or attempt to commit an act prohibited by this section," Kan. Stat. § 47-1827(c)(3), without "effective consent" of the owner and with the intent of "damaging the enterprise."  Again, if investigators shield their identity to gain access to an agricultural facility

and either violate or *attempt* to violate the photography prohibition with the same intent to use the results of their investigation to publicize the misconduct observed, they would violate section (c)(3) as well.

### iii.   Other Prohibitions That Could Be Used to Criminalize Investigators' Conduct

#### a. Damage Provision

46.    Section (a) of the law makes it a crime for any person to "damage or destroy an animal facility" without "effective consent" of the owner and with the intent of "damaging the enterprise." Kan. Stat. § 47-1827(a). The Kansas Attorney General authoritatively interprets the term "damage" to trigger the statute's compensatory damages provision, which would include "damages for impairment of reputation, personal humiliation, lost profit, both present and future." Exhibit A, Op. Kan. Att'y Gen. No. 90-72 at 9 (1990). Thus, because of the broad ranging interpretation of the Attorney General, this provision could be used to prosecute any investigator who engages in the type of investigation described throughout this Complaint. Moreover, the legislature's emphasis on intent to "damage *the enterprise*" bolsters the conclusion that the law is designed to protect the agricultural industry from damage to its members' reputation, and not merely to tangible property.

47.    It might be possible to construe section (a) more narrowly to apply only to actual *physical* damage, rather than reputational harm or lost profits from bad publicity. Nevertheless, this section imposes a substantial deterrent to conducting agricultural investigations, because of (1) the Kansas Attorney General's authoritative opinion and (2) the placement of this provision in the context of the Kansas statute's other Ag-Gag prohibitions.

#### b. Control Provision

48.    Section (b) of the law makes it a crime for any person to "acquire or otherwise

exercise control over an animal facility" without "effective consent" of the owner and with the intent to "deprive the owner of such facility" and the intent to "damage the enterprise." Kans. Stat. § 47-1827(b). Given the breadth of this language and the nature of the work carried out by investigators, this provision could be enforced against investigators who take relatively minor steps to hide their investigative activities. The provision therefore inhibits Plaintiffs from conducting agricultural investigations. For example, an investigator working in a supervisory capacity at an agricultural facility might use his or her authority to temporarily close off a part of that facility so as not to be observed photographing the conditions, which could be viewed as exercising "control" over that part of the facility.

49.     Although it might be possible to construe section (b) more narrowly to apply only to actual physical control over an entire agricultural facility, given the placement of this provision in the context of the other Ag-Gag prohibitions in the Kansas statute, this section imposes a substantial deterrent to conducting agricultural investigations.

### c.  Concealment Provision

50.     Section (c)(2) of the law makes it a crime for any person to "remain concealed, with intent to commit an act prohibited by this section," without "effective consent" of the owner and with the intent to "damage the enterprise." Kan. Stat. § 47-1827(c)(2). Given the breadth of this language and the nature of the work carried out by investigators, this provision could be enforced against investigators who take relatively minor steps to "conceal" themselves to hide their investigative activities. This provision therefore inhibits Plaintiffs from conducting agricultural investigations. For example, an investigator who took a physical position obscured from other employees so as not to be observed photographing the conditions of that facility, could be viewed as remaining "concealed" for the time needed to take the photographs.

51.     Although it might be possible to construe section (c)(2) more narrowly to apply

only to those who, for example, physically conceal themselves until after an agricultural facility is closed for business, given the placement of this provision in the context of the other Ag-Gag prohibitions in the Kansas statute, this section imposes a substantial deterrent to conducting agricultural investigations.

### d.  Entering and Remaining Despite Notice Provision

52.     Finally, section (d)(1) of the law makes it a crime for any person to "enter or remain on an animal facility" without "effective consent" and with the intent to "damage the enterprise" if that person "[h]ad notice that the entry was forbidden" or "received notice to depart but failed to do so."  Kan. Stat. 47-1827(d)(1). Given the breadth of this language and the nature of the work carried out by investigators, this provision could be enforced against investigators who use deception to gain access to agricultural facilities intending to expose misconduct, where such exposure could lead to lost business or even boycotts of such operations, because those investigators can reasonably be construed as intending to damage the "enterprise." In addition, because agricultural facilities frequently post notices forbidding nonconsensual access, photography, or video recording, investigators will frequently be on notice that their investigative behavior is forbidden by facilities owners, subjecting them to prosecution under section (d)(1). This section also permits agricultural facilities owners to effectively use such notices to stop speech activities.

53.     Although it might be possible to construe section (d)(1) more narrowly to apply only to those who, for example, were to enter and remain on the premises of an agricultural facility and belligerently refuse to leave after being specifically directed to do so, given the placement of this provision in the context of the other Ag-Gag prohibitions in the Kansas statute, this section imposes a substantial deterrent to conducting agricultural investigations.

### iv.     Other provisions that exacerbate the law's chilling effect

### a. Criminal Punishment

54.     The primary chilling effect of the Kansas Ag-Gag law stems from the possibility of criminal prosecution—including at the felony level—for violations of the foregoing provisions.

55.     Violations of section (a) are classified as anything from a class A, nonperson misdemeanor to a severity level 7, nonperson felony, depending upon the extent of the economic harm resulting from the violation. Kan. Stat. § 47-1827(g)(1). Violations of section (b) are a severity level 10, nonperson felony. Kan. Stat. § 47-1827(g)(2). Violations of section (c) are a class A, nonperson misdemeanor, while violations of section (d) are a class B, nonperson misdemeanor. Kan. Stat. § 47-1827(g)(3–4).

56.     Persons convicted of violating these provisions can therefore face up to 16 months imprisonment and a fine of up to $2,500 (and can be placed on probation for a period of up to two years).

57.     Remarkably, the criminal penalties are the same for a person who intends to take a *picture* in an animal facility without the consent of the owner as for a person who knowingly *kills* or injures an animal. *Compare* Kan. Stat. § 47-1827(g)(3) *with* Kan. Stat. § 21-6412(b)(2)(A). In other words, Kansas's law punishes those who expose animal cruelty as severely as those who commit it.

### b. Damages and Restitution Clauses

58.     In addition to the possible criminal penalties, a further chilling effect stems from the statute's damages and restitution provisions. The damages provision authorizes any person who "has been damaged by reason of a violation of K.S.A. 47-1827" to bring an action against the person committing such violation for damages in an amount "equal to three times all actual and consequential damages" and "court costs and reasonable attorney fees." Kan. Stat. § 47-

1828. Moreover, the Kansas Attorney General has authoritatively construed the damages provision to authorize compensation "for impairment of reputation, personal humiliation, and loss of profit, both present and future." Exhibit A, Op. Kan. Att'y Gen. No. 90-72 at 9 (1990). The prospect of personal financial liability for substantial damages compounds the chilling effect already put in place by the criminal penalties and further deters speech protected by the First Amendment.

59.     In addition to the criminal penalties and civil damages provisions under the law, the Kansas Attorney General has authoritatively interpreted the Kansas Ag-Gag law to permit a sentencing court to order restitution under other provisions of the Kansas statutes. Exhibit A, Op. Kan. Att'y Gen. No. 90-72 at 8 (1990). Like the damages provision, this restitution authority is likely to include reputational and publication damages. When read together with the Ag-Gag law's other provisions, this reinforces that the law is designed to punish and deter Plaintiffs from engaging in speech specifically because of their viewpoint and the content of their messages.

### c.  Breadth of the Statute's Definition of Agricultural Facility

60.     In addition to the punishments and financial penalties embodied in the law that directly discourage speech, the chilling effect of Kansas's Ag-Gag law is enhanced by the almost limitless definition of "animal facility"—as "*any* vehicle, building, structure, research facility or premises where an animal is kept, handled, housed, exhibited, bred or offered for sale." Kan. Stat.  § 47-1826(b) (emphasis added). "Animal[s]" covered by the law include "any warm or coldblooded animal used in food, fur or fiber production, agriculture, research, testing or education and includes dogs, cats, poultry, fish and invertebrates."  Kan. Stat. § 47-1826(a). And the law defines "research facility" to include "any place, laboratory, institution, medical care facility, elementary school, secondary school, college or university, at which any scientific test, experiment or investigation involving the use of any living animal or field crop product is carried

out, conducted or attempted." Kan. Stat.  § 47–1826(i).

61.     These broad definitions would include not just factory farms, slaughterhouses, fur farms, and research laboratories; but also roadside zoos, restaurants with lobster or fish tanks, pet stores, circuses, petting zoos, and elementary school classrooms with an ant farm or a classroom pet. The law therefore criminalizes access by false pretenses and/or photography or videography at all these places. Given that the law does not specify whether animals must be alive, virtually any place that sells or cooks animals for food could plausibly fall into the category of an "animal facility" in Kansas, including grocery stores, delis, schools, retirement homes, and hospitals.

62.     Under the plain terms of Kansas's law, it would be unreasonable for Plaintiff ALDF to conduct the types of investigations it contemplates, on which it relies for its advocacy and on which Plaintiffs CFS, Shy 38, and Hope Sanctuary also rely. Journalists and investigators are reasonably deterred from accessing or recording conditions in animal facilities using the time-tested tools of investigative journalism. Likewise, farmworkers and other employees working in agricultural production facilities are reasonably deterred from concretely documenting unsafe conditions in their workplaces without risking arrest and prosecution.

**C. The law was intended to suppress speech that is negative to the animal research and animal agriculture industries.**

63.     The Kansas Ag-Gag law's legislative history demonstrates that it was introduced with the explicit intent of silencing or impeding speech by animal protection organizations, by suppressing undercover investigations that shed light on industrial animal agriculture's practices and other animal abuses.

64.     The law was enacted precisely at the time of an uptick in animal rights activism in the United States—specifically the use of undercover investigations into animal facilities. As a district court in Utah noted, it was only "[a]fter these initial investigations became public" that

"Kansas, Montana, and North Dakota all enacted ag-gag laws."[13]  Indeed, animal rights activists began picketing outside the University of Kansas Medical Center to oppose the unnecessary use of animals in research in 1989, just one year before Kansas enacted its Ag-Gag law.[14]

65.     When then-Governor Mike Hayden signed the Kansas Ag-Gag law, formally known as the "Farm Animal and Field Crop and Research Facilities Protection Act," Kan. Stat. 47-1825, it was in direct response to, and had the express intent of quashing, this increased activism. Governor Hayden publicly said that the legislation was designed to "deal with damage caused by radical elements of the animal-rights movement" and was in direct "response to . . . actions across the nation by some activists."[15]

66.     The Kansas legislature also acknowledged the law was "aimed at protecting farms, ranches and research operations from animal-rights extremists."[16]  In early 1989, newspapers reported that Kansas farmers were "concerned about the impact of the [animal rights] movement on livestock production" and that the Kansas Farm Bureau meeting in December 1988 and the Kansas Livestock Association's annual meeting addressed the groups' growing concerns about the movement.[17]

67.     On information and belief, no other statutes in Kansas criminalize any other specific category of whistleblowing or investigative journalism. Undercover investigations of

---

[13] *Herbert*, 263 F. Supp. at 1193.

[14] *Animal rights group protests at med center*, THE HUTCHINSON NEWS (May 1, 1989), attached as Exhibit B.

[15] *Law Aims to Curb Attacks by Animal-Rights Militants*, ORLANDO SENTINEL (May 14, 1990) ("The Farm Animal and Research Facility Protection Act was in response to militant actions across the nation by some activists . . ."), attached as Exhibit C; *see also* Andrew Cassel, '*Puppy Mill' Dogs Jam Midwest Shelters*, PHILADELPHIA INQUIRER (July 1990), attached as Exhibit D.

[16] ORLANDO SENTINEL, *supra* note 15, attached as Exhibit C.

[17] Michael Bates, *Kansas Farmers Wary of Animal Rights Movement*, THE WICHITA EAGLE (Jan. 22, 1989), attached as Exhibit E.

other industries, such as financial institutions or medical providers are not subject to similar penalties.

68.     Upon information and belief, legislators and trade groups advocated for Kansas's Ag-Gag law specifically because it would silence animal protection organizations.

69.     The Kansas legislature's intent to silence a viewpoint critical of animal industry is further evident by the utter redundancy of the Ag-Gag statute to target trespass and other property crimes. Comprehensive, content-neutral laws prohibiting fraud, trespass, adulteration of food products, theft, theft of trade secrets, and destruction of property already existed in Kansas at the time of Ag-Gag statute's enactment.[18]

**D.  The law fundamentally impairs Plaintiffs' important public interest missions.**

70.     ALDF uses its own investigations and those of other groups to file lawsuits and promote legislation to further their missions of protecting animals. ALDF uses videos and photos of illegal conduct obtained through undercover employment-based investigations to seek enforcement of civil and criminal laws and regulations, to encourage legislative and industry reform, to educate the public about factory farms and other animal-abusing industries, and to effectuate changes in corporate policies and supply chains. ALDF also uses investigations to document the problems with the legal system's treatment of animals, such as the absence of federal laws that protect animals on farms or the under-enforcement of state anti-cruelty laws. Kansas's Ag-Gag law all but forecloses investigative accounts of the animal research and animal agriculture industries, creating an information vacuum that directly undermines the ALDF's litigation, legislation, outreach, and educational programs.

71.     If ALDF was permitted to conduct investigations in Kansas, it is prepared to share

---

[18] Kan. Stat. §§ 21-5808, 65-664, 21-5801, 60-3320 *et seq.*, 21-5813 *et seq.*

its findings with the public, the media, and with CFS, Shy 38, and Hope Sanctuary. Because they do not conduct their own investigations, CFS, Shy 38, and Hope Sanctuary rely on and use videos and recordings obtained during undercover industrial agriculture investigations by groups such as ALDF and others for their legal, policy, advocacy, and educational and outreach work. Therefore, Kansas's Ag-Gag creates an information vacuum that directly undermines the other Plaintiffs' litigation, legislation, outreach, and educational programs.

72.     For example, CFS was involved in litigation in Texas to enforce the state's Health and Safety Code at egg production facilities with the goal of protecting the public from contracting foodborne illnesses. The lawsuit stemmed in part from an undercover investigation that revealed unsanitary and inhumane conditions at a Texas facility.

73.     To take another example, Shy 38 regularly shares to its over 6,000 social media followers videos from undercover investigations conducted by groups like Mercy for Animals; such investigations are critical to Shy 38's advocacy against the abuse of farmed animals in industrial agriculture.

74.     CFS, Shy 38, and Hope Sanctuary are uniquely situated recipients of the undercover recordings as they are listeners; without access to undercover recordings each has difficulty fulfilling its mission and providing information to the public about food production and the treatment of animals at agricultural operations.

75.     The fact that Plaintiff ALDF has not done an investigation in Kansas makes Kansas's animal agriculture and animal research industries uniquely important subjects for investigation. Indeed, given that these industries have effectively been a black box for nearly thirty years, while investigations in other states have shown inhumane and unsafe conditions, the need for Plaintiff ALDF to gather information about the Kansas industries is particularly acute.

76.     Plaintiff ALDF has engaged in, and intends to continue to engage in, undercover investigations of animal facilities in the United States. ALDF conducts investigations because they are useful to the organization's legal advocacy, as well as its educational and outreach missions.

77.     ALDF's undercover investigations would violate the Kansas Ag-Gag law by "tak[ing] pictures by photograph, video camera or by any other means" without the consent of the owner and with the "intent to damage" the enterprise by reporting misconduct and exposing its cruelties to public view, understanding that such exposure may lead to boycotts, lost business, or other harm to reputation resulting from the adverse publicity.

78.     ALDF's undercover investigations would also violate the Kansas Ag-Gag law by providing the investigator with access through misrepresentation. A typical applicant applies for employment with the primary motive of obtaining a job in exchange for a wage. An ALDF applicant with an *investigatory* motive would obtain the job under (what the law would consider) the deception of being a typical applicant—thus violating the Ag-Gag law, even without making an affirmative misrepresentation, though they also intend to perform the work they are hired to do. Other examples of a job applicant's conduct that would violate the Ag-Gag law include: failing to disclose during the employment process the intent to video record any suspected illegal conduct at the facility, omitting affiliations with animal protection organizations,[19] omitting status as licensed private investigators (where applicable), downplaying educational background, or telling innocuous white lies to ingratiate oneself to interviewers, such as "I like your corporate philosophy."

---

[19] Industry documents for the agricultural field routinely instruct agricultural employers to inquire about affiliations with animal protection organizations. On information and belief, agricultural employers in Kansas inquire whether a potential employee has any connections to an animal protection organization.

79.     As a matter of policy, journalists and undercover investigators, including Plaintiff ALDF, instructs its employees and agents not to exaggerate their qualifications for a position (such as purporting to have skills, licenses, or clearances they do not in fact have), and to undergo the same training and perform the same lawful tasks as any other employee, including respecting all biosecurity protocols.

80.     The cameras worn by investigators are hidden on the clothing and are operated with no or virtually no effort; they do not interfere with the investigator's ability to perform the tasks required of the position. In terms of safety, efficiency, and productivity, investigators are no different from any other employee.

81.     Plaintiffs reasonably believe that prosecutors in Kansas intend to enforce Kan. Stat. § 47-1827, but Plaintiffs would never intentionally violate any criminal law.[20]

82.     Despite this, all Plaintiffs have the goal and organizational purpose of producing and disseminating speech that shows the hidden side of industrial animal agriculture and, for Plaintiff ALDF, of the animal research industry as well.

83.     ALDF has a specific interest in animal research and animal agriculture investigations in Kansas, which is among the nation's largest contributors to industrial animal agriculture.

84.     ALDF's core mission is fundamentally impaired by Kansas's Ag-Gag law. Realistically, there is no investigation strategy that would meaningfully reveal the conditions inside agricultural production facilities without violating Kansas's Ag-Gag law.

85.     Plaintiff CFS's "right to know" core mission is likewise fundamentally impaired by Kansas's Ag-Gag law because such laws prevent CFS from obtaining and disseminating

---

[20] Indeed, Plaintiffs routinely work alongside law enforcement officials. ALDF has a Criminal Justice Program that provides free legal assistance and training to law and enforcement prosecutors.

information about the conditions at animal production facilities to their members, impede the transparency in agriculture that CFS promotes, and encourage the continuation of the harmful, inhumane, industrial animal agriculture model. CFS would use its limited resources promoting alternatives to the industrial animal raising system in Kansas but for the Ag-Gag law. Kansas's law directly impedes Plaintiff CFS' litigation and outreach efforts by diminishing the supply of investigations.

86.    CFS has imminent plans to rely on undercover investigations to pursue legal and policy work as part of its campaign against concentrated animal feeding operations. CFS has hundreds of thousands of members concerned about foodborne illness outbreaks caused by unsanitary confined animal feeding operations. The reasonable fear of foodborne illnesses from certain agricultural facilities, the difficulty in obtaining information, and the inability to protect the public from environmental and public health threats of certain agricultural operations are themselves actual injuries.

87.    Plaintiffs Shy 38 and Hope Sanctuary's core missions, too, are fundamentally impaired by Kansas's Ag-Gag law. Both organizations' work—educating the public about and advocating against the abuse of farmed animals in industrial agriculture—is heavily reliant on information and materials gained through undercover investigations of factory farms and slaughterhouses, given that such investigations are the chief window into how these animals live and die. Because Ag-Gag laws like Kansas's prevent Shy 38 and Hope Sanctuary from obtaining and sharing information about industrial animal agriculture, they thwart the organizations' efforts to inform their audiences about what animals in the region's factory farms and slaughterhouses endure—an integral part of each organization's mission. If not for the Kansas law, Shy 38 and Hope Sanctuary would seek out and use undercover investigations conducted in Kansas to

advocate against the mistreatment of farmed animals in the state, to galvanize public support for the animals' humane treatment, and to motivate listeners to adopt a cruelty-free, vegan lifestyle.

88.    Further, Plaintiff ALDF's inability to conduct undercover investigations in Kansas allows agricultural and research enterprises in Kansas to claim that they are treating their animals in a way that is different than what is shown in the videos obtained by Plaintiffs from other states. Food safety, labor, and animal welfare issues are uniquely hidden from public scrutiny because of the Kansas Ag-Gag law.

89.    ALDF has the current capacity and intention to conduct an employment-based undercover investigation at an animal facility in Kansas and would proceed with such an investigation but for the Ag-Gag law.

90.    However, while Kansas's law remains in effect, ALDF and CFS must expend resources to educate the public about the concrete harm caused by Ag-Gag laws and to counteract the unconstitutional restriction on information that directly impedes the development of laws to protect and benefit animals. The time, money, and other resources Plaintiffs ALDF and CFS spend opposing and doing outreach regarding Ag-Gag laws diminishes the very limited resources available for their core missions.

91.    Simply put, the Kansas law infringes on all Plaintiffs' rights and gives the animal agriculture and research industries a virtual monopoly on the most relevant and probative speech on topics that are of vital importance to the public. The Ag-Gag law allows the industries to provide misleading accounts of their activities and hide violations of laws designed to protect workers, curtail environmental harm, ensure a safe food supply, and prevent animal cruelty.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (First Amendment: Content- & Viewpoint- Based Discrimination)

92.     Plaintiffs incorporate herein by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

93.     The most important function of the First Amendment is to protect against laws that target certain messages or speech because of their "ideas, subject matter, or content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95–96 (1972).

94.     "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). Audiovisual recordings are protected by the First Amendment as recognized "organ[s] of public opinion" and as a "significant medium for the communication of ideas." *Wasden*, 878 F.3d at 1203.

95.     The Supreme Court has recognized that misrepresentations, like those indirectly criminalized by the Ag-Gag law, are constitutionally protected unless they cause legally cognizable harms or yield undeserved material gains to the speaker, as in the case of one who commits fraud. *United States v. Alvarez*, 567 U.S. 709, 719 (2012).

96.     The Kansas Ag-Gag law is a content-based restraint on constitutionally protected speech on a matter of significant public concern because it prohibits some types of investigative conduct focused on animal facilities, but not investigations of other industries or businesses. The State has not limited the ability to engage in investigations and whistleblowing activity in other highly regulated or important industries, including medical providers, defense contractors, banks, and childcare providers. The law applies only to speech that involves the subject matter of the

animal industry and its practices and is therefore content-based on its face.

97.     The improper, speech-suppressing purpose behind the law is revealed not only by the statutory language, but also by examining the impact of the law and the historical background for its enactment. The Ag-Gag law is content-based in its intent as evidenced by the contemporaneous statements and actions of lawmakers and industry trade organizations. It was enacted with the legislative motive of eliminating undercover, employment-based investigations by animal rights groups into animal research facilities and other industries that use animals, including factory farms and other agricultural production facilities in order to protect those industries and prevent the public backlash that follows when the industry's true practices are exposed. By purposefully singling out the agriculture and animal research industries for protection against political speech that may be harmful to their profits, the Ag-Gag law must be treated as a content- and viewpoint-based regulation. The law ensures that only industry's side of the debate about these industries is raised.

98.     The Ag-Gag law is a content- and viewpoint-based regulation that is neither justified by a compelling interest nor narrowly tailored, and therefore violates Plaintiffs' First Amendment rights.

99.     The Kansas Ag-Gag law is not narrowly tailored because the State already has, and had at the time of the law's passage, generally applicable laws protecting the interests that purportedly motivated the legislature—laws protecting privacy, prohibiting trespass, and promoting biosecurity. The only "harm" not accounted for by existing law is the embarrassment and political fallout suffered by the agriculture and animal research industries when otherwise-legal undercover investigations paint the industry in a negative light, which are not legally cognizable or material harms.

100.     Even if the speech in question is construed as not being protected speech—for example, if the investigative conduct in question is interpreted as trespassing—the State still may not make a content-based distinction. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992). That is to say, content-based distinctions are impermissible even for speech that is generally unprotected.

101.     As detailed below, Plaintiffs are entitled to prospective relief from Defendants to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

102.     As detailed below, Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the Ag-Gag law is unconstitutional and unenforceable in any situation.

## SECOND CAUSE OF ACTION

### (First Amendment: Overbreadth)

103.     Plaintiffs incorporate by reference all allegations contained in the above paragraphs.

104.     Criminal statutes must be examined particularly carefully for overbreadth, *City of Houston v. Hill*, 482 U.S. 451, 459 (1987), and the Ag-Gag Law targets a vast range of protected recording and false statements, thus sweeping within its reach a substantial amount of protected speech. Although some applications of the Kansas Ag-Gag law would not violate the Constitution, such as its enforcement against persons engaged in industrial espionage to steal trade secrets, because the Ag-Gag law categorizes so much protected speech as "criminal," including the type of investigations described in this Complaint, it is substantially overbroad and therefore unconstitutional.

105.     The Kansas Ag-Gag law is unconstitutionally overbroad because, while some of its provisions may apply to unprotected conduct, the law as a whole restricts substantially more

speech than the First Amendment permits. A law that prohibits substantially more speech than the First Amendment permits is unconstitutionally overbroad even though the State could lawfully punish some of the conduct targeted by the law. *See United States v. Stevens*, 559 U.S. 460, 473 (2010).

106.    As detailed below, Plaintiffs are entitled to prospective relief enjoining Defendants from enforcing the Ag-Gag law.

107.    As detailed below, Plaintiffs are entitled to declaratory relief in the form of this Court ruling that the Ag-Gag law is unconstitutionally overbroad and unenforceable in any situation.

## PRAYER FOR RELIEF

Plaintiffs respectfully request an order and judgment:

108.    Declaring that the challenged law, Kansas Statutes section 47-1825 *et seq*., in its entirety, violates the U.S. Constitution on its face and as applied to Plaintiffs;

109.    In the alternative, declaring that the following provisions of the Kansas Ag-Gag law violates the U.S. Constitution on its face and as applied to Plaintiffs:

a. the prohibition of photography and video recording, Kan. Stat. § 47-1827(c)(4);

b. the prohibitions of deceptive entry to commit an act prohibited by another provision of the law, Kan. Stat. §§ 47-1827(c)(1), (3);

c. the damage provision, Kan. Stat. § 47-1827(a);

d. the control provision, Kan. Stat. § 47-1827(b);

e. the concealment provision, Kan. Stat. § 47-1827(c)(2); and

f. the entering and remaining despite notice provision**,** Kan. Stat. §  47-1827(d)(1).

110.    In the alternative, declaring that the damage provision, Kan. Stat. § 47-1827(a),

the control provision, Kan. Stat. § 47-1827(b), the concealment provision, Kan. Stat. § 47-1827(c)(2), and the entering and remaining despite notice provision, Kan. Stat. § 47-1827(d)(1), do not apply to the types of investigative activity described in this Complaint and which Plaintiffs allege they would engage in but for the existence and enforceability of the Kansas Ag-Gag law; and also declaring that the prohibition of photography and video recording, Kan. Stat. § 47-1827(c)(4), and the prohibitions of deceptive entry to commit an act prohibited by another provision of the law, Kan. Stat. § 47-1827(c)(1) are unconstitutional on their face and as applied to Plaintiffs.

111.    Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the challenged law;

112.    To ensure that the public has accurate notice of the requirements of the law and the Kansas Code, and to prevent chilling speech, requiring Defendants to provide public notice, including in the official and online editions of the Kansas Code, that Kansas Statutes section 47-1825 *et seq.* is unconstitutional;

113.    Awarding Plaintiffs reasonable attorneys' fees, expenses, and costs pursuant to 42 U.S.C. § 1988; and

114.    Awarding any other such relief as the Court may deem just and proper.

Dated this 4th Day of December, 2018

                                         ___ /s/   Michael D. Moss_____

Michael D. Moss, KS Bar #22624
Foley & Mansfield, P.L.L.P.
8575 W. 110th Street, Suite 306
Overland Park, KS 66210
913-232-8767
913-800-7238 (fax)
mmoss@foleymansfield.com

Alan K. Chen (*Pro Hac Vice application
forthcoming*)
University of Denver Sturm College of Law
    (for identification only)
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6283
achen@law.du.edu

Justin Marceau (*Pro Hac Vice application
forthcoming*)
Of Counsel, Animal Legal Defense Fund
University of Denver Sturm College of Law
    (for identification only)
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

Matthew Liebman
Kelsey Eberly
Amanda Howell
(*Pro Hac Vice applications forthcoming*)
Animal Legal Defense Fund
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533, ext. 1028
mliebman@aldf.org
keberly@aldf.org
ahowell@aldf.org

Matthew Strugar (*Pro Hac Vice application forthcoming*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
(213) 252-0091 (fax)
matthew@matthewstrugar.com

David S. Muraskin (*Pro Hac Vice application forthcoming*)
Public Justice, P.C.
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 861-5245
(202) 232-7203 (fax)
dmuraskin@publicjustice.net

George A. Kimbrell (*Pro Hac Vice application forthcoming*)
917 SW Oak St., Suite 300
Portland, OR 97205
(971) 271-7372
(971) 271-7374 (fax)
gkimbrell@centerforfoodsafety.org

*Counsel for Plaintiffs*