## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANIMAL LEGAL DEFENSE FUND, *et al.*   )
                                     )
           Plaintiffs,        )
                                     )
           v.              )     Case No. 18-2657-KHV-JPO
                                     )
LAURA KELLY, in her official        )
Capacity as Governor of Kansas, and   )
DEREK SCHMIDT, in his official     )
Capacity as Attorney General of Kansas,  )
                                     )
           Defendants.       )

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Statement of Uncontroverted Facts

1.     The plaintiffs are: Animal Legal Defense Fund ("ALDF"), Center for Food Safety ("CFS"), Shy 38, Inc. ("Shy"), and Hope Sanctuary ("Hope"). Each plaintiff is a corporation and 501(c)(3)[1] organization. Exhibit 1, Plaintiffs' Supplemental Responses to Defendant's First Set of Interrogatories, served May 29, 2019, answer to interrogatory # 1; Exhibit 2, Plaintiff's responses to Requests for Admissions, served April 22, 2019, ## 1-4.

---

[1] As the Court is aware, Section 501(c)(3) is that portion of the US Internal Revenue Code which allows for federal tax exemption of nonprofit organizations.

i

    a.  Initially, incorporated as Attorneys for Animal Rights, Inc., ALDF's

        articles of incorporation report the specific purpose the corporation as

        follows:

> The specific purpose of this corporation is to further the welfare of animals, and to initiate or participate in legal actions and proceedings, in connection with the furtherance of the care and welfare of animals, and in connection with any act, omission, or neglect, which causes or permits physical pain, behavioral distress, suffering, debilitation and/or death to animals; such legal actions to be an incidental activity in the furtherance of the care and welfare of animals, and in no way to include police powers.

Exhibit 3, Articles of Incorporation of Attorneys for Animal Rights, Inc., ¶ II, bates

number ALDF – 0963.

    b.  ALDF's organizational mission is:

> [N]ationwide to assure that animal abusers are punished for their crimes; supporting tough animal protection legislation; and providing resources and opportunities to law students and professionals to advance the emerging field of animal law. [cont. Sch O]

Exhibit 4, at Form 990 (2017), Part III, Statement of Program Service Accomplishments,

#1, bates number ALDF – 1096.

    c.  ALDF lists its organization's program service accomplishments for each of

        its three largest programs as follows:

ALDF PROGRAM SERVICE ACCOMPLISHMENTS

Litigation Program
The Litigation program files cutting-edge lawsuits to end the abuse of animals, including companion animals, wildlife, and those abused in industries like factory farming, laboratories, and the entertainment industry. Our litigation efforts promote recognition of the bonds between human and nonhuman animals with a strategy of securing strong and lasting protections under the law. From filing as plaintiffs or representing other organizations and individuals, to filing formal complaints against

government agencies, the Litigation Program makes a substantial impact on the lives of individual animals and expanding the entire field of animal law. (Continued on Schedule O)

[Exhibit 4, at Form 990 (2017), Part III, Statement of Program Service Accomplishments, #4a, bates number ALDF – 1096]

Program Services Accomplishments (continued)

Pro Bono Program
The Animal Legal Defense Fund's Pro Bono Program is the nation's largest pro bono network for animal protection. The program partners with attorneys and pro bono coordinators across the United States to expand the practice of animal law. Collectively, legal professionals donate thousands of hours to the Animal Legal Defense Fund's cases annually. The donated value of services for 2017, included in the total expenses of the Pro Bono Program, was $3,660,085. The program also works to increase the understanding of animal law in the legal community by educating professionals at law firm and bar association events and keeping volunteers engaged and up-to-date on the latest developments in the field.

Animal Law Program
The Animal Legal Defense Fund's Animal Law Program works closely with law students and law professionals to advance the emerging field of animal law. Working to expand animal law into the curriculum of every law school in the country, the Animal Law Program collaborates with students, faculty, and school administrations to facilitate the development of animal law courses and assists students in forming Animal Legal Defense Fund Student Chapters.

As part of the Animal Legal Defense Fund's Animal Law Program, the organization makes grants available to various organizations, law centers, individuals, and Animal Legal Defense Fund Student Chapters at law schools across the country to support the efforts to inform, educate, and take action for animal protection laws. The Animal Legal Defense Fund grants are critical to encouraging the next generation of animal lawyers. Grants and scholarships funded during the year ending December 31, 2017 included various donations to law schools, organizations, and individuals.

Criminal Justice Program
The Animal Legal Defense Fund's Criminal Justice Program is staffed by attorneys, including former prosecutors, with expertise in animal protection. Criminal Justice Program attorneys provide free legal assistance

and trainings to prosecutors and law enforcement agencies to ensure that state criminal anti-cruelty statutes are vigorously enforced and that those convicted of animal cruelty and neglect receive appropriate sentences. They work with state legislators to enact felony anti-cruelty statutes in states that do not yet have them and to upgrade existing laws in states that do. The Criminal Justice Program also maintains a nationwide database of animal cruelty cases and current and model animal protection laws available to prosecutors, legislators, and researchers.

Other Legal Programs
The Animal Legal Defense Fund's other legal programs include Legislative Affairs. Efforts focus on working at local levels to advance legislation that would promote or protect the lives and interests of animals or to oppose legislation that would be detrimental to animals' well-being. The program works closely with the Animal Legal Defense Fund's other programs to identify opportunities to create model legislation that addresses strategic legal issues in the areas of civil and criminal law, and monitor legislation that impacts animals at the federal, state, and local levels.

Public Education
Public education informs the public of, and facilitates support for, the organization's mission in protecting the lives and advancing the interests of animals through the legal system.

[Exhibit 4, at Form 990 (2017), Schedule O, bates numbers ALDF – 1134 to ALDF – 1135]

    d.  CFS's articles of incorporation report the purpose the corporation as

       follows:

The corporation is organized and will be operated exclusively for charitable and educational purposes under section 501(c)(3) of the Internal Revenue Code, including: educating the public about food safety issues, and informing and participating in regulatory and legislative decision making to ensure safe and sustainable food production and handling.

Exhibit 5, Articles of Incorporation of The Center for Food Safety, Inc., ¶ Fourth, bates

number CFS – 0154.

    e.  CFS's organizational mission is:

THE CENTER FOR FOOD SAFETY (CFS) IS A NON-PROFIT PUBLIC INTEREST AND ENVIRONMENTAL ADVOCACY MEMBERSHIP ORGANIZATION ESTABLISHED FOR THE PURPOSE OF CHALLENGING HARMFUL FOOD PRODUCTION TECHNOLOGIES AND PROMOTING SUSTAINABLE ALTERNATIVES. CFS COMBINES MULTIPLE TOOLS OF
STRATEGIES IN PURSUING ITS GOALS, INCLUDING LITIGATION AND LEGAL AGRICULTURE AND FOOD SAFETY CONSTITUENCIES, AS WELL AS PUBLIC EDUCATION, GRASSROOTS ORGANIZING AND MEDIA OUTREACH.

Exhibit 6, at Form 990 (2017), Schedule O, bates numbers CFS – 0197.

    f.  CFS lists its organization's program service accomplishments for

       each of its three largest programs as follows:

FOR ITS PROGRAM ON "GENETICALLY ENGINEERED (GE) CROPS" (ALSO CALLED: AGRICULTURAL BIOTECHNOLOGY:), CFS CONTINUED ITS WORK CHALLENGING USDA AND OTHER GOVERNMENT AGENCIES FOR NOT ADEQUATELY REVIEWING THE ENVIRONMENTAL AND ECONOMIC IMPACTS OF GE CROPS. THIS WORK INCLUDED SUBMITTING POLICY COMMENTS TO THESE AGENCIES TO ENSURE THEY ARE COMPLYING WITH ENVIRONMENTAL AND OTHER LAWS, AND EDUCATING THE PUBLIC AND POLICYMAKERS ABOUT THE IMPACTS OF GE CROPS.

FOR ITS PROGRAMS ON CAFO: CFS WORKS TO REFORM FACTORY FARMS THAT ARE HARMFUL TO PUBLIC HEALTH AND THE ENVIRONMENT THROUGH LEGAL ACTIONS, GRASSROOTS CAMPAIGNS AND PUBLIC EDUCATION.

FOR ITS PROGRAM ON POLLINATORS, CFS WORKED TO EDUCATE THE PUBLIC, POLICYMAKERS, AND OTHERS ABOUT THE ENVIRONMENTAL IMPACTS OF PESTICIDES ON BEES AND OTHER POLLINATORS. THIS INCLUDED POLICY COMMENTS TO GOVERNMENT AGENCIES TO ENSURE THEY ARE COMPLYING WITH ENVIRONMENTAL AND OTHER LAWS.

[Exhibit 6, at Form 990 (2017), Part III, Statement of Program Service Accomplishments, #4a-c, bates number CFS – 0158]

CFS's TRUE FOOD NETWORK CONDUCTS PUBLIC EDUCATION ON ALL OF CFS'S PROGRAM AREAS VIA ONLINE AND MAIL COMMUNICATIONS.

CFS'S ORGANIC PROGRAM WORKS TO ENSURE THE INTEGRITY OF THE NATIONAL ORGANIC STANDARDS AND EDUCATE THE PUBLIC ABOUT THE BENEFITS OF ORGANIC FOOD AND FARMING.

CFS'S COOL FOOD PROGRAM IS AIMED TO INFORM PEOPLE ABOUT THE IMPACT OF THEIR FOOD CHOICES ACROSS THE ENTIRE FOOD SYSTEM AND SEEK SOLUTIONS TO THE PROBLEM OF GLOBAL WARMING, AND FOCUSES ON AGRICULTURAL PRACTICES THAT CAN REDUCE AND REVERSE THIS TREND.

[Exhibit 6, at Form 990 (2017), Schedule O, bates number CFS – 0197]

2.      Plaintiffs' lawsuit challenges the constitutionality of the Kansas farm animal and field crop and research facilities protect act, codified at K.S.A. 2018 Supp. § 47-1825 *et seq*. as amended, ("KFAFCRF"). Complaint, filed Dec. 4, 2018, EFC 001 ("Complaint").

3.      The current version of the KFAFCRF reads:

**47-1825. Short title**. The provisions of K.S.A. 47-1825 through 47-1828, and amendments thereto, shall be known and may be cited as the farm animal and field crop and research facilities protection act.

**47-1826. Definitions**. As used in the farm animal and field crop and research facilities protection act:

       (a) "Animal" means any warm or coldblooded animal used in food, fur or fiber production, agriculture, research, testing or education and includes dogs, cats, poultry, fish and invertebrates.

       (b) "Animal facility" includes any vehicle, building, structure, research facility or premises where an animal is kept, handled, housed, exhibited, bred or offered for sale.

       (c) "Consent" means assent in fact, whether express or apparent.

(d) "Deprive" means to:

(1) Withhold an animal or other property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the animal or property is lost to the owner;

(2) restore the animal or other property only upon payment of reward or other compensation; or

(3) dispose of an animal or other property in a manner that makes recovery of the animal or property by the owner unlikely.

(e) "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(1) Induced by force, fraud, deception, duress or threat;

(2) given by a person the offender knows is not legally authorized to act for the owner; or

(3) given by a person who by reason of youth, mental disease or defect or under the influence of drugs or alcohol is known by the offender to be unable to make reasonable decisions.

(f) "Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor.

(g) "Person" means any individual, state agency, corporation, association, nonprofit corporation, joint stock company, firm, trust, partnership, two or more persons having a joint or common interest or other legal entity.

(h) "Possession" means actual care, custody, control or management.

(i) "Research facility" means any place, laboratory, institution, medical care facility, elementary school, secondary school, college or university, at which any scientific test, experiment or investigation involving the use of any living animal or field crop product is carried out, conducted or attempted.

**47-1827. Prohibited acts; criminal penalties.** (a) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, damage or destroy an animal facility or any animal or property in or on an animal facility.

(b) No person shall, without the effective consent of the owner, acquire or otherwise exercise control over an animal facility, an animal from an animal facility or other property from an animal facility, with the intent to deprive the owner of such facility, animal or property and to damage the enterprise conducted at the animal facility.

(c) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility:

(1) Enter an animal facility, not then open to the public, with intent to commit an act prohibited by this section;

(2) remain concealed, with intent to commit an act prohibited by this section, in an animal facility;

(3) enter an animal facility and commit or attempt to commit an act prohibited by this section; or

(4) enter an animal facility to take pictures by photograph, video camera or by any other means.

(d) (1) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, enter or remain on an animal facility if the person:

(A) Had notice that the entry was forbidden; or

(B) received notice to depart but failed to do so.

(2) For purposes of this subsection (d), "notice" means:

(A) Oral or written communication by the owner or someone with apparent authority to act for the owner;

(B) fencing or other enclosure obviously designed to exclude intruders or to contain animals; or

(C) a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden.

(e) No person shall, without the effective consent of the owner and with the intent to damage or destroy the field crop product, damage or destroy any field crop product that is grown in the context of a product development program in conjunction or coordination with a private research facility or a university or any federal, state or local governmental agency.

(f) No person shall, without the effective consent of the owner and with the intent to damage or destroy the field crop product, enter any property, with the intent to damage or destroy any field crop product that is grown in the context of a product development program in conjunction or coordination with a private research facility or a university or any federal, state or local governmental agency.

(g) (1) Violation of subsection (a) or (e) is a severity level 7, nonperson felony if the facility, animals, field crop product or property is damaged or destroyed to the extent of $25,000 or more. Violation of subsection (a) or (e) is a severity level 9, nonperson felony if the facility, animals, field crop product or property is damaged or destroyed to the extent of at least $1,000 but less than $25,000. Violation of subsection (a) or (e) is a class A nonperson misdemeanor if the facility, animals, field crop product or property damaged or destroyed is of the value of less than $1,000 or is of the value of $1,000 or more and is damaged to the extent of less than $1,000.

(2) Violation of subsection (b) is a severity level 10, nonperson felony.

(3) Violation of subsection (c) is a class A, nonperson misdemeanor.

(4) Violation of subsection (d) or (f) is a class B nonperson misdemeanor.

(h) The provisions of this section shall not apply to lawful activities of any governmental agency or employees or agents thereof carrying out their duties under law.

**47-1828. Recovery of damages.** (a) Any person who has been damaged by reason of a violation of K.S.A. 47-1827, and amendments thereto, may

bring an action in the district court against the person causing the damage to recover:

(1) An amount equal to three times all actual and consequential damages. Actual and consequential damages shall include the damages involving production, research, testing, replacement and crop or animal development costs directly related to the field crop or animal that has been damaged or destroyed; and

(2) court costs and reasonable attorney fees.

(b) Nothing in this act shall be construed to affect any other rights of a person who has been damaged by reason of a violation of this act. Subsection (a) shall not be construed to limit the exercise of any such rights arising out of or relating to a violation of K.S.A. 47-1827, and amendments thereto.

K.S.A. 2018 Supp. 47-1825, 47-1826, 47-1827 & 47-1828.[2]

4.      The KFAFCRF, then known as the "farm animal and research facilities protection act," became law July 1990. Exhibit 7, 1990 Kan. Sess. Laws, Ch. 192.[3]

---

[2] Hereafter K.S.A. 47-1825, 47-1826, 47-1827, 47-1828.

[3] The history in ¶¶ 4–7 is provided against the chance–however slight–that the Court finds it pertinent. However, defendants believe that it is not material. In *United States v. O'Brien*, 391 U.S. 367 (1968), the Court noted: "... [W]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork" *id.*, at 383–84; and, "We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it," *id.*, at 384. *Cf. Sorrell v. IMS Health Inc*., 564 U.S. 552, 565 (2011) (stating "***formal legislative findings***," as a "statute's stated purposes may also be considered" in evaluating whether it is content-based or content-neutral). Furthermore, under Kansas substantive law, "[c]ourts must apply a [Kansas] statute's language when it is clear and unambiguous, rather than determining what the law should be, speculating about legislative intent, or consulting legislative history." *State v. Williams*, 298 Kan. 1075, 1079 (2014). "It is only when the language is unclear or ambiguous that the court employs the canons of statutory construction, consults legislative history, or considers other background information to ascertain the statute's meaning." *Whaley v. Sharp*, 301 Kan. 192, 196 (2014).

a. 1990 Senate Bill No. 776 (SB 776), which as amended became the first version of the KFAFCRF, was referred to the Senate Committee on Agriculture on March 20, 1990. KS Sn. Jour., 1990 Reg. Sess. No. Fifteen, at 1300.

b. The Senate Committee on Agriculture conducted a hearing on the bill on March 23, 1990. Exhibit 8, Minutes of the Senate Committee on Agriculture, March 23, 1990, with 11 attachments.

    i. Jerry Slaughter, then Executive Director of the Kansas Medical Society testified in favor to the bill, reporting there had been "numerous incidents of activist groups who have interfered with, or even damaged the property of bona fide research facilities" and expressing his hope that the bill, if passed, would "discourage acts of vandalism, harassment, and property damage against research facilities," Exhibit 8 at AG000055, AG000058;

    ii. Jack Riley, then Head of Animal Sciences and Industry Department, Kansas State University, testified in favor of the bill, reporting "there are individuals so opposed to the use of animals for research that they resort to theft, vandalism, destruction of property and even threats against human life" and argued "regardless of the underlying motive, illegal acts, destruction of property and vandalism are, in all cases, contrary to public policy," Exhibit 8 at AG000055, AG000059-60;

iii. Mike Beam, then Executive Secretary of Kansas Life Stock
Association's Cow-Calf/Stocker Division, testified in favor of the
bill, reporting "[r]atical animal rights groups have shown an
increasing tendency towards actual and threatened disruption and
violence to agricultural operations, university research activities, and
state livestock associations" and argued "it seems appropriate to
send a signal to individuals and groups with radical actions that
Kansas will not tolerate such behavior," Exhibit 8 at AG000055,
AG000061;

iv. Warren Parker, then Assistant Director of Public Affairs Division,
Kansas Farm Bureau, testified in favor of the bill, reporting (and
providing newspaper articles that he believed supported his
statements) "[i]n many states fire have been set at farms and ranches,
meat processing facilities, and veterinary services buildings" and
argued: "S.B 776 is a recognition of the increased occurrences of
these specific acts, its defines them, it applies the punishments these
crimes warrant. Kansas may not yet have seen some of the more
radical occurrences that can be perpetrated by these groups, but let's
not close the barn door after the horses have escaped," Exhibit 8 at
AG000055, AG000063-72;

v. Howard Tice, the Executive Director of the Kansas Association of
Wheat Grower, testified in favor of the bill, and argued the bill

recognized the threat "when people who don't understand the value of animal research and meat animal production decide to go outside the law to make their point," Exhibit 8 at AG000055, AG000073;

vi.  Gina Bowman-Morrill, with Farmland Industries, Inc., testified in favor of the bill, expressing the belief "that restrictive laws are needed to address the evolving animal rights movement and its actions toward animal research facilities," and stating the "concern that persons who want to prohibit what they define as 'cruelty to animals' will needlessly destroy facilities, records, and research," Exhibit 8 at AG000055, AG000074-80;

vii.  Nancy Kantola, of the Committee of Kansas Farm Organizations, testified in favor of the bill, reporting "[t]he reports of activities of extremist groups threatening and terrorizing people who are involved in research with animals, whether for human medical progress or for genetic and disease research for livestock [,] are highly disturbing," Exhibit 8 at AG000055-56, AG000082-83;

viii.  Chris Wilson, then Director of Governmental Relations of the Kansas Grain and Feed Association, testified favor of the bill, reporting (and providing newspaper articles that he believed supported his statements) "break-ins at laboratories, facilities such as auction markets, and even farms, have become an all-too-frequent occurrence," "animal rights activists have become more and more

violent" and such groups "seek to go far beyond the animal welfare laws already well-established," Exhibit 8 at AG000056, AG000084-98A;

    ix.  Then Kansas Senator Don Montgomery provided other committee members with copies of information concerning threats made by national animal right persons, a statement concerning the murder of the Dean of Veterinary Medicine at Univ. of Tennessee, the Humane Society of United States activities regarding housing for hog and chickens, and a description of the activities of "People for the Ethical Treatment of Animals," Exhibit 8 at AG000056, AG000099-111.

c.  The Senate Committee on Agriculture amended a draft of SB 776 to insure the KU Medical Center and other state institutions were included in the act's definition of "person" and reworked bill's the criminal penalty section, principally making certain violations a misdemeanor. Exhibit 8 at AG000056. *See also* AG0000140-42, attachment to house committee minutes.

d.  SB 776 was referred to House Committee on Agriculture and Small Business on April 2, 1990. KS H.R. Jour., 1990 Reg. Sess. No. fifty-ninth, at 1966.

e.  The House Committee on Agriculture and Small Business conducted a hearing on the bill on April 3, 1990. Exhibit 8, Minutes of the House

Committee on Agriculture and Small Business, April 3, 1990, with 6

attachments;

    i.  Chris Wilson, Warren Parker, Robert Wunsch, Gina Bowman-

       Morrill, Jack Riley and Mike Beam provided substantially the same

       testimony they had provided to the Senate Committee on

       Agriculture. Exhibit 8, AG000113-14; AG000115-45.

   f.  SB 776, as amended by committees, after legislative approval and the

     Governor's signature, became law effective July 1, 1990, the date of the

     statute book's publication. Exhibit 8; KS H.R. Jour., 1990 Reg. Sess. No.

     sixty-ninth, at 2330; KS S. Jour., 1990 Reg. Sess. No. fifty-eight, at 1442.

   5.    The KFAFCRF was amended in 2001, by 2001 House Substitute for Senate

Bill 36 (SB 36), earning the "Kansas farm animal and field crop and research facilities

protect act" its name, with inclusion of provisions addressing damage and entry onto

property to damage field crop production, as defined.[4] Changes were made to possible

penalties for violation of the act, and the following language was added in K.S.A. § 47-

1828(a)(1): "Actual and consequential damages shall include the damages involving

production, research, testing, replacement and crop or animal development costs directly

related to the field crop or animal that has been damaged or destroyed." Exhibit 9, 2001

Kan. Sess. Laws, Ch. 90.

---

[4] *See* K.S.A. 2018 Supp. 47-1826(j), -1827(e), (f), (g), -1828(a)(1).

a. SB 36 was referred to Senate Judiciary Committee on January 17, 2001. KS S. Jour., 2001 Reg. Sess. No. seventh, at 56.

b. The Senate Judiciary Committee conducted a hearing on the bill on January 25, 2001. *See* Exhibit 10, Minutes of the Senate Judiciary Committee, January 25, 2001, with 3 attachments.

    i. Kansas Senator Steve Morris testified as a proponent of the bill. He said he introduced the legislation to address the serious issue of expanding organized eco-terrorism, Exhibit 10 at AG000146, AG000148;

    ii. Doug Wareham for the Kansas Fertilizer and Chemical Association and the Kansas Grain and Feed Association testified in favor of the bill, reporting (and providing copies of documents and articles which he believed supported his statements) special interest extremists were engaging in bio-terrorism and eco-terrorism by willfully destroying and damaging field crops and advocating for greater civil penalties for damage to crops and loss of development costs, Exhibit 10 at AG000146, AG000149-62;

    iii. Testimony was also provided by the Kansas Grain and Sorghum Producers Association in favor of the bill, reporting "examples of the destruction of field crops both in commercial production and research plots, among, others continues to occur around the country

and world on an increasing basis," Exhibit 10 at AG000146, AG000163.

    c.   SB 36 became law effective July 1, 2001, the date of the statute book's publication. Exhibit 9; KS H.R Jour., 2001 Reg. Sess. No. fifty-third, at 555; KS S. Jour., 2001 Reg. Sess. No. thirty-second, at 196.

6.    By 2006 Senate Bill 366 (SB 366), the KFAFCRF was again amended in 2006. The threshold dollar value of property damage/destruction required to elevate criminal penalties for violations of certain sections in the act was increased from $500 to $1,000. Exhibit 11, 2006 Kan. Sess. Laws, Ch. 194, Sec. 32.

    a.   SB 366, which had broad general application to several statute concerning crimes, punishments and criminal procedure, was referred to the House Judiciary Committee on February 24, 2006. KS H.R. Jour., 2006 Reg. Sess. No. thirty-fourth, at 1321.

    b.   The House Judiciary Committee conducted a hearing on the bill on March 29, 2006. Exhibit 12, Minutes of the House Judiciary Committee, March 14, 2006, with 3 attachments. However there is no mention of the KFAFCRF in either the minutes or its attachments. *Id.*

    c.   SB 366 became law effective July 1, 2006, the date of the statute book's publication. Exhibit 11; KS H.R. Jour., 2006 Reg. Sess. No. fifty-third, at 1655; KS S. Jour., 2006 Reg. Sess. No. thirty-third, at 1131.

7.    Finally, the KFAFCRF was amended in 2012 by Senate Substitute for House Bill 2596 (HB 2596), which added additional language to the definition of "effective consent" in K.S.A. § 47-1825(e)(1). This language is shown in italics below:

(e) … Consent is not effective if: (1) Induced by force, *fraud, deception, duress* or threat; …

Exhibit 13, 2012 Kan. Sess. Laws, Ch. 125, Sec. 41. The 2012 amendment also increased the court's possible misdemeanor fining authority from not less than $50 to $100 and not more than $500 to $1,000. *Id*.

   a.    2012 Senate Bill 414 (SB 414), which became HB 2596, was referred to the Senate Agriculture Committee on February 10, 2012. KS S. Jour. 2012 Reg. Sess. No. 24, at 1486.

   b.    The Senate Agriculture Committee conducted a hearing on SB 414 on February 22, 2012. Exhibit 14, Minutes of the Senate Agriculture Committee, February 22, 2012, with 19 attachments.

      i.    Bill Brown, then Animal Health Commissioner, Division of Animal Health, Kansas Department of Agriculture, testified in support of the bill concerning the KFAFCRF, explaining that through the amendment "consent induced by fraud, deception or duress, such as lying on a job application to gain access to a farm or ranch, will not be considered effective consent under the Farm Animal and Research Facilities Act."

Exhibit 14, Attachment 1, bates number AG000204-06, AG000208.

      ii.   Mike Beam of the Kansas Livestock Association testified in favor of

            portions of the bill. He stated:

> KLA also supports Section 41 of HB 414 as it strengthens the Farm
> Animal and Research Facilities Act to make it clear that "fraud,
> deception, or duress" do not constitute "effective consent."
>
> Under current law, to prove a crime under the Act, a prosecutor must
> show a person intended to damage an animal facility-related
> enterprise by doing one of the enumerated acts in the statute, without
> the effective consent of the owner. The change to exclude "fraud,
> deception, or duress" from the definition of "effective consent"
> clarifies that the animal activists concealing their identity or lying on
> a job application cannot avail themselves to the defense that they
> were given permission to work on or enter the facility.

Exhibit 14, Attachment 4, bates number AG00204, AG000266.

      iii.   Tim Stroda of the Kansas Port Association also testified in favor of

            portions of the bill. He stated:

> The KPA also supports the amendment to [t]he Farm Animal and
> Research Facilities Protection Act on page 27, Section 41 (e)(1). We
> believe this amendment strengthens our statutes protecting farmers
> from those willing to falsify records in order to gain access to farms
> or ranches.

Exhibit 14, Attachment 5, bates number AG00204, AG000267.

      8.     None of the plaintiffs intend or have plans, nor would they, to intentionally

violate a criminal law in Kansas. Exhibit 2, # 7; Complaint ¶ 81. And plaintiffs allege that

the KFAFCRF is redundant to several Kansas laws of general application already in

place, stating:

> [T]he State already has, and had at the time of the law's passage, generally
> applicable laws protecting the interests that purportedly motivated the

legislature–laws protecting privacy, prohibiting trespass, and promoting biosecurity.[5]

Complaint ¶ 99.

9.    ALDF is not presently being charged with or prosecuted for violation (actual or alleged) of the provisions of the KFAFCRF. Exhibit 2, # 9.

10.    ALDF has never been charged with or prosecuted for violation (actual or alleged) of the provisions of the KFAFCRF. Exhibit 2, # 10.

11.    ALDF has never been threatened with charge(s) or prosecution for violation (actual or alleged) of the provisions of the KFAFCRF. Exhibit 2, # 11.

12.    ALDF describes the undercover investigations or types of investigative activity that it has the present intent to conduct, for the Court to determine whether and how the investigations would violate the KFAFCRF, as follows:

…. The investigation Plaintiff ALDF desires to carry out in Kansas would follow an established protocol. ALDF would retain a qualified investigator to obtain photographic and/or video footage documenting the conditions inside a Kansas factory farm, slaughterhouse, or other animal facility. Working with the investigating entity, a target would be identified, and the investigator, or an investigator hired by the investigating entity ALDF retained, would go about gaining access to the facility, mostly likely by applying for and securing employment at the facility. In order to secure such employment, or otherwise to gain access to the non-public parts of the animal facility, the investigator would be forced to conceal his or her true motive for applying for the job or trying to gain access. The investigator would either lie through omission—by concealing his or her affiliation with ALDF—or, if necessary, directly, by denying that she was being sent by an animal rights organization, a commonly-asked question in the application process for animal agriculture facility positions. Once the investigator gained access to the facility, as directed by ALDF she would go about documenting the conditions therein by "tak[ing] pictures by photograph,

---

[5] Plaintiffs cited to K.S.A. 21-5808, 65-664, 21-5801, 60-3320 *et seq.*, 21-5813 *et seq.* Complaint ¶ 18.

video camera or by any other means." Again without telling her employer, the investigator would perform all the duties of her job while concealing a hidden camera worn on her clothing and operated with no or virtually no effort (so as not to interfere with the investigator's ability to safely and competently perform the tasks required of the position). Although ALDF cannot predict the exact trajectory of the investigation it would conduct in Kansas but for the Ag-Gag law, in going about collecting investigative footage undetected inside an animal facility, several scenarios are plausible, as detailed in Plaintiffs' Complaint. First, an ALDF-retained investigator could temporarily "exercise control" over a specific room or section of a facility by, if he had such supervisory or other authority, temporarily closing off a part of the facility, so as not to be observed photographing the conditions. [ ]

Or he could "remain concealed" by hiding behind a door or wall for the time needed to take a photograph or capture something on video, in order to record the activity undetected. [ ] Finally, it is likely that ALDF's investigator would be on notice that his investigative activity was forbidden by the facility's owners. [ ] The facility could have notices posted forbidding nonconsensual access, photography, or video recording, putting the investigator on notice that he should leave.

ALDF's investigation in Kansas would be aimed at gaining an unvarnished look into what goes on at the factory farm, slaughterhouse, or other animal facility. ALDF would direct its investigating entity to document any illegal and unethical practices happening at the facility, with the specific goal of exposing to public view animal cruelty, unsafe working conditions, food safety violations, and other misconduct discovered therein. ALDF would pursue its investigation knowing full well that such exposure might lead to boycotts, lost business, a plant closure, or other harm to investigated entity's or its affiliates' reputations resulting from the adverse publicity, which foreseeably may cause economic harm to the enterprise.

Exhibit 1, answer to interrogatory # 3.

And

That said, Plaintiffs cannot predict and describe every minor permutation of how the conduct of an investigator, in the course of an investigation, might be construed as violating the "damage" provision, K.S.A. 47-1827(a), the "control" provision, K.S.A. 47-1827(b), the "concealed" provision, K.S.A. 47-1827(c)(2), or the "enter[ing] or remain[ing]" despite "notice" provision, K.S.A. 47-1827(d)(1). Plaintiffs can more accurately describe

what the investigative activities described in their response to Interrogatory
No. 3 and in their Complaint do not include: causing actual physical
damage to animal facilities; exercising actual and ongoing physical control
over an entire agricultural facility; physically concealing themselves until
after an agricultural facility is closed for business or otherwise physically
concealing themselves in order to be able to do actual physical damage;
entering and remaining on the premises of an agricultural facility and
refusing to leave after being specifically and directly instructed to do so. …

Exhibit 1, answer to interrogatory # 4.

13.     None of the plaintiffs intend to or have plans to cause physical or tangible

damage to any "animal facility," "animal," "research facility," or "field crop product that

is grown in the context of a product development program" as the quoted terms are used

in the KFAFCRF [this excludes damage to reputation, goodwill, lost profits and other

intangible damages]. For the purpose of this statement of fact, "tangible" has the common

meaning: touchable, palpable, tactile, material, physical, real, substantial, corporeal, solid

or concrete. For example, tangible damage includes the taking of property from its owner,

even if the property is not physically damaged. By contrast, lost profits or loss of good

will are not a 'tangible' damage. Exhibit 2, # 6.

14.     Plaintiffs CFS, Shy and Hope CFS do not allege that they, their employees

or agents will engage in any of the conduct that, as asserted in the Complaint, would or

may violate the KFAFCRF. Exhibit 2, ## 12-14.

15.     Plaintiffs do not seek damages or any remedy at law from the Defendants in

this litigation. Exhibit 2, # 15.

16.     There is no evidence that anyone has ever been charged or prosecuted for

violation of the KFAFCRF's provision(s). Exhibit 1, answer to interrogatory # 6.

17.     Plaintiff ALDF itemized its expenses incurred because of the KFAFCRF and stated the principal and material facts quantifying its alleged consequent drain on its resources from the KFAFCRF as follows:

> For at least the past seven years, ALDF has devoted substantial organizational resources to countless activities in order to combat Ag-Gag laws around the country, including in Kansas. ALDF staff have engaged in numerous activities to publicize and support the organization's legal, legislative, and public advocacy against Ag-Gag, in a variety of settings and to a number of audiences. These activities include researching, drafting, editing, and disseminating numerous communications pieces, such as press releases, blogs, action alerts, donor communications, newsletters, social media posts, brochures, pamphlets, and other materials [ ]. Activities also include attorneys and staff speaking to audiences at conferences, symposia, law student events, and ALDF member and supporter events [ ]. Further, ALDF's Animal Law Program has provided Ag-Gag-related resources, content, CLEs, and other programming to legal audiences including attorneys, paralegals, judges, law students and to lay audiences [ ]. Each of these activities has required the expenditure of financial resources, and thus, such resources are far too numerous to fairly be itemized with any degree of specificity.

> At a minimum, ALDF expenses on these activities include: dozens of hours of paid staff time; payments to communications and operations vendors and contractors, such as designers and direct mail vendors; payments for printing and production of brochures, pamphlets, placards, and other collateral; travel and related costs for events; server upkeep and overhead; and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content). Examples of such expenses include:

> - Payments of at least $4,000 for brochures related to the Ag-Gag Laws from 2015 to the present [ ].
> - Payments of roughly $520 for Ag-Gag-related Occasional Cards [ ].
> - A May 2018 payment of roughly $405 for an Ag-Gag display image/caption [ ].
> - A grant of roughly $135 to a student group at the University of Texas for a talk on Ag-Gag, March 6, 2015.
> - A grant of roughly $152 to a student group at American University for a talk on Criminalizing Free Speech & the Animal Rights Movement, April 8, 2015.

xxiii

- A grant of roughly $300 to a student group at Harvard University for a talk on Ag-Gag, Nov. 20, 2015.
- A grant of roughly $180 to a student group at Loyola Chicago for a talk on Ag-Gag, Oct. 5, 2016.

Exhibit 1, answer to interrogatory # 10.

18.    Plaintiff CFS itemized its expenses incurred because of the KFAFCRF and stated the principal and material facts quantifying its alleged consequent drain on its resources from the KFAFCRF as follows:

> For at least the past six years, CFS has devoted substantial organizational resources to organizational activities in order to combat Ag-Gag laws around the country, including in Kansas. As part of CFS's Animal Factories Reform program, one of the organization's flagship program areas, CFS staff have engaged in numerous activities to publicize and support the organization's legal, policy, and outreach advocacy against Ag-Gag laws. These activities include researching, drafting, editing, and disseminating communication documents, such as reports [ ], press releases [ ]; blogs [ ], social media posts [ ], and action alerts [ ]. CFS uses investigative information about animal welfare and food safety as part of this program and these documents. Activities have also concluded attorneys and staff speaking to audiences at conferences and law school events and classes. These activities have required the expenditure of financial resources, which are too numerous and intertwined with Animal Factory Reform work to be itemized with any degree of specificity. At a minimum, CFS expenses on these activities include: dozens of hours of salaried or hourly staff time; payments to communications and operation vendors and contractors, such as designers; server upkeep and overhead, and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content).

Exhibit 1, answer to interrogatory # 10.

19.    Plaintiffs Shy and Hope do not allege that they have expended any resources because of the KFAFCRF. Exhibit 1, answer to interrogatories ## 10 & 11.

### Argument

**1.  Plaintiffs lack standing to prosecute all or some of their claims.**

The parties are anxious to resolve the merits of the dispute. But standing cannot be assumed "in order to proceed to the merits of the underlying claim, regardless of the claim's significance." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016).

Tested against the elements for constitutional standing[6] there are several reasons that the plaintiffs cannot prosecute all or some of their claims.[7]

> a.  *The sponsored undercover investigations are not facial violations of subsections (a) or (b) in K.S.A. 47-1827.*

Sufficient injury in fact exists to support a pre-prosecution challenge to a criminal statute where "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l*

---

[6] A plaintiff asserting entitlement to prospective relief carries the burden to show (1) that the plaintiff suffers injury in fact which is concrete rather than conjectural or hypothetical; (2) that the facts reveal a causal connection between the injury and the conduct complained of; and (3) that it is likely and not speculative that the injury complained of will be redressed by a favorable decision. *Outdoor Systems, Inc. v. Lenexa*, No. 98–2534–KHV, 1999 WL 203461 *2 (D. Kan. April 6, 1999). *Accord, Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). Furthermore, "(e)ach plaintiff must have standing to seek each form of relief in each claim." *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019). *Accord, Clark v. City of Williamsburg, Kansas*, No. 17-CV-02002, 2019 WL 2058725 *4 (D. Kan. 2019).

[7] The limited exception to prudential standing requirements, where the plaintiff challenges the facial validity of a law impacting speech protected by the First Amendment, does not dispense with the requirement that the party itself suffer justiciable injury. *National Council for Improved Health v. Shalala*, 122 F.3d 878, 882 (10th Cir. 1997); *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).

*Union,* 442 U.S. 289, 298 (1979).[8] However, plaintiffs–in particular ALDF–are not threatened by prosecution under subsections (a) or (b) in K.S.A. 47-1827.

Plaintiffs acknowledge that there will be no physical damage or destruction in their sponsored undercover investigations. Uncontroverted Facts ("UF") ¶¶ 12-13. However, physical damage or destruction must be proved for criminal responsibility under subsection (a).[9] This follows for several reasons.[10] First, "animal facility" is defined as physical location, *see* K.S.A. 47-1826(b), and the animals or property, which must be damaged, have to be physical to be "in or on" the animal facility. Second, the penalty for violating subsection (a) ranges from felony to misdemeanor depending upon the dollar value "extent" that the animal facility or animal is damaged or destroyed, K.S.A. 47-1827(g)(1), demonstrating that the legislature understood physical damage or destruction was a necessary element. Third, what purpose is served by the required specific intent to "damage to enterprise conducted," if damage/destruction to facilities, animals or property means the same thing? Finally, in contrast to subsection (a), other subsections of the KFAFCRF expressly recite circumstances when economic loss is part of an offense or "damages." *E.g.*, K.S.A. 47-1828 (allowing private cause of action to

---

[8] A plaintiff faces a credible threat of prosecution "if a law facially restricts expressive activity by the class to which plaintiff belongs and plaintiff reasonably fears prosecution for violation of that law." *Outdoor Systems, Inc.*, 1999 WL 203461 *3. A reasonable fear of prosecution can exist if a law clearly prohibits plaintiff's intended conduct and the defendant has not renounced intention to enforce the law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

[9] Subsection (a) says, "No person shall … damage or destroy an animal facility or any animal or property in or on an animal facility."

[10] As there has been no KFAFCRF prosecution, the defendants' interpretation of the act should be persuasive if not controlling. *See Jordon v. Soca*, 654 F.3d 1012, 1019-20 (10th Cir. 2011).

2

recover "actual and consequential" damages, inclusive of "development costs directly related to field crop or animal" "damaged or destroyed").

Just like subsection (a), plaintiffs are not threatened with prosecution under subsection (b) of K.S.A. 47-1827. Subsection (b) criminalizes exercise of control over an animal facility or animals or property from an animal facility where the perpetrator intends to "deprive" the owner "of the facility, animal or property and intends to damage the enterprise conducted at the facility. "Deprive" is defined in KFAFCRF. It means to:

> (1) Withhold an animal or other property from the owner **permanently or for so extended a period of time that a major portion of the value or enjoyment of the animal or property is lost** to the owner;
>
> (2) restore the animal or other property only upon payment of reward or other compensation; or
>
> (3) dispose of an animal or other property in a manner that makes recovery of the animal or property by the owner unlikely.

K.S.A. 47-1826(d) (emphasize supplied). However, the undercover investigations, which ALDF would sponsor, have no intent to deprive owners of their facilities, animals or property. *See* UF ¶ 12.

  b. *Similarly, plaintiffs lack standing to challenge the private cause of action codified in K.S.A. 47-1828*

Rights under K.S.A. 47-1828 are limited to a person "who has been damaged" by violation of the KFAFCRF.[11] *See e.g.*, *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 265 (1972) (noting that a state may not sue in *parens patriae* capacity for damages to its

---

[11] This is unlike, for example, K.S.A. 50-632 which authorizes the attorney general to pursue a private cause of action under the Kansas Consumer Protection Act.

3

general economy under Section 4 of the Clayton Act). Therefore, any injury in fact plaintiffs might allege from the private cause of action in K.S.A. 47-1828 cannot be caused by or remedied by either defendant. *See Associated Or. Indus. v. Avakian*, No. 09–1494, 2010 WL 1838661, at *5 (D. Or. May 6, 2010) (court would not allow a plaintiff to preemptively challenge the right of a private actor to bring a private cause of action "before that cause of action has arisen"); *Temple v. Abercrombie*, 903 F.Supp.2d 1024, 1035 (D. Hawai'i 2012) ("[i]t is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision").

    c.  *Plaintiffs make only speculative claims concerning possible violations of subsections (c) or (d) in K.S.A. 47-1827 and fail to challenge a separately enforceable legal obstacle to their demanded relief.*

As plaintiffs lack standing to assert claims under subsections (a) and (b) and K.S.A. 47-1828, they must look to subsections (c) or (d) of K.S.A. 47-1827 to support their prosecution.[12]

Described in general terms, subsections (c) and (d) criminalize trespass at animal facilities. Subsection (c) (emphasis supplied) makes it a crime for a person[13] to:

---

[12] Subsections (e) or (f) in K.S.A. 47-1827 apply to actual or intended damage or destruction of "field crop." Plaintiffs raise no claims about these provisions.

[13] We understand that ALDF's asserted potential criminal responsibility for hiring or procuring a person to commit the crime or in aiding in the commission of the crime. *See* K.S.A. 2018 Supp. 5210. Corporate criminal responsibility can exist under Kansas law. *See* K.S.A. 2018 Supp. 21-5211.

4

1. Without effective consent, K.S.A. 47-1827(c); and

2. With intent to damage the enterprise conducted at the animal facility, *id.*;

3. ***Enter or remain*** concealed with intent to commit an act prohibited by the KFAFCRF, *id.*(c)(1) & (2), ***enter*** and commit prohibited act, *id.*(c)(3), or ***enter*** "to take pictures," *id.*(c)(4).

Subsection (d) (emphasis supplied) similarly makes it a crime for a person to:

1. Without effective consent, K.S.A. 47-1827(d); and

2. With intent to damage the enterprise conducted at the animal facility, *id.*;

3. ***Enter or remain*** on an animal facility, if the person had notice[14] entry was forbidden or received notice to depart but failed to do so, *id.*(d)(1)(A)&(B).

Under both of these subsections, there is no effective consent if "[i]nduced by force, fraud, deception, duress or threat." K.S.A. 47-1826(e)(1).

It is speculative that ALDF's retention of an investigator, "to obtain photographic and/or video footage" at animal facilities, is prohibited by subsections (c) or (d). ALDF's announced plan is: The investigator would most "likely" apply for and secure a job to gain access to the facility; the investigator–where access is obtained through employment–would either "lie through omission–concealing his or her affiliation with ALDF" or "if necessary, directly, by denying" affiliation to an animal right organization; and, once gaining access, the investigator would document the conditions by taking pictures (photo, video or other means), but the "exact trajectory of the investigation"

---

[14] Notice is defined restrictively to mean: (A) Oral or written communication by the owner or someone with apparent authority to act for the owner; (B) fencing or other enclosure obviously designed to exclude intruders or to contain animals; or (C) a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden. K.S.A. 47-1827(d)(2).

cannot be predicted. UF ¶ 12. This plan supports only that the investigator *might or might not* engage in conduction which violates parts of subsections (c) or (d) if the animal facility operator cooperate by hiring the investigator.

The ethereal nature of ALDF's fear of prosecution under the KFAFCRF is further shown by (1) ALDF has not been threatened and is not and has not been charged with a violation of the act, UF ¶¶ 9-11; (2) no one has been charged or prosecuted for a violation of the act, UF ¶ 17; and (3), assuming that the investigator is actually hired at an animal facility, "concealing his or her affiliation with ALDF" is not clearly consent "[i]nduced by force, fraud, deception, duress or threat."[15]

Courts are cautioned "[a]llegations of possible future injury are not sufficient" to convey standing. *Clapper*, 568 U.S. at 409. *Clapper's* directive applies to foreclose standing premised upon ALDF's speculation that its retention of an investigator, "to obtain photographic and/or video footage" at animal facilities, just *may be* prohibited by subsections (c) or (d) of K.S.A. 47-1827. *See id*. at 114 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

---

[15] We are unable to find authority that the investigator owes a duty disclose his or her affiliation with ALDF unless asked. Usually, fraud and deception is understood to include concealment involving a breach of legal or equitable duty, trust, or confidence justly reposed. *E.g., Umbehr v. Board of County Com'rs of Wabaunsee*, 252 Kan. 30, 37, 843 P.2d 176 (1992). In other words, it may arise only when there is an affirmative duty to speak. *E.g., OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 344, 918 P.2d 1274 (1996) (fraud); *Dunn v. Dunn*, 47 Kan.App.2d 619, 639, 281 P.3d 540 (2012) (deception).

Yet, perhaps more problematic to ALDF's attempt to challenge subsections (c) and (d), plaintiffs do not challenge K.S.A. 2018 Supp. 21-5808, which they claim outlaws their intended undercover investigations. UF ¶ 8. Moreover, they insist that they will not knowingly violate Kansas' criminal laws. UF ¶ 8.

K.S.A. 2018 Supp. 21-5808 (emphasis supplied) states in its pertinent parts:

(a) Criminal trespass is entering or remaining upon or in any:

(1) Land, nonnavigable body of water, structure, vehicle, aircraft or watercraft by a person *who knows such person is not authorized or privileged to do so*, and:

\*\*\*
(B) such premises or property … *are locked or fenced or otherwise enclosed, or shut or secured against passage or entry*; ….

ALDF's theory of possible criminal responsibility under subsections (c) or (d) begins with the premise that its investigator knows that the investigator is not authorized or privileged to be at the animal facility. *Id.* at §(a)(1). And areas at the facility "locked or fenced or otherwise enclosed, or shut or secured against passage or entry the circumstances," *id.* at §(a)(1)(B), provide constructive notice to not enter and/or leave the facility. *State v. Rush*, 255 Kan. 672, 877 P.2d 386 (1994).

While it is conceivable that ALDF's investigator might encounter unrestricted areas at or within animal facilities–those not are locked, fenced, enclosed, or shut or secured against passage or entry–, there is no restraint (or at least no practical restraint) on taking photographic and/or video footage of activities in these unrestricted areas under the KFAFCRF. No force, fraud, deception, duress or threat is necessary to take pictures or video footage from the unrestricted areas. *See* K.S.A. 47-1826(e)(1). Consent is

7

"apparent" if the areas are unrestricted. *See* K.S.A. 47-1826(c). All this explains why plaintiffs have maintained that the present Kansas criminal statutes of general application outlaw their intended undercover investigations. UF ¶ 8.[16] *Cf.* K.S.A. 47-1827(c)(4) (subsection (c)(4) does not criminalize taking pictures; rather only entry without "effective consent" "to take pictures" and with the intent to cause damage is proscribed).

As a result, the plaintiffs lack standing because of their failure to challenge a separately enforceable legal obstacle to the relief sought. *See McConnell v. Federal Election Com'n,* 540 U.S. 93, 229 (2003), *overruled on other grounds, Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010) (found lack of standing for concerning an alleged violation of the First Amendment from limits on political contributions because striking the challenged statutory provisions would not remedy plaintiffs' alleged injury in light of unchallenged contribution limitations imposed by other statutes). *See also, Bishop v. Smith*, 760 F.3d 1070, 1077 (10th Cir. 2014) (recognizing courts hold standing is not present because a second, unchallenged legal obstacle bars their desired remedy, but finding lack of standing on another basis); *White v. United States,* 601 F.3d 545, 549 (6th Cir. 2010) (plaintiffs lacked standing because the economic injury they alleged was not a "traceable" act to the challenged law, which criminalized interstate sale and transport of fowl and items used in cockfighting, nor "redressable" by injunction or

---

[16] However, the KFAFCRF criminalizes some conduct not covered by other penal statutes and enhances punishment for conduct covered by other general statutes. *See State v. Belcher*, 269 Kan. 2, 4 P.3d 1137 (2000) (discussion of lesser included criminal offenses).

declaratory judgment as cockfighting is still illegal even the challenged statutes were declared unconstitutional).

Furthermore, plaintiffs cannot finesse causation and remediation problems by requesting declaratory judgment. A declaratory judgment stating KFAFCRF is unconstitutional will not limit prosecution under other criminal statutes. The attorney general will not be prohibited from prosecuting plaintiffs for violations of K.S.A. 2018 Supp. 21-5808. Neither, will any order in this case prohibit plaintiffs' prosecution by county and district attorneys. *See Bronson,* 500 F.3d at 1112 (declaratory judgment would not redress future possibility of criminal prosecution when those charged with enforcement of the statute were not parties); *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (plaintiff seeking declaratory judgment must assert a claim for relief which, if granted, would affect the behavior of the particular parties to the litigation). *See also, Nova Health Systems v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) ("[i]f courts may simply assume that everyone [ ] will honor the legal rationales that underlie their decrees, then redressability will always exist").

      d.   *Plaintiffs do not rescue standing by alleging that they are required to divert resources.*

Plaintiffs say *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), supports ALDF and CFS have the required standing from drains on their resources. *See* UF ¶¶ 17-18 (plaintiffs' description of expenses incurred and consequent drain on resources).[17]

---

[17] Plaintiffs Shy and Hope do not assert standing on this basis. UF ¶ 19.

While it is unclear whether they maintain drain on resources alone is sufficient to prove injury in fact in this case[18], the holding in *Havens* does not apply to our circumstances.

First, plaintiffs do not seek damages. *See* ECF 028. By contrast, in *Havens*, the plaintiff organization sought damages, not injunction or declaratory relief, *id*. at 378[19]; and damages are a classic basis for standing. *See Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014); *Young Advocates for Fair Education v. Cuomo*, 2019 WL 235643 (E.D. N.Y. Jan. 16, 2019) (both recognizing the import and validity of this distinction).

Second, a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id.*

Third, an interest unrelated to an injury in fact is insufficient to give standing. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982); *Sierra Club v. Morton*, 405 U.S. 727 734–735 (1972). *See also ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989) (teachers association's special

---

[18] That is, whether they claim that the alleged drain provides standing separate from ALDF's assertion that it is subject to the threat of criminal prosecution.

[19] In *Havens*, the plaintiff organization's standing was based, from its pleadings, on allegation that the defendant's unlawful conduct was tied directly to a concrete harm inflicted upon the primary activity of the plaintiff organization—the organization's counseling and referral efforts were rendered futile when the defendant turned away referred housing applicants. 455 U.S. at 379. Again, it sought only to recover money for the damages it claimed to have suffered. *Id.* And, of course, the organization was tasked, by the Court, to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it would be entitled to judicial relief. *Id.* at 379, n. 21.

interest in the quality of education did not confer standing). The resources ALDF and CFS list as expense or drain from the KFAFCRF only evidence political activities voicing objection to laws across the country which they perceive enable animal abuse. *See* UF ¶¶ 17-19. *Cf.* UF ¶ 1 (describing plaintiffs' missions). They may have an interest concerning the KFAFCRF, but they suffer no distinct and concrete injury because of the law. *See Colorado Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992) (addressing *Havens,* refused to find standing in the plaintiff organization's claim that it was forced to counteract the Governor's activities through the expenditure of additional funds); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) (the concrete injury in fact requirement for standing "would be eviscerated if an advisor or organization can be deemed to have Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law"); *Young Advocates for Fair Education v. Cuomo*, 359 F.Supp.3d 215 (E.D.N.Y. 2019) (plaintiff organizations did not have standing from their "significant effort[s]" opposing an amendment to New York's education laws which allegedly "shift[ed] valuable resources away from [the organizations'] traditional advocacy and education efforts," *id.* at 231, otherwise "if the Court were to accept this argument, it would be difficult to conceive of a case in which an organization or individual would not have standing to challenge a statute that they find politically or socially disagreeable," and "[i]f any plaintiff with a strong objection to a statute could manufacture standing by spending time and money opposing that very statute—and then arguing that the expenditure of that time and money was itself an injury—there would be

no real constraint upon standing at all, except perhaps the size of the plaintiff's bank account," *id.*).

      e.   *Additionally, plaintiffs suffer no redressable injury from an alleged denial of receipt of speech.*

The First Amendment's right to "receive information and ideas," "presupposes a willing speaker." *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). A plaintiff must clearly establish the existence of a willing speaker to have standing to assert a right-to-receive claim. *See Bond v. Utreras*, 585 F.3d 1061, 1077-78 (7th Cir. 2009) (collecting circuit decisions reaching the same conclusion). The purpose of the willing speaker requirement is "to ensure that there is an injury in fact that would be redressed by a favorable decision." *United States v. Wecht*, 484 F.3d 194, 203 (3rd Cir. 2007). *See also Pennsylvania Family Institute, Inc. v. Black*, 489 F.3d 156, 166 (3rd Cir. 2007) ("Thus, if there is no infringement claimed by a speaker—that is, someone who is willing to state that his rights were infringed upon, or that his exercise of rights was chilled by, in this case, the Canons or Rules—there can be no violation of the right to listen").

Therefore, plaintiffs cannot claim standing from their desire to receive the fruits of undercover investigations which will not happen because of unchallenged criminal statutes of general application.

      f.   *Even if plaintiffs' claims satisfy the standing concerns discussed, the governor should be dismissed.*

Kansas' governor has no specific statutory or constitutional duty to enforce KFAFCRF and should be dismissed. *See Bronson*, 500 F.3d at 1111 ("redressability

prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute"); *Donahue v. Brownback*, No. 18-2055-CM, 2018 WL 5281546, 3 (D. Kan. Oct. 24, 2018) (finding dismissal of governor was proper). *See also Bishop v. Oklahoma*, 333 Fed. Appx. 361, 2009 WL 1566802 (10th Cir., *unpub.*, June 5, 2009) (a generalized duty to enforce the state law does not subject Kansas officials to suit challenging the constitutionality of statutes the official no specific duty to enforce); *1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 112-13, 116 (3d Cir. 1993) ("If we were to allow [plaintiffs] to join ... [the State officials] in this lawsuit based on their general obligation to enforce the laws ..., we would quickly approach the nadir of the slippery slope; each state's high policy officials would be subject to defend every suit challenging the constitutionality of any state statute, no matter how attenuated his or her connection to it").

## 2. Assuming standing, summary judgment against plaintiffs' claims is proper because the KFAFCRF does not regulate constitutionally protected activity.

Plaintiffs' insistence on mislabeling the KFAFCRF as an "ag-gag" law acknowledges the central problem with their claims. The KFAFCRF does not "gag" anything. Plaintiffs are free to express their views about animals and agriculture. The ALDF investigator can lie in a job application–assuming that is protected speech. The KFAFCRF does not prohibit or punish publication of photos, videos or anything else. Nevertheless, the threshold question here is whether KFAFCRF regulates constitutionally protected activity: if not, the Court "need go no further." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797 (1985).

Plaintiffs assert that they are denied their right to create exposés. UF ¶ 12-13. But "location, location, location" can be and here is central to whether First Amendment rights are abridged. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 (10th Cir. 2013) (judgment entered against First Amendment claims by groups who were forced to move their protest from private property while opponent groups were allowed to remain).

There is no constitutional right to trespass onto private property to speak or create speech. Plaintiffs' "desire to access certain information, no matter how important or sacrosanct they believe the information to be, does not compel a private landowner to yield his property rights and right to privacy," *Western Watersheds Project v. Michael*, 196 F.Supp.3d 1231, 1241 (D. Utah 2016), *rev'd on other grounds*, 869 F.3d 1189 (10th Cir. 2017).

To begin with, the First Amendment only protects ''conduct that is inherently expressive.'' *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc*., 547 U.S. 47, 66 (2006). Conduct does not generate First Amendment protection ''merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed,'' *id*. at 62 (*quoting Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949) (antitrust laws can prohibit "agreements in restraint of trade")). For example, a ban on race-based hiring "may require employers to remove "White Applicants Only" signs." *Rumsfeld*, 547 U.S. at 62. Thus, plaintiffs' desire to illegally access private property and to invade the owners' right to privacy are not constitutionally protected even if initiated or carried out by spoken words or video recordings. *See Cohen v. Cowles Media Co*., 501 U.S. 663, 669 (1991) ("generally applicable laws do not offend

14

the First Amendment simply because their enforcement ... has incidental effects on [the] ability to gather and report the news)."[20]

Second, not all "creation" of speech is protected expressive activity for purposes of the First Amendment. *See, Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (no First Amendment right to unrestricted access to prisoners, noting the right to gather news does not compel private persons or governments to supply such information); *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728 (1970) (the right to be free from unwanted mail at a private home outweighs the right to send mail to a private home because "[t]o hold less would tend to license a form of trespass"); *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (no First Amendment right was involved based upon a travel ban which restricted the plaintiffs ability to visit Cuba and collect information, noting "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow"); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 n. 4 (1980) (Powell, J. concurring) ("law that required homeowners to permit speakers to congregate on their front lawns would be a massive and possibly unconstitutional intrusion into personal privacy and freedom of belief"); *Garner v. Louisiana*, 368 U.S. 157, 202 (1961) (Harlan, J. concurring) (right to speech "would surely not encompass verbal expression in a private home if the owner has not consented").[21]

---

[20]*E.g., Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949) (antitrust laws can prohibit "agreements in restraint of trade").

[21] *See also, United States v. Judd*, 315 Fed. Appx. 35, 2008 WL 4183920 (10th Cir., *unpub*., September 12, 2008) (holding statements to a judge at his private home were not protected by First Amendment. The Amendment "does not protect a person's right to speak whenever and wherever they please.").

Third, plaintiffs' First Amendment right to create speech does not carry with it an exemption from other principles of law or the legal rights of others. Courts do not view "creation" of speech in a vacuum; the right to "create" speech via access to information is protected activity only if conducted "by means within the law." *Branzburg v. Hayes*, 408 U.S. 665, 681-82 (1972). Simply put, there is no First Amendment right to engage in speech on the private property of another. *See e.g., Lloyd Corp., LTD. v. Tanner*, 407 U.S. 551, 567-68 (1972) (holding First Amendment did not require a private corporation to allow handbill distribution on its private property)[22]; *Hudgens v. NLRB*, 424 U.S. 507, 509 (1976) (holding employer was not required to permit workers to picket on company property); *Cornelius v. NAACP*, 473 U.S. 788, 801 (1985) ("a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment Concerns ...."); *Adderley v. State of Fla.,* 385 U.S. 39, 47 (1966) (conviction of criminal trespass at and around a jail by student demonstrators did not deprive students their constitutional rights to freedom of speech, press, assembly or petition). *See also*, *Bray v. Alexandria Women's Health*, 506 U.S. 263, 286 (1993) ("Trespassing upon private property is unlawful in all States, as is, in many States and localities, intentionally obstructing the entrance to private premises. These offenses may be prosecuted criminally under state law, and may also be the basis for state civil damages. They do not, however, give rise to a federal cause of action simply because their objective is to prevent

---

[22] Writing for the majority, Justice Powell stated, "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." 407 U.S. at 568.

the performance of abortions, any more than they do so (as we have held) when their objective is to stifle free speech.").

To one degree or another, courts have repeatedly espoused these principles in disputes concerning news gathering, even for exposés. *See e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505 (4th Cir. 1999) (no First Amendment protection to television network and network employees against claims for fraud, breach of duty of loyalty, and trespass by grocery store chain which had been subjected of an undercover investigation of its food handling practices); *Dietemann v. Time, Inc*., 449 F.2d 245, 249 (9th Cir. 1971) (First Amendment did not shield reporter against invasion of privacy suit who had lied to obtain access and then surreptitiously recorded plaintiff in his home; *Turnbull v. American Broadcasting Cos.,* No. 03-3554, 2004 WL 2924590 (C.D. Cal. Aug. 19, 2004) (trespass to make unauthorized, surreptitious recording of the plaintiffs' voices and likenesses for exposé was not protected by first amendment); *Special Force Ministries v. WCCO Television,* 584 N.W.2d 789, 792-93 (Min. Ct. App. 1998) (First Amendment did not shield reporter who had obtained a volunteer position at a facility for special needs persons and then surreptitiously recorded staffs' care of patients at the facility); *Belluomo v. KAKE TV & Radio, Inc*., 3 Kan.App.2d 461, 470-71, 596 P.2d 832 (1979) (exposé concerning a restaurant was not accorded immunity from liability for tort damages, and First Amendment did not license trespass).[23] *See also*, *Cohen v. Cowles Media Co.,* 501 U.S. 663, 669 (1991) ("generally applicable laws do not offend the First

---

[23] Media ride-along violated the Fifth Amendment. *Wilson v. Layne*, 526 U.S. 603, 611-14 (1999).

Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news," thus "[t]he press may not with impunity break and enter an office or dwelling to gather news"); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609 ("press [has] no right to information ... superior to that of the general public").[24]

In *Western Watersheds Project v. Michael*, 196 F.Supp.3d 1231 (D. Wyo. 2016), *rev'd on other grounds*, 869 F.3d 1189 (10th Cir. 2017), the district court considered a Wyoming statute which had criminalized: a) entering private land with the intent to collect resource data; b) entering private land and actually collecting resource data; and c) crossing private land without authorization to collect resource data on adjacent or proximate public land. *Id.* at 1237-38 (*quoting* Wyo. Stat. §§ 6-3-414(a)-(c)).

Accepting collection of data could constitute speech or creation of speech, the court found subsections (a) and (b) of the statute did not violate the First Amendment because "there is no First Amendment right to trespass upon private property for the purpose of collecting resource data." 196 F.Supp.3d at 1242. The lynchpin of the court's holding was that there is no right to trespass upon private property in order to speak or create speech because creation of speech is protected activity only if conducted by means within the law. *Id.* at 1240-42. The court also found subsection (c) was constitutional. An appeal followed.

---

[24] *See also Pell v. Procunier*, 417 U.S. 817, 834 (1974) (rejecting argument that "the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally").

While the district court's findings and reasoning concerning subsections (a) and (b) of the Wyoming statute were not challenged in the appeal, *Western Watersheds Project*, 869 F.3d 1189, 1193-94 (10th Cir. 2017), the Tenth Circuit's panel accepted the lower court's conclusion concerning subsections (a) and (b). It noted that the district court had "relied on Supreme Court precedent [ ] that individuals generally do not have a First Amendment Right to engage in speech on the private property of others," and then stated "[a]lthough subsections (a) and (b) of the statutes govern actions on private property, the district court was mistaken in focusing on these cases with respect to subsection (c)" which pertained to collecting data on public land. *Id.* at 1194.

The panel held that the fact one aspect of subsection (c) concerned private property did not defeat the need for First Amendment scrutiny. It reasoned subsection (c) enhanced the preexisting penalty for trespass only for creation of speech on ***public property***, *id.* at 1194-95 (emphasis supplied). As to this, it found *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), controlling. In *Watchtower*, the Supreme Court applied the First Amendment to invalidate an ordinance which "prohibit[ed] canvassers from going on private property for the purpose of explaining or promoting any cause, unless they receive[d] a permit and the residents visited [had] not opted for a no solicitation sign." 536 U.S. at 165.

The panel's analysis of subsection (c) and *Watchtower* are not applicable to KFAFCRF. For example, the state cannot criminalize criticism of the Governor wherever it may take place, but it can prosecute the unauthorized entry into the Governor Kelly's office whether the intrusion was motivated or not by desire to record and publicize

behavior seen or heard in these private spaces. *See Rowan v. United States Postal Service*, 397 U.S. 728, 737 (1970) (upholding law wherein person could require mailer to remove his name from mailing list and stop all future mailings to the householder; "[a] mailer's right to communicate must stop at the mailbox of an unreceptive addressee.... To hold less would tend to license a form of trespass"); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 148 (1943) (approving of a "regulation ... which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed"). *Cf. Watchtower*, 536 U.S. at 168 (indicating that ordinance provision, which provides for posting of "No Solicitation" signs, "coupled with residents' unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener," in response to village's assertions pertaining to interest in protecting privacy).

Plaintiffs have referenced decisions in lawsuits that ALDF filed in Iowa, Utah and Idaho. For the most part, the language in the statutes challenged in those cases is materially different from that in KFAFCRF.

The Iowa and Utah statutes directly criminalized speech–pure speech: *i.e.*, "false pretenses," "false statement or representation," "records." Iowa Statute § 717A.3A(1)[25];

---

[25] The challenged parts of Iowa Statute § 717A.3A(1) made a person guilty of "agricultural production facility fraud" "if the person willfully" "obtain[ed] access" "by false pretenses" or "makes a false statement or representation" in an employment application or agreement "with an intent to commit an act not authorized by the owner of the agricultural production facility." *Id.*

Utah Code § 76-6-112.[26] By contrast, the KFAFCRF criminalizes interference **on private property** with the animal facility owners' rights concerning property (real and personal) and privacy: *i.e.*, "damage or destroy" facility, animal or property, "exercise control" "with intent to deprive the owner," "enter," remain concealed," "enter or remain." K.S.A. 2018 Supp. 47-1827(a), (b), (c) & (d). Stated another way, KFAFCRF does not outlaw a false statement to secure consent to damage or enter property in and of itself. And there is no crime or penalty, under the KFAFCRF, for taking pictures or publishing the results of any undercover investigation.

Parts of the challenged Idaho statute are similar to provisions in the KFAFCRF. Idaho Code § 18-7042(1) outlawed entry to an agricultural production facility "by force, threat, misrepresentation or trespass." However, unlike KFAFCRF, the Idaho statute also separately criminalized making "audio or video recordings of the conduct of an agricultural production facility's operations," and obtaining employment "by force, threat, or misrepresentation with the intent to cause economic or other injury" to the facility's operations, property, business interests or customers. *Id.*

The majority opinion in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1190-205 (9th Cir. 2018), felt that the Idaho statute regulated some constitutionally

---

[26] The Utah Code § 76-6-112 provided a person is guilty of agricultural operation interference if the person "knowingly or intentionally records" an image or sound "by leaving a recording device on the agricultural operation; obtains access to an agricultural operation "under false pretenses;" becomes employed and "while present on, the agricultural operation, records an image of, or sound from, the agricultural operation;" or "knowingly or intentionally records an image of, or sound from, an agricultural operation while the person is committing criminal trespass." *Id.*

protected activity. However, Judge Carlos T. Bea's dissent and concurrence better

adheres to Supreme Court precedent and *Western Watersheds Project.* It should be

followed here.

Judge Bea cogently explained the difference between regulation of speech and

regulation of alleged creation of speech by conduct outside the law.

> I dissent because I would hold that the "ability to hold property or to
> exercise control of it" requires recognition by courts of the owner's right to
> exclusive possession of the land—the right to exclude anyone from entry, at
> any time, and for any reason at all or indeed for no reason. The majority
> brushes aside this longstanding principle of property in concluding that
> entry by misrepresentation "does not infringe upon the specific interests
> trespass seeks to protect." The majority's result contradicts the "universally
> held" principle that the "right to exclude" is "a fundamental element of the
> property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80
> (1979).[27]
>
> ***
>
> The majority analyzes this case under *United States v. Alvarez*, in which the
> Supreme Court invalidated under the First Amendment the Stolen Valor
> Act, 18 U.S.C. § 704, a federal statute which made criminal false claims
> that the speaker had received the Congressional Medal of Honor. [citation
> omitted] At the outset, it is important to note that subsection (a) of the
> Idaho statute at issue in this case differs from the version of the Stolen
> Valor Act at issue in *Alvarez* in at least one crucial aspect: Whereas the
> Stolen Valor Act prohibited the act of lying about a particular subject
> (receipt of military decorations or medals), 18 U.S.C. § 704, subsection (a)
> of Idaho's statute prohibits the act of entering a particular type of property
> ("agricultural production facilities") by particular means (including
> "misrepresentation"), Idaho Code § 18–7042(1)(a). By the plain meaning of
> the statute, liability attaches only to those who "enter[ ]" an agricultural
> production facility through lying, not to any and all who tell lies to
> agricultural facility owners or to the public about such owners. *Id.* In other

---

[27] *See e.g., United States v. Lyons*, 992 F.2d 1029, 1031 (10th Cir.1993) (our Circuit recognizes and applies the principle). *See also Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (the right to exclude is a fundamental element of the property right); *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978) (the right has long been recognized as one of the main rights attaching to property, citing Blackstone Commentaries).

words, subsection (a) of the Idaho statute does not prohibit "pure speech." Although under *Alvarez* a lie—without "more"—is pure speech, the Idaho statute is directed at something "more": the conduct of knowingly entering an agricultural facility through the use of a lie. The use of the term "enters" is a clear invocation of the standards and interests of the law of trespass. This provision no more regulates pure speech than do prohibitions on larceny by trick or false pretenses.

Therefore, I don't see how *Alvarez* is applicable, or that a First Amendment analysis is at all necessary to subsection (a) of the subject Idaho statute. *See Pickup v. Brown*, 740 F.3d 1208, 1230 (9th Cir. 2014) ("[A]n act that 'symbolizes nothing,' even if employing language, is not 'an act of communication' that transforms conduct into First Amendment speech." (*quoting Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126–27 [ ] (2011))). Here, as in *Pickup* and *Carrigan*, a common law trespass "symbolizes nothing."

*Id.* at 1207-08.

### 3. Even assuming KFAFCRF restricts some expressive activity, it does not impermissibly infringe First Amendment rights.

The expressive activities which plaintiffs claim are proscribed by the KFAFCRF are lies to gain employment, in order to access animal facilities for the purpose of damaging the property's owner, and the taking of photographic and/or video footage inside animal facilities.

### a. *A lie to damage the enterprise conducted at an animal facility is "proscribeable speech."*

A lie made with the specific intent to damage the enterprise conducted at the animal facility–an element to each possible violation of the act–is constitutionally proscribeable. *United States v. Alvarez*, 567 U.S. 709 (2012). *Alvarez* addressed the constitutionality of a statute criminalizing false claims that the speaker had received the Congressional Medal of Honor. The Court's plurality and concurrence decided lying

23

about receiving the Medal of Honor, without more, was protected speech. *Id*. at 722 (plurality), 731–32 (concurring). Yet, the plurality outlined, false speech may be criminalized–is proscribeable–if made "for the purpose of material gain" or "material advantage," or if such speech inflicts a "legally cognizable harm." *Id*. at 723, 719. The concurring justices agreed: statutes that criminalize falsities typically require proof of specific or tangible harm. *Id.* at 734–36.[28] The lies to access animal facilities, which plaintiffs would exalt, violate the KFAFCRF ***only*** if made with the "intent to" and in order to "damage the enterprise conducted at the animal facility."

*Wasden's* majority applied *Alvarez*. It concluded provisions in the involved Idaho statute, which criminalized misrepresentation to gain entry and prohibiting recording once on the premises, violated the First Amendment. *Id.* at 1194-99, 1203-05. But it also found that a provision regarding lying to obtain employment did not. *Id.* at 1199-201. The majority reasoned, misrepresentation to obtain employment was proscribeable speech because it was illegal only if there was "intent to cause economic or other injury," unlike the other provisions in the Idaho statute but exactly like the provisions in the KFAFCRF which plaintiffs challenge here. *Id.* at 1201-02.[29]

---

[28] The concurring Justices distinguished the Stolen Valor Act from presumptively constitutional statutes, such as those prohibiting fraud, impersonation, trademark infringement etc., which prohibit "a subset of lies where specific harm is more likely to occur. *Id.* at 734-36.

[29] Judge Bea maintained, Idaho statute's prohibited misrepresentations which inflicted a "legally cognizable harm" so that all its provisions were constitutional even if it was assumed expressive activity was implicated. *Id.* at 1208-10.

>   b.   *Reasonable regulation prohibiting photographing, filming, or otherwise recording on nonpublic governmental and private property does not abridge the First Amendment.*

If it is supposed that the taking of photographic and/or video footage is prohibited by the KFAFCRF–as opposed a criminalization of malicious, unconsented entry/presence at a facility–the prohibition must be tested against a reasonableness standard.

Government may impose restrictions on speech in government's nonpublic forums[30], including restrictions that exclude political advocates and forms of political advocacy. *Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1886 (2018).[31] It also follows government may also enforce restrictions on speech unwanted by owners of non-public private owned forums. *Compare*, *Lloyd Corp., LTD. v. Tanner*, 407 U.S. 551, 567-68 (1972) (First Amendment did not require a private corporation to allow handbill distribution on its private property). Yet, even under scrutiny applicable to nonpublic fora, regulation governing speech in such a place is evaluated against the low bar of reasonableness of the restriction in light of the purpose of the forum. *McDonnell v. Denver*, 878 F.3d 1247, 1254 (10th Cir. 2018). *See also, Iancu v. Brunetti*, – U.S. –, 2019 WL 2570622 *17 (S.Ct. June 24, 2019) (J. Sotomayor, describing the nonpublic fora scrutiny). *See Mocek v. City of Albuquerque*, 3 F.Supp.3d 1002, 1071-74 (D. Colo. 2014),

---

[30] The KFAFCRF applies to both publicly and privately owned facilities. *See* K.S.A. 47-1826(f) & (g).

[31] Courts employ a distinct standard of review to assess speech restrictions in nonpublic forums because the government is "no less than a private owner of property." *Adderley v. Florida*, 385 U.S. 39, 47 (1966).

*aff'd on slightly different grounds*, 813 F.3d 912, 930-31 (10th Cir. 2015) (reasonable to restrict video filming at an airport security checkpoint, a nonpublic forum).

The KFAFCRF protects animal and crop facilities owners' intended use (the dedicated use) of their property, which includes their ability to exclude unwanted visitors and secure their privacy regarding the use of their property. The facilities dedicated uses are food, fur or fiber production; and agriculture, research, testing or education concerning animal or crops. *See* K.S.A. 47-1826(a) (b) & (i).

Prohibition of unconsented entry onto an animal facility and hiding after entry in order to make recordings is reasonable to preserve these lawfully dedicated purposes. Recordings could show the facilities' layouts (inside and surrounding properties) and the facilities' security features. Recordings could steal confidential business practices, confidential research or trade secrets. The very process of making the recordings may interfere with operations within the facilities by way of the "investigator's" effort to concealing the recording activity.[32] The recording process would likely negatively influence employee behaviors by impacting their productivity or by enhancing the probability of violent conflict between the employees and the person making unwanted recordings.

In summary, any incidental "restriction" under the KFAFCRF to the taking of photographic and/or video footage is, at the very least, one reasonable response to protect

---

[32] Plaintiffs appear to admit as much saying it investigators "could temporarily 'exercise control' over a specific room or section of a facility by [ ] temporarily closing off a part of the facility, so as not to be observed photographing the conditions. UF ¶ 12. *See also* Complaint, ¶ 48.

animal and crop facilities owners' intended use their property. Ultimately, restriction on taking of photographic and/or video footage "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Lee*, 505 U.S. at 683; *McDonnell,* 878 F.3d at 1254.

      c. *The KFAFCRF is viewpoint neutral.*

In the nonpublic forum analysis, there is a distinction between content discrimination, which may be permissible if it preserves the purposes of that limited forum, and viewpoint discrimination, which is presumed impermissible. *Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1885, 201 L.Ed.2d 201 (2018); *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999).

If KFAFCRF indirectly prohibits the taking of photographic and/or video footage, the regulation does not take sides on either how the recording is made[33] or what images are recorded. Its legislative history, if relevant, shows security issues were the preeminent purpose of the act. UF ¶¶4-7.[34] And K.S.A. 47-1827(c)(4) applies equally to recordings, taken of the facilities or its contents or surrounding properties or persons, which they are propaganda as opposed to exposé materials, theft of trade secrets or advantageous, confidential business or research practices or facility layouts and access points relevant to security concerns for persons.

---

[33] A nuance to plaintiffs' arguments is that they have maintained the act of recording by itself is protected speech. However, K.S.A. 47-1827(c)(4) does not discriminate about how the recording is made. Any artistic qualities or esthetic judgments made during the recordings are equally restricted.

[34] The act helps assure a safe and plentiful food supply, and it is designed to protect persons working at animal and crop facilities.

Furthermore, K.S.A. 47-1827(c)(4) expresses no position that is dependent upon whether publication of the recordings would cause injury. There must be an intent to cause damage to the facilities enterprise, K.S.A. 47-1827(c), but not necessarily from the publication of the photographs or videos. Furthermore, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral [content or viewpoint], even if it has an incidental effect on some speakers or messages but not others." *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 695-96 (2010) (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1999). *See also Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763 (1994) ("the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based").

### 4.  Finally, plaintiffs' overbreadth challenge must be rejected.

Facial challenges are "disfavored," as "strong medicine" to be "employed sparingly and only as a last resort," and "best when infrequent." *United States v. Brune*, 767 F.3d 1009, 1019 (10th Cir. 2014) (internal quotation marks omitted). And plaintiffs' facial "overbreadth" claim, Complaint, ¶¶103-07, is make-weight.

The claim's description in the Complaint is conclusory. *Id.* The only detail provided is plaintiffs protest "animals" and "animal facility" are broadly defined in the KFAFCRF. *Id.* ¶¶ 60-61 (*citing* K.S.A. 47-1826(a) & (b)).[35] This overlooks the specific

---

[35] Defendants dispute plaintiffs' assertion that the KFAFCRF applies to zoos, restaurants, pet stores, circuses, elementary school classrooms because these facilities do not "keep, handle, bred, or offer for sale animals ***used in*** food or fur ***production***" and are research facilities "us[ing] any ***living*** animal." *See* K.S.A. 47-1826(a), (b) & (i) (emphasis supplied). *See also*, Op. Kan.

elements that the State must prove to establish criminal liability under the act regardless of the nature and location of the animal facility. See discussion, *supra*, at 2-5. It ignores the crop facility provisions in the act. The count presents no reason that the KFAFCRF punishes protected free speech in a manner which is separate and independent from the justifications discussed and shown to be invalid in the above discussion.

Anyway, "[f]inding *some* overbreadth only satisfies part of the inquiry, as the challenger must also show that the law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Brune*, 767 F.3d at 1018 (emphasis in original; internal quotation to *Broadrick v. Okla.*, 413 U.S. 601, 615 (1973) and other internal quotation marks omitted). "The Supreme Court has 'vigorously enforced the requirement that a statute's overbreadth be substantial in both absolute and relative terms." *Id.* at 1018 (emphasis in original; *quoting United States v. Williams*, 553 U.S. 285, 292 (2008)). Thus, even where a fair amount of constitutional speech is implicated, courts will not invalidate a statute unless significant imbalance exists." *Id.* at 1018. Plaintiffs do not establish such an imbalance.

## Conclusion

For the reasons discussed, summary judgment should be entered against plaintiffs' claims.

---

Att'y Gen. No. 90-72, pp. 4-5 (1990) (distinguishing animal cruelty statute and KFAFCRF) (copy filed at ECF 001-1).

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

s/ Arthur S. Chalmers_____
Arthur S. Chalmers, KS S. Ct. #11088
Assistant Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612
Ph: (785) 368-8426
Fax: (785) 291-3707
Email:  art.chalmers@ag.ks.gov
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that on this 25th day of July, 2019, I electronically filed the above

and foregoing with the Clerk of the Court using the Court's Electronic Filing System,

which will send a notice of electronic filing to all counsel of record:

Amanda Howell
ahowell@aldf.org
David Muraskin
dmuraskin@publicjustice.net
George Kimbrell
gkimbrell@centerforfoodsafety.org
Kelsey Eberly
keberly@aldf.org
Matthew Liebman
mliebman@aldf.org
Michael Moss
mmoss@foleymansfield.com
Alan Chen
achen@law.du.edu
Justin Marceau

30

jmarceau@law.du.edu
Matthew Strugar
Matthew@matthewstrugar.com

*Attorneys for Plaintiff*

s/ Arthur S. Chalmers
Arthur S. Chalmers