## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND,** *et al.,*       ) | |
| ) | |
| ) | |
| **Plaintiffs,**     ) | |
| ) | |
| **v.**     ) | **Case No. 18-2657-KHV-JPO** |
| ) | |
| **LAURA KELLY,** *et al.,*     ) | |
| ) | |
| **Defendants.**     ) | |
|     ) | |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

Plaintiffs Animal Legal Defense Fund ("ALDF"), Center for Food Safety ("CFS"), Shy 38, Inc. ("Shy"), and Hope Sanctuary ("Hope"), submit this memorandum in support of their motion for summary judgment.

### Plaintiffs' Statement of Uncontroverted Facts

1.     Kansas is the among the largest animal agriculture producers in the United States, accounting for nearly 11% of commercial red meat production nationwide. https://agriculture.ks.gov/docs/default-source/ag-marketing/kansas-farm-facts-2018-final.pdf?sfvrsn=937184c1_4

2.     Kansas has the third most cows of any state in the United States (6.3 million). https://agriculture.ks.gov/docs/default-source/ag-marketing/kansas-farm-facts-2018-final.pdf?sfvrsn=937184c1_4

3.     Kansas is among the country's largest producers of pigs—with approximately two million pigs raised for slaughter. https://agriculture.ks.gov/docs/default-source/ag-marketing/kansas-farm-facts-2018-final.pdf?sfvrsn=937184c1_4;

https://www.nass.usda.gov/Statistics_by_State/Kansas/Publications/Livestock_Releases/Hogs_and_Pigs/2019/KS-hogs1906.pdf.

4.      Animal rights activists began picketing outside the University of Kansas Medical Center to oppose the unnecessary use of animals in research in 1989, one year before the passage of the farm animal and research facilities protection act, K.S.A. 47-1825 – 47-1828 (hereafter, the "Kansas Ag-Gag law"). ECF 1-2, Complaint Exhibit B, *Animal rights group protests at med center*, THE HUTCHINSON NEWS (May 1, 1989), A014.[1]

5.      In signing the bill that became the Kansas Ag-Gag law, then-Governor Mike Hayden publicly stated that the legislation was designed to deal with damage caused by radical elements of the animal-rights movement. ECF 1-3, Complaint Exhibit C, *Law Aims to Curb Attacks by Animal-Rights Militants*, ORLANDO SENTINEL (May 14, 1990), A016.

6.      Newspaper reports at the time stated that the Kansas Ag-Gag law was "aimed at protecting farms, ranches and research operations from animal-rights extremists." ECF 1-3, Complaint Exhibit C, *Law Aims to Curb Attacks by Animal-Rights Militants*, ORLANDO SENTINEL (May 14, 1990), A016.

7.      Included as an attachment to the Minutes of the Senate Committee on Agriculture meeting held on March 23, 1990, provided by Senator Montgomery (hereafter, the "Minutes"), is an article in *The Wichita Eagle* entitled "Kansas Farmers Wary of Animal Rights Movement", which reported that Kansas farmers were "concerned about the impact of the [animal rights] movement on livestock production" and that the Kansas Farm Bureau meeting in December 1988 and the Kansas Livestock Association's annual meeting addressed the groups' growing concerns about the movement. ECF 1-5, Complaint Exhibit E, *Kansas Farmers Wary of Animal*

---

[1] Citations in the format of AXXX refer to the Appendix of affidavits and exhibits supporting Plaintiffs' Motion for Summary Judgment.

*Rights Movement*, THE WICHITA EAGLE (Jan. 22, 1989), A019; ECF 47-9, Defendants' Motion for Summary Judgment, Exhibit[2] 8, AG000101.

8.      *The Wichita Eagle* article contains a quote from Steve Kopperud, then-executive director of the Animal Industry Foundation, who pointed to The Humane Society of the United States' "breakfast of cruelty" campaign against pork and egg producers because swine and chickens are held in confinement. ECF 1-5, Complaint Exhibit E, Michael Bates, *Kansas Farmers Wary of Animal Rights Movement*, THE WICHITA EAGLE (Jan. 22, 1989), A018-19; ECF 47-9, Defs' MSJ Ex. 8, AG000101.

9.      Included as an attachment to the Minutes is an *Associated Press* article entitled "Animal Rights Debate Invades The Barnyard", containing a quote from Steve Kopperud, executive director of the Animal Industry Foundation, labeled a "pro-agriculture" group, in which he says, of the "animal rights movement": "It is well-funded. It is well-organized. It's a European import. And it's coming to Kansas." ECF 47-9, Defs' MSJ Ex. 8, AG000101.

10.      Included as an attachment to the Minutes is an article entitled "Animal rights groups plan ongoing national strategy," in *Drovers Journal*, a beef industry publication, dated July 13, 1989, which specifically references Plaintiff ALDF: "There are now several groups that sponsor legal defense funds for animals. One is the Animal Legal Defense Fund, a nationwide network of 250 attorneys. ALDF has fought hot-iron face-branding of dairy cows, veal calf confinement and the patenting of genetically altered farm animals." The article goes on, "But right now the animal rights movement seems to be growing in numbers, clout, zeal, sophistication and willingness to fight livestock producers." ECF 47-9, Defs' MSJ Ex. 8, AG000102.

---

[2] Defendants' Motion for Summary Judgment and supporting exhibits will be referred to herein as "Def's MSJ".

11.     Included as another attachment to the Minutes is an article by Karen McMillan in *Beef Today* dated March 1990, which contains the following statements: "all the [animal-protection] groups have two things in common: plenty of money, and agendas that will have a big impact on the cattle industry in the '90s"; "But many of these people are well spoken and skilled at getting their points out to the general public." The author describes actions of the group, People for the Ethical Treatment of Animals (PETA), as follows: "PETA's main goal is to tell as many people as possible that 'eating animals is bad for the whole ecosystem.' Education plays the key role here. PETA distributes videotapes showing pigs castrated and ear-notched without anesthesia, and pigs in farrowing crates and slaughterhouses, and asks whether this is an ethical society and whether we can endure this treatment." ECF 47-9, Defs' MSJ Ex. 8, AG000107-11.

12.     On June 13, 1990, then-Kansas Attorney General Robert T. Stephan issued an Attorney General Opinion regarding the Kansas Ag-Gag law, addressed to Kansas State Representative Sheila Hochhauser. ECF 1-1, Complaint Ex. A, Op. Kan. Att'y Gen No. 90-72 (1990), A002.

13.     In the Opinion, Attorney General Stephan wrote,

> You also ask in relation to section (3)(c)(4) of Senate Bill 776 whether the phrase "intent to damage the enterprise conducted at the animal facility" is limited to physical damage or whether it also includes damages resulting from the later publication of a photograph taken at the facility.
>
> …
>
> Upon a conviction for the crime defined in section (3)(c)(4), the sentencing court has authority to order restitution. K.S.A. 21-4603(2)(c), K.S.A. 21-4610(4)(a). In a criminal case the measure of damage is that loss suffered by the victim of the crime; restitution should make the victim whole. Actual loss suffered is therefore the measure of restitution to be ordered. State v. Hinckley, 13 Kan.App.2d 417 (1989). The actual amount of restitution is a question of fact for the trial court's

determination based on evidence presented of loss incurred in connection with the crime.

Section 4(a) of Senate Bill 776 provides authority for a civil cause of action thus:

"Any person who has been damaged by reason of a violation of section (3) may bring an action in the district court against the person causing the damage to recover:
  "(1) an amount equal to three times all actual and consequential damages; and
"(2) court costs and reasonable attorney fees."

In such a civil action actual damages, sometimes referred to as compensatory damages, is also compensation for the actual loss for injuries sustained by reason of the actor's wrong doing. The term contemplates out-of-pocket losses and may also include damages for impairment of reputation, personal humiliation, and loss of profit, both present and future. Compensatory damages generally must have a money value, and be capable of estimation with a pecuniary standard. 22 Am.Jur.2d Damages, §§ 24 and 28 (1988).

…

The intent to damage the enterprise conducted at the animal facility is a necessary element of a criminal prosecution or a civil action for damages. Upon conviction of the crime defined in a criminal case, or upon a finding of liability in a civil case, actual damages, which include consequential damages, may be assessed. The dollar amount of such order of restitution or assessment of civil damages will depend upon evidence of the amount required to make the injured party whole for losses actually suffered.

ECF 1-1, Complaint Ex. A, Op. Kan. Att'y Gen No. 90-72 (1990), A009-11.

14.     The Plaintiffs are each 501(c)(3) tax-exempt not-for-profit or non-profit corporations. Affidavit of Mark Walden in support of Plaintiffs' Motion for Summary Judgment (hereafter, "Walden Aff.") 3, A021; Affidavit of Rebecca Spector in support of Plaintiffs' Motion for Summary Judgment (hereafter, "Spector Aff.") 3, A243; Affidavit of Kris Taylor in support of Plaintiffs' Motion for Summary Judgment (hereafter, "Taylor Aff.") 2, A300; Affidavit of Cambria Martin in support of Plaintiffs' Motion for Summary Judgment (hereafter, "Martin Aff.") 2, A316; Defs' MSJ Ex. 1, Plaintiffs' Response to Defendants' Interrogatory No. 1; Defs' MSJ Ex. 2, Plaintiffs' Responses to Defendants' Requests for Admissions, Nos. 1-4.

15.     Plaintiff Animal Legal Defense Fund (ALDF) is a national animal protection organization that uses education, public outreach, investigations, legislation, and litigation to carry out its work on behalf of animals, including those raised for food and experimented upon in laboratories. Walden Aff. 3, A021-22.

16.     Plaintiff Center for Food Safety (CFS) is a national environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impact of industrial agriculture. CFS uses legal, scientific, and grassroots action to protect and promote the public's right to safe food and the environment. Spector Aff. 3, A243.

17.     Plaintiff Shy 38, Inc.'s mission is to change attitudes about industrialized farm animals by offering a compassionate public humane education program, promoting a cruelty-free, vegan lifestyle, and providing opportunities for the public to interact with its rescued farmed animal residents. Taylor Aff. 2, A300.

18.     Shy 38 is based in Lawrence, Kansas, where it provides a permanent home to over 30 rescued farm animals. Taylor Aff. 3, A300.

19.     The mission of Plaintiff Hope Sanctuary, based in Kansas City, Missouri, is to rescue and rehabilitate factory farmed animals, and to raise awareness about their lives, through education and by sharing rescued animals' unique stories of resilience, desire, and will to live. Hope Sanctuary aims to create a sustainable society that invests in the integrity of our environment and our animals, guaranteeing fair and humane treatment for farmed animals worldwide. Martin Aff. 2, A316.

20.     Common to the Plaintiffs' missions is a dedication to exposing, addressing, and reforming the harms caused by industrial animal agriculture, including the mistreatment of

animals and unsafe and unsustainable food production practices. Walden Aff. 3-4, A21-22; Spector Aff. 5, A244; Taylor Aff. 5-7, A301-302; Martin Aff. 2, 4-5, A317.

21.     Plaintiffs seek out and rely upon whistleblower and investigative employees' undercover investigations inside animal facilities—including industrialized farms and slaughterhouses—to pursue their mission-driven advocacy and educational efforts on matters of public concern including the treatment of animals, food safety, and the environmental effects of industrialized animal facilities. Walden Aff. 4, A022; Spector Aff. 8-9, 14, A244-45; Taylor Aff. 7-8, A302; Martin Aff. 5-6, A317.

22.     Because access to truthful information about the conditions and practices inside facilities that exploit animals is so vital to ALDF fulfilling its mission, ALDF retains investigators to conduct undercover investigations, described further below, at such facilities around the country. Walden Aff. 9, A023.

23.     For example, in 2016, ALDF conducted an investigation of a Nebraska pig breeding operation owned by The Maschhoffs, the nation's third-largest pig producer and a Hormel Foods supplier. The investigation revealed long-term neglect and lack of appropriate veterinary care, with pigs suffering for days or weeks with grossly prolapsed rectums, intestinal ruptures, large open wounds, and bloody baseball-sized ruptured cysts. Pigs were denied food for long periods of time, and a botched "euthanasia" resulted in a mother pig slowly dying after being shot in the head multiple times over the course of several minutes. Walden Aff. 10, A023.

24.     ALDF broadly disseminated the video, photos, and information gained in its Maschhoffs investigation to the media and its supporters, to educate consumers about Hormel's cruel and unnatural sourcing practices. Walden Aff. 11, A023-24; Walden Aff. Ex. D, A119-24.

25.     ALDF created an action alert to call on its audiences to advocate for supply chain reforms by Hormel, and prepared complaints to the Attorneys General of Illinois (where The Maschhoffs is based) and Nebraska, calling on them to take action to hold The Maschhoffs accountable for its legal violations. Walden Aff. 12, A024; Walden Aff. Ex. E, A125-50.

26.     ALDF later relied on the investigation in a false advertising lawsuit against Hormel over the company's "Natural Choice" products. And after ALDF's release of the investigation, Hormel suspended the supplier and promised an internal investigation. Walden Aff. 13, A024; Walden Aff. Ex. F, A151-56.

27.     Similarly, in 2015 ALDF conducted an employment-based undercover investigation of a Carthage, Texas-based Tyson Foods chicken slaughterhouse. Over the course of several months, ALDF's investigator documented the atrocious conditions suffered by the birds and workers inside the plant, with birds left to suffocate by the hundreds on overcrowded conveyor belts and discarded, still alive, in heaps of dead and dying chickens, feathers, and filth. Walden Aff. 14, A024.

28.     ALDF's investigation further documented the injuries and illnesses the investigator endured working on the chicken-hanging line, including carpal tunnel syndrome from attempting to hang 35 live birds a minute, eye infections from the chicken feces, dirt, dust, and dander that got into her eyes because of inadequate "protective" gear provided by Tyson, and extreme heat abrasion on her arms, which caused a painful, red rash. Walden Aff. 15, A024.

29.     ALDF's Tyson chicken slaughter investigation resulted in the filing of complaints—concerning the treatment of chickens, food safety, worker protection, and false corporate statements—with several federal and state agencies, as well as sustained efforts to engage ALDF's audiences about the suffering of chickens and mistreatment of workers in Tyson

facilities like the one ALDF investigated. Walden Aff. 16, A024-25; Walden Aff. Ex. G-H, A157-A239.

30.     CFS seeks out and relies upon whistleblower and investigative employees' undercover investigations inside industrialized farms and slaughterhouses to pursue its mission-driven advocacy on matters of public concern, including the treatment of animals, food safety, and the environmental effects of industrialized animal facilities. Spector Aff. 8, A244.

31.     CFS relies on and uses photos, video, and other information obtained during undercover industrial agriculture investigations from a variety of organizations and sources, including ALDF, to write online content accurately depicting the industrial meat industry, so as to educate the public about food safety concerns regarding industrial meat, misleading labels, and animal welfare concerns. Spector Aff. 9, 14, A244-45; Spector Aff. Ex. A-C, A248-99.

32.     From Shy 38's founding, the undercover investigation videos released by groups like ALDF have played a critical role in its mission-driven work to advocate for the humane treatment of factory farmed animals, and to educate the public about the evils of factory farms. Taylor Aff. 8-10, A302-03.

33.     Shy 38 believes that undercover investigation videos and images are crucial to the organization's ability to show the public, in Kansas and beyond, what farmed animals have to endure before becoming meat or producing the milk or eggs people eat. Taylor Aff. 6, A301.

34.     Shy 38 maintains an active presence on social media, its primary educational and outreach tool, and very frequently shares and posts images and videos gained through undercover investigations of factory farms and slaughterhouses. Taylor Aff. 8-10, A302-03.

35.     By using in its advocacy and sharing video footage and images from undercover investigations, Shy 38 hopes to motivate its followers and audience to adopt a humane, vegan

diet, to lobby their elected officials for more humane treatment of farmed animals, and to call on the companies producing and selling meat and other animal products to end their cruel factory farming practices. Taylor Aff. 7, A302.

36.     For example, in February of 2015, Shy 38 posted on Facebook an undercover video taken by Mercy for Animals at Wiese Brothers Farm in Wisconsin, showing workers viciously kicking, beating, and whipping cows in the face and body, and blood pouring from a cow's nose; Shy 38 called on viewers to sign a petition opposing Wisconsin's proposed Ag-Gag bill. Taylor Aff. 11-12, A303; Taylor Aff. Ex. A, A306-07.

37.     Similarly, in November of 2018, Shy 38 posted on Instagram an image taken by Animal Equality (and posted by the Humane League), showing a person holding a baby piglet by the head and using a metal device to cut the animal's teeth; Shy 38 urged viewers to go vegan. Taylor Aff. 11, 13, A303; Aff. Ex. D, A312-13.

38.     Images and information made public through undercover investigations are what motivated Hope Sanctuary's founding; if Hope could help consumers and decision-makers see the videos and images gained from undercover investigations, it believed, they would make more humane purchasing choices and demand corporate and legislative change to stop the institutionalized abuse of farmed animals. Martin Aff. 5, A317.

39.     Hope has therefore, for as long as it has operated, relied upon and used in its advocacy the undercover investigation videos of factory farms released by organizations like ALDF. Martin Aff. 6, A317.

40.     Hope engages in its advocacy through its website, on social media, and in person, using and sharing images and information gained through undercover investigations of factory farms and slaughterhouses. Martin Aff. 7-8, A317-18.

41.     For example, Hope often uses pamphlets published by the animal advocacy and rescue organization Farm Sanctuary, such as *The Truth Behind Pork*, which pulls back the curtain on what pigs endure in factory farms and slaughterhouses. Hope has used this pamphlet, showing cruel confinement of pregnant and lactating pigs in body-gripping gestation and farrowing crates, to educate its audiences about cruel practices in the pig industry, such as the use of these crates. Martin Aff. 9, A318; Martin Aff. Ex. A, A321-23.

42.     Undercover investigations of animal facilities have resulted in many news stories and have triggered legislative and regulatory changes, corporate reforms, criminal prosecutions, and consumer boycotts. A324-55; Spector Aff. Ex. B, A253-94.

43.     Plaintiff ALDF conducts such undercover investigations, while CFS, Shy 38, and Hope use and rely upon, but do not themselves conduct, such investigations. Walden Aff. 9, A023; Spector Aff. 8-9, 14 A244-45; Taylor Aff. 8, A302; Martin Aff. 6, A317; Defs' MSJ Ex. 2, Plaintiffs' Responses to Defendants' Requests for Admission Nos. 12-14.

44.     ALDF has the capability to conduct an undercover investigation of an animal facility in Kansas, and would do so but for the Kansas Ag-Gag law. ALDF possess the funds, infrastructure, expertise, and personnel necessary to complete an undercover investigation in Kansas, as well as to share information obtained from such an investigation with the public. Walden Aff. 17, A025; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 2.

45.     ALDF also has the current intention to conduct an undercover investigation in Kansas, and would do so but for its fear of criminal prosecution for violating the Kansas Ag-Gag law. This intention is a factor of the great need for undercover investigations to pursue ALDF's advocacy and fulfill its mission, coupled with ALDF's specific interest in Kansas as a site for

such investigations, because of its being a major locus of animal agriculture. Walden Aff. 18, A025; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 2.

46.    The investigation Plaintiff ALDF desires to carry out in Kansas would follow an established practice. ALDF would retain a qualified investigator to obtain photographic and/or video footage documenting the conditions inside a Kansas factory farm, slaughterhouse, or other animal facility. Working with the investigating entity, a target would be identified, and the investigator, or an investigator hired by the investigating entity ALDF retained, would go about gaining access to the facility, mostly likely, as ALDF's investigator did in Texas for the Tyson facility and Nebraska for The Maschhoffs facility, by applying for and securing employment at the facility. Walden Aff. 19-20, A025-26; Plaintiffs' Response to Defendants' Statement of Undisputed Fact (hereafter, "DUF") #12 (citing Plaintiffs' Second Supplemental Response to Defendants' Interrogatory No. 3).

47.    In order to secure such employment, or otherwise to gain access to the non-public parts of the animal facility, the investigator would be forced to conceal his or her true motive for applying for the job or trying to gain access. The investigator would either lie through omission—by concealing his or her affiliation with ALDF—or, if necessary, directly, by denying that she was being sent by an animal rights organization, a commonly-asked question in the application process for animal facility positions. Walden Aff. 20, A025-26; Pltfs' Response to DUF #12.

48.    The investigator would not lie about or misrepresent her qualifications in a way that would implicate safety or their fitness for the position; she would not represent that she has skills or certifications she does not possess. Investigators retained by ALDF are transparent about their relevant work experience and knowledge, only omitting their investigatory goals and

affiliation with an animal advocacy organization. Walden Aff. 21, A026; Pltfs' Response to DUF #12.

49.     Without deception (either by commission or omission) to conceal their investigatory motives and advocacy organization affiliations, ALDF-contracted investigators could not secure employment at an animal facility to conduct an investigation. Walden Aff. 20, A025-26; Pltfs' Response to DUF #12.

50.     Investigators pursuing investigations for ALDF may be hired in supervisory or management roles, or as employees with no supervisory responsibilities. During the course of their employment, ALDF-contracted investigators perform, to the best of their abilities, all aspects of the work they are hired to do. They receive the same training as normal employees, and are directed to carry out all tasks they are lawfully instructed to perform in good faith and to follow all applicable biosecurity and safety protocols. Walden Aff. 22, A026; Pltfs' Response to DUF #12.

51.     The investigators wear a minute camera on their clothing that is operated with no or virtually no effort, with which they covertly take video and audio recordings of what they observe as they perform their job functions inside the facility. Walden Aff. 23, A026; Pltfs' Response to DUF #12.

52.     During the course of an investigation, an ALDF-sent investigator may exercise control over animals or parts of the facility, whether by taking a managerial position, exercising supervisory authority, or temporarily closing off a part of the facility so as not to be observed photographing or videotaping the conditions. Walden Aff. 24, A026-27; Pltfs' Response to DUF #12.

53.     During the course of an investigation, the investigator may take minor steps to conceal himself to hide his investigative activities, such as by standing behind a wall or post in order to film a suffering animal undetected. Walden Aff. 25, A027; Pltfs' Response to DUF #12.

54.     The investigator will frequently be on notice that his investigative activities are forbidden by facility owners, because agricultural facilities commonly post notices forbidding nonconsensual access, photography, or video recording. Walden Aff. 26, A027; Pltfs' Response to DUF #12.

55.     At the conclusion of the investigation, ALDF publicizes the results of the investigations and uses the investigations to further its advocacy, by disseminating the footage to the media and ALDF's audiences, urging criminal prosecution where warranted, submitting regulatory complaints, and filing civil lawsuits. Walden Aff. 31, A027.

56.     Neither ALDF nor the investigators it sends intend to or would cause physical or tangible damage—actual destruction and theft of property—to any animal facility, animal, research facility, or field crop product. Walden Aff. 27, A027; Pltfs' Response to DUF #13.

57.     Neither ALDF nor the investigators intend to or would exercise actual and ongoing physical control over an entire animal facility. Walden Aff. 28, A027; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 4.

58.     Neither ALDF nor the investigators intend to or would physically conceal themselves until after an agricultural facility is closed for business or otherwise physically conceal themselves in order to be able to do actual physical damage. Walden Aff. 29, A027; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 4.

59.     Neither ALDF nor the investigators intend to or would enter and remain on the premises of an agricultural facility and refuse to leave after being specifically and directly

instructed to do so. Walden Aff. 30, A027; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 4.

60.     ALDF's undercover investigations are aimed at gaining an unvarnished look at goings on inside industrial farms, slaughterhouses, or other animal facilities. Walden Aff. 32, A028; Plaintiffs' Second Supplemental Response to Defendants' Interrogatory No. 3.

61.     In directing its investigating entity to document any illegal and unethical practices happening at the animal facility, ALDF acts with the specific goal of exposing to public view animal cruelty, unsafe working conditions, food safety violations, and other misconduct, in the hopes that such exposure will spur reforms. Walden Aff. 32, A028; DUF #12.

62.     ALDF proceeds with investigations intending that they have warranted negative consequences for the investigated facility and resulting economic harm, including boycotts, lost business, a plant closure, or other economic harm. Walden Aff. 33, A028; Walden Aff. Ex. I, A240-42; Pltfs' Response to DUF #12.

63.     Among these intended consequences are depriving the owner of animals found suffering and mistreated in the facilities by causing them to be removed from the owner and sent to sanctuary, or seized as evidence or to render aid to them as a result of a criminal investigation. Walden Aff. 34, A028; Pltfs' Response to DUF #12.

64.     If it were to proceed with an investigation of an animal facility in Kansas, ALDF would fear prosecution under the Kansas Ag-Gag law because of its role in facilitating, funding, supporting, and using the results of the investigation. This is the case even though ALDF does everything in its power to ensure that investigators sent on its behalf follow all applicable protocols and rules, and that the *only* damage caused is the economic consequences which flow

from public and government scrutiny of the conditions and practices they document. Walden Aff. 35, A028; DUF #13.

65.     If the Kansas Ag-Gag law was declared unconstitutional and its enforcement enjoined, ALDF would pursue an undercover investigation of an animal facility in Kansas. Walden Aff. 36, A029; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 2.

66.     Just as it has done with its and others' previous undercover investigations, ALDF would use the information, photos, and video gained through its and others' investigations of factory farms, slaughterhouses, and animal research facilities in Kansas to further its advocacy, educational, and programmatic efforts to expose and reform animal industries. Walden Aff. 37, A029; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory Nos. 2, 4.

67.     If ALDF conducted an undercover investigation in Kansas, it would share and make available the evidence it recovered to Plaintiffs CFS, Shy 38, Hope, and other peer organizations. Walden Aff. 38, A029.

68.     CFS would use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansas to further its advocacy, educational, and programmatic efforts to expose and reform industrial farming. Spector Aff. 11, A245.

69.     Shy 38 would jump at the chance to use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansas to educate its fellow Kansas about how farmed animals are being treated in their home state. Taylor Aff. 16, A304.

70.    The lack of such investigations in Kansas has been a major obstacle to Shy 38 fulfilling its mission, because Shy 38 is chiefly a Kansas organization trying to tell its fellow Kansans what the farmed animals in the state are experiencing right in their backyards. Taylor Aff. 15-16, A304.

71.    Without undercover investigations taken on factory farms in its home state, Shy 38 believes it cannot fully educate people about what farmed animals in Kansas and beyond need to be protected from. Taylor Aff. 17, A304-05.

72.    Hope would likewise use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansas in its advocacy, informing its audiences in the Kansas City region what farmed animals there endure, so as to create a rallying point to protect farmed animals in its home region. Martin Aff. 11-12, A318-19.

73.    For at least the past seven years, ALDF has devoted substantial organizational resources to countless activities in order to combat Ag-Gag laws around the country, including in Kansas. Walden Aff. 5, A022; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

74.    ALDF staff have engaged in numerous activities to publicize and support the organization's legal, legislative, and public advocacy against Ag-Gag, in a variety of settings and to a number of audiences, including: researching, drafting, editing, and disseminating numerous communications pieces, such as press releases, blogs, action alerts, donor communications, newsletters, social media posts, brochures, pamphlets, and other materials; and attorneys and staff speaking to audiences at conferences, symposia, law student events, and ALDF member and

supporter events. Walden Aff. 6, A022; Walden Aff. Ex. A, A031-86; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

75.     ALDF's Animal Law Program has provided Ag-Gag-related resources, content, Continuing Legal Education sessions, and other programming to legal audiences including attorneys, paralegals, judges, law students and to lay audiences. Walden Aff. 7, A022-23; Walden Aff. Ex. B, A087-109; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

76.     Each of these activities has required the expenditure of financial resources, including dozens of hours of paid staff time; payments to communications and operations vendors and contractors, such as designers and direct mail vendors; payments for printing and production of brochures, pamphlets, placards, and other collateral; travel and related costs for events; server upkeep and overhead; and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content). Walden Aff. 8, A023; Walden Aff. Ex. C, A110-18; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

77.     For at least the past six years, CFS has devoted substantial organizational resources to organizational activities in order to combat Ag-Gag laws around the country, including in Kansas. Spector Aff. 12, A245; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

78.     As part of CFS's Animal Factories Reform program, one of the organization's flagship program areas, CFS staff have engaged in numerous activities to publicize and support the organization's legal, policy, and outreach advocacy against Ag-Gag laws, including: researching, drafting, editing, and disseminating communication documents, such as reports,

press releases, blogs, social media posts, and action alerts; and attorneys and staff speaking to audiences at conferences and law school events and classes. Spector Aff. 13, A245; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

79.     CFS's Ag-Gag-related activities have required the expenditure of financial resources, including dozens of hours of salaried or hourly staff time; payments to communications and operation vendors and contractors, such as designers; server upkeep and overhead, and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content). Spector Aff. 15, A245-46; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

80.     Kansas's Ag-Gag law forces CFS to do public outreach and education about Ag-Gag laws generally, including Kansas's, and as such CFS has less money and time to devote to outreach on topics that are central to its mission. Spector Aff. 15, A246.

### Introduction

Plaintiffs incorporate by reference the introduction to their Memorandum in Opposition to the Defendants' Motion for Summary Judgment ("Pltfs. Opp. Mem.") at 1-3.

### Argument

I.    **THE UNDISPUTED FACTS DEMONSTRATE THAT THE PLAINTIFFS HAVE STANDING TO CHALLENGE EACH OF THE SPECIFIED PROVISIONS OF THE KANSAS AG-GAG LAW.**

This case arises in the context of a nationwide effort in agricultural states such as Kansas to protect the commercial animal agriculture industry from undercover investigations that have exposed inhumane practices and violations of legal and regulatory provisions. That Kansas would desire to protect such industries from public criticism is no surprise, given the importance of animal agriculture to the State's economy. Pltfs SJ Mem., Statement of Undisputed Fact (hereafter, "Pltfs SUF") 1-3. Information obtained by undercover investigations of animal facilities has resulted in many news stories and has triggered legislative and regulatory changes, corporate reforms, criminal prosecutions, and consumer boycotts. Pltfs SUF #42, A324-55, A253-94.

In the present case, ALDF has provided evidence that it has engaged in the type of speech-producing undercover investigations that are directly restricted by the Kansas Ag-Gag law. Pltfs SUF #22-29, A023-25, A119-239. It has provided undisputed evidence that it has the present capability and desire to engage in such investigations in Kansas. Pltfs SUF #44-45, A025. And it has made a plausible claim that it will not carry out such an investigation out of fear that it or its investigators will be prosecuted under the challenged provisions of the Kansas Ag-Gag law. *Id.* Plaintiff ALDF conducts such undercover investigations, while Plaintiffs CFS,

Shy, and Hope use and rely upon, but do not themselves conduct, such investigations. Pltfs SUF #43, A023, A244-45, A302, A317.

To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (citation omitted); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) ("chilling effect" on plaintiffs established by "(1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced" (emphasis in original)). Furthermore, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U. S. 452, 459 (1974).

The uncontroverted evidence demonstrates that ALDF is being unconstitutionally chilled from engaging in core First Amendment-protected activity by the reasonable fear of prosecution under the Kansas Ag-Gag law. It further demonstrates that all Plaintiffs have been unlawfully deprived of the information that each depends upon to further their mission-driven activities, and that ALDF and CFS have also suffered organizational injuries by having to divert resources to address the harms to their missions caused by the Kansas Ag-Gag law. Each of these injuries is fairly traceable to the Kansas Ag-Gag law, and would be fully redressed by the law's invalidation.

2

Because ALDF-sent investigators are highly likely, in the course of an undercover investigation, to violate one or more of the law's provisions, they would be subject to criminal prosecution, thus imposing a chill on their and ALDF's protected First Amendment activities. The Kansas Ag-Gag law provides that persons convicted of violating its provisions can face up to 16 months' imprisonment and a fine of up to $2500. K.S.A. § 47-1827(g). They may also be placed on probation for up to two years. *Id.* [3]; *see also* https://www.sentencing.ks.gov/docs/default-source/2013-forms/sentencing-range---nondrug-offenses.pdf?sfvrsn=0.

A.      **The Undisputed Facts Show That Plaintiff ALDF and Its Investigators Would Violate the Kansas Ag-Gag Statute by Carrying out Undercover Investigations.**

1.    **ALDF's Undercover Investigation Practices**

Plaintiff ALDF carries out undercover investigations of animal facilities in a specific manner, described below. DUF #12; Pltfs SUF #46-55, A025-027. It is prevented from doing so in Kansas only by the Kansas Ag-Gag law. Pltfs SUF #64-65, A028-029. In order to assess ALDF's injury, its investigative practices must be compared to the Ag-Gag law's provisions.

As it has done in other jurisdictions, ALDF would hire a qualified investigator or investigative entity to secure access to a Kansas factory farm, slaughterhouse, animal research, or other animal facility, to gain a first-hand look at the conditions inside and obtain photographs and/or video footage. Pltfs SUF #46, 60, A025-26, A028. ALDF would direct its investigator to

---

[3] In addition to the criminal penalties under the law, according to the Kansas Attorney General Opinion, the law's chilling effect is enhanced by the possibility of exposure to restitution for reputational and publication damages and a civil damages provision trigged by "a violation of K.S.A. 47-1827," for up "equal to three times all actual and consequential damages" and "court costs and reasonable attorney fees," K.S.A. § 47-1828, also including liability for "for impairment of reputation, personal humiliation, and loss of profit, both present and future." Pltfs SUF #12-13, A002, A009-11. These arguments are presented in greater detail in Pltfs. Opp. Mem., at 8-9, 12-13.

document any illegal and unethical practices happening at the facility, with the specific goal of exposing to public view any animal cruelty, unsafe working conditions, food safety violations, and other misconduct discovered therein. Pltfs SUF #61, A028; DUF #12.

The investigator would seek to gain access to the facility, mostly likely by applying for and securing employment at the facility. Pltfs SUF #46, A025-26. In order to secure such employment, or otherwise to gain access to the non-public parts of the facility, the investigator would need to conceal her true motive for applying for the job or trying to gain access. Pltfs SUF #47, 49, A025-26. She would either lie through omission—concealing her affiliation with an animal advocacy group—or, if necessary, directly, by denying that she was being sent by such an organization, a commonly-asked question in the application process for animal agriculture facility positions. *Id.*

While working at the facility, the investigator would perform all the duties of her job while concealing a hidden camera worn on her clothing and operated with no or virtually no effort (so as not to interfere with the investigator's ability to safely and competently perform the tasks required of the position). Pltfs SUF #50-51, A026. In carrying out her investigation, the investigator may have to take steps to ensure that her investigative activities are not discovered. Pltfs SUF #52-53, A026-27.  The investigator could exercise control over animals or the facility (or sections thereof), whether by taking a managerial position, exercising supervisory authority, or temporarily closing off a part of the facility so as not to be observed photographing the conditions. Pltfs SUF #52, A026-27.

In carrying out an investigation, ALDF and its investigator would have the intent to deprive the owner of such animals in that ALDF would intend the resulting negative publicity from the investigation to lead the animals to be removed from the facility, whether to be taken to

a sanctuary or, in a criminal investigation, to be seized as evidence or to render aid to them. Pltfs SUF #62-63, A028.

An ALDF-retained investigator could also remain concealed by hiding behind a door or wall for the time needed to take a photograph or capture something on video, in order to record the activity undetected. Pltfs SUF #53, A027. Furthermore, it is likely that the investigator would be on notice that her investigative activity was forbidden by the facility's owners, since agricultural facilities commonly post notices posted forbidding nonconsensual access, photography, or video recording, putting the investigator on notice that she should leave. Pltfs SUF #54, A027.

ALDF would pursue its investigation knowing full well that exposing the facility's practices might lead to boycotts, lost business, a plant closure, or other harm to an investigated facility's or its affiliates' reputations resulting from the adverse publicity, causing foreseeable economic harm to the enterprise. Pltfs SUF #61-62, A028. ALDF would carry out its investigation fully intending that it have these warranted economic consequences. *Id.*

### 2. Undercover Investigations Following ALDF's Practices Would Violate Sections 47-1827(c)(1), 47-1827(c)(3), and 47-1827(c)(4).

The Kansas Ag-Gag statute criminalizes several different components of the standard investigative methods used by ALDF and other animal advocacy organizations. First, the law prohibits deceptive entry onto animal facilities to engage in photography and video recording: "No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility . . . enter an animal facility to take pictures by photograph, video camera or by any other means." § 47-1827(c)(4) ["Photography and Video Recording Provision"]. Second, two provisions prohibit deceptive entry with the intent to commit an act prohibited by another provision of the law or to commit or attempt to commit an

act prohibited by another provision of the law, which includes the Photography and Video Recording Provision: "No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility . . . Enter an animal facility, not then open to the public, with intent to commit an act prohibited by this section [including section (c)(4)]." § 47-1827(c)(1). "No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility . . . enter an animal facility and commit or attempt to commit an act prohibited by this section [including section (c)(4)]." § 47-1827(c)(3).

Although the original 1990 law included these provisions, it was not until 2012 that the Kansas legislature amended the law to expand the meaning of "effective consent." DUF #7. After that amendment, the law specifically dictates that "Consent is not effective if . . . Induced by . . . fraud, [or] deception." § 47-1826(e)(1). The 2012 amendment thus broadened the law to explicitly cover undercover investigations (the hallmark of which is the use of deception to secure access or employment, as noted above), coinciding with a wave of other Ag-Gag bills introduced in many states that year.[4]

The investigative practice employed by ALDF and peer animal advocacy organizations expressly involves investigators seeking employment at animal agriculture and research facilities using deception by omitting or affirmatively misrepresenting their association with an animal rights group. It is simply common sense that, were investigators to disclose their true motives for

---

[4] In 2012, Utah and Iowa successfully enacted Ag-Gag bills, both of which have been declared unconstitutional. *Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812, 827 (S.D. Iowa 2019) (*Reynolds II*); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1213 (D. Utah 2017). That same year, Missouri enacted an Ag-Gag bill and six other states—Florida, Illinois, Indiana, Minnesota, Nebraska, New York—introduced Ag-Gag bills that were not enacted. Jessalee Landfried, *Bound & Gagged: Potential First Amendment Challenges to "Ag-Gag" Laws*, 23 DUKE ENVTL. L. & POL'Y F. 377, 378-79 & n.13 (2013) ("between 2011 and 2013, legislative interest in ag-gag bills exploded.").

seeking access to such facilities, consent would be denied. Pltfs SUF #49, A025-026. Thus, investigators would be entering an animal facility without "effective consent" with the intent "to take pictures by photograph, video camera or by any other means," which would violate all three subsections. Moreover, although ALDF-sent investigators never intend to cause physical harm or tangible damage (Pltfs SUF #56, A027; DUF #13), they would seek access to a facility through deception (i.e. without the owner's "effective consent") with the intent to "damage the enterprise conducted at the animal facility" because the organization's mission includes obtaining and disclosing information about animal cruelty and other misconduct in the animal agriculture and research industries. Pltfs SUF #55, 61, A027-28. Such exposure could—and very often does— harm an "enterprise" (i.e., business) through consumer boycotts, loss of business or goodwill due to reputational harm, plant closures, and lost profits from any business lost as a result of the public blowback. Pltfs SUF #62, A028, A240-42.

ALDF has presented uncontroverted evidence that in its standard investigations, as demonstrated by past investigations it has actually conducted, investigators use deception to obtain employment in order to gain access to animal facilities and observe and video record abusive treatment of animals. Pltfs SUF 47-49, A025-26. Put simply, this is the *only* way that investigators could possibly gain access to animal facilities, which is why so many states have tried to outlaw this speech-producing conduct. *Id.* This conduct would be a clear violation of 14-1827(c)(1), (c)(3) and (c)(4).

Because ALDF conducts such investigations with the objective of exposing misconduct to the public, which foreseeably will lead to negative publicity, and other responses that are likely to reduce agricultural enterprises' profits due to consumer boycotts or reputational harm, these investigative actions meet the element that they must be done with the "intent to damage

the enterprise." The legislature's clear focus to protect the *business enterprise* of animal agriculture and research operations, meaning, to shield such enterprises from reputational harm, lost profits, or other consequences of bad conduct exposed through undercover investigations, is clear from the text. However, ALDF's fear of prosecution under the Kansas Ag-Gag law is substantially heightened by a 1990 Kansas Attorney General Opinion making clear the statute covers this type of reputational damage. Pltfs SUF #12-13, A009-11. In response to a specific question about whether the phrase "intent to damage the enterprise conducted at the animal facility" is limited to physical damage or whether it also "includes damages resulting from the later publication of a photograph taken at the facility," the Attorney General explicitly endorsed the latter notion. *Id*. at A009-10.[5] This reading of the law's criminal prohibitions is confirmed by the statute's restitution and civil damages provisions, as the Attorney General Opinion explains, which provide for compensation if the public is informed of and reacts to wrongdoing, resulting in impairment of an animal enterprise's reputation and lost profits. *Id*. at A010-11.[6]

> **3.    Undercover Investigations Following ALDF's Practices Would Further Expose ALDF and Its Investigators to Criminal Liability for Violating 47-1827(c)(2) and 47-1827(d)(1).**

Two additional provisions of the Kansas Ag-Gag law expose Plaintiff ALDF and its investigators to criminal liability because the provisions employ broad language that is not further defined under the law. Plaintiffs challenged the part of Kansas Ag-Gag law that prohibits a person from "remaining concealed, with intent to commit an act prohibited by this section" including the photography and video recording provision, § 47-1827(c)(2) ["Concealment Provision"], and the provision that prohibits deceptive entry to an animal facility if the person

---

[5] Under Kansas law, attorney general opinions are not binding, but are "persuasive authority," *Willis v. Kansas Highway Patrol*, 41 P.3d 824, 829 (Kansas 2002) (*citing City of Junction City v. Cadoret*, 946 P.2d 1356 (Kansas 1997)).

[6] Of course, it the Court finds the Plaintiffs have standing to challenge *any* provisions of the Kansas law, the case must proceed with respect those provisions.

has notice that such entry is forbidden. § 47-1827(d)(1) ["Notice Provision"].

As supported by record, ALDF-sent investigators sometimes have to briefly conceal themselves to avoid being detected while they conduct their investigations and take photographs or video recordings. Pltfs SUF #53, A027. Furthermore, the investigators frequently enter facilities using deception and observe posted notices that designed to exclude investigators. Pltfs SUF #54, A027. Because subsections (c)(2) and (d)(1) are broadly worded and unlimited by scope or time, prosecutors could invoke them to go after investigators who concealed themselves, however briefly, in order to take a photograph or video recording undetected, or an investigator who enters an animal facility through deception where the facility had posted notices forbidding nonconsensual access, photography, or video recording. Because the latter situation is common, it would permit animal facility owners to effectively use such notices to stop speech activities, something akin to a heckler's veto. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 880 (1997) (noting the First Amendment problems with laws that allow private entities to stop others' speech). ALDF therefore has a reasonable fear of being prosecuted under these two provisions.

### 4. Undercover Investigations Following ALDF's Practices Would Further Expose ALDF and Its Investigators to Criminal Liability for Violating Sections 47-1827(a) and 47-1827(b).

Finally, the undisputed facts show that ALDF's investigations are also facial violations of section 1827(a) and 1827(b). Section 1827(a) ["Damage Provision"] makes it a crime to "damage or destroy an animal facility" without the effective consent of the owner, and with the intent to "damage the enterprise conducted at the animal facility."

In its entirety, that section states that "No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, damage

or destroy an animal facility or any animal or property in or on an animal facility." 47-1827(a). An ALDF investigation could "damage" an animal facility by exposing misconduct that has occurred there, causing it to lose customers or suppliers because of the publication of truthful information that damages its reputation. Because the word "damage" is not further defined, and because the Kansas Attorney General Opinion equates damage to the enterprise conducted at the facility to include reputational harm and other intangible losses, Pltfs SUF #12-13, A009-11, a Kansas prosecutor could charge ALDF and/or its investigator with damaging an animal facility for truthfully disclosing accurate information about misconduct occurring at an animal facility, having known and intended that such disclosure would have warranted negative economic consequences for the facility. To read the statute otherwise, would be to give "damage" different meanings in two parts of the same sentence of 1827(a). *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning. . . . We therefore avoid interpretations that would 'attribute different meanings to the same phrase.'") (citations omitted).

Since there have been no implementing regulations or assurances of non-enforcement here, this Court should evaluate the constitutionality of a statute by assessing the manner in which it is implemented and enforced by the governmental officials who administer it. *See, e.g., Forsyth Cnty., Ga. v. Nationalist Movement,* 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, *we must consider the county's authoritative constructions of the ordinance*, including its own implementation and interpretation of it.") (emphasis added); *Jordan v. Sosa*, 654 F.3d 1012, 1019–20 (10th Cir. 2011).

Section 1827(b) broadly prohibits persons from exercising "control" over an animal facility without the owner's effective consent, and with the "intent to deprive the owner of such

facility, animal or property and to damage the enterprise conducted at the animal facility."
["Control Provision"].  As supported by evidence of the investigative practices ALDF uses,
ALDF and/or its investigator might be prosecuted under the Control Provision if the investigator
exercises "control" over an animal facility by taking on any supervisory role, or taking relatively
minor steps to further her investigation, such as briefly closing off a part of a facility to avoid
being observed while photographing the conditions. Pltfs SUF #52, A026-27. Though ALDF
investigators would not physically remove an animal from a facility, Pltfs SUF #56, A027, an
investigation could well lead to publicization of animal cruelty or other misconduct at an animal
facility, prompting public officials to seize animals during a pending criminal investigation, or
remove them to a sanctuary in order to protect their welfare, thus "depriving" the animal facility
of some or all its animals—consequences ALDF fully intends, if the situation warrants. Pltfs
SUF 62-62, A028. This removal to protect the animals would meet the definition of "deprive"
because it would result in the withholding "of the animal from the owner permanently or for so
extended a period of time that a major portion of the value or enjoyment of the animal . . . is lost
to the owner." 47-1826(d)(1).

Although the Damage Provision *might* be more narrowly read to mean only actual
physical damage and the Control Provision *might* be more narrowly read to mean exercising
actual physical control over an entire animal facility, nothing in the statute limits a prosecutor
from using these provisions to target an undercover animal facility investigator, and Defendants
do not dispute ALDF's investigative practices described above.

C.    **All Plaintiffs Have Standing As Listeners Denied Information Vital to Each's Ability to Fulfill Its Mission.**

All Plaintiffs, including CFS, Shy, and Hope, have standing because they have shown
through undisputed facts that they rely on information produced by ALDF's and others' similar

undercover investigations, which are currently prohibited by the Kansas Ag-Gag law.[7] Pltfs SUF #21, 43, A022, A244-45, A302, A317.

When a Plaintiff raises a First Amendment challenge as a recipient of information from a willing speaker, the recipient "need not be subject to a speech restriction in order to have standing to advance a challenge. First Amendment protections extend to both speakers and listeners, the latter having a right to receive information and ideas." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1115 (10th Cir. 2008) (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976)); *see also U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1232 (10th Cir. 1999) ("Effective speech has two components: a speaker and an audience [and a] restriction on either of these components is a restriction on speech.").

In *Kansas Judicial Review*, the court found that an organization, KJR, which sought information from judicial candidates, had standing to challenge a rule that limited those same candidates' ability to respond, even though KJR itself was not directly subject to the rule. *Kansas Judicial Review*, 519 F.3d at 1115. The fact that the rule choked off the supply of information to KJR gave it a sufficient injury to raise a free speech challenge. *Id.* Like the rule at issue in *Kansas Judicial Review*, the Kansas Ag-Gag law eliminates Plaintiffs' access to information that is vital to their political, advocacy, and educational missions. Pltfs SUF #31, 66, 69-72, A029, A244-45, A304-05, A318-19.

Indeed, undercover investigations are indispensable to Plaintiff Shy's and Plaintiff Hope's advocacy and activities. To adequately fulfill their missions of educating Kansas

---

[7] Even though each Plaintiff amply demonstrates its standing, in the event that this Court finds that any Plaintiff has standing, it need not analyze the standing of the remaining Plaintiffs. *See Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981) ("Because we find [that one plaintiff] has standing, we do not consider the standing of the other plaintiffs."); *see also Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1114 (10th Cir. 2010); *State of Utah v. Babbitt*, 137 F.3d 1193, 1215 n. 36 (10th Cir. 1998).

audiences about what farmed animals in Kansas endure, and protecting farmed animals in the Kansas region, each strongly desires to access and use undercover investigations of animal agriculture facilities *in Kansas*—desires that are thwarted by the Kansas Ag-Gag law. Pltfs SUF #33, 70-72, A301, A304-05, A318-19. Shy and Hope thus would be not merely an audience, but the *primary* listeners, in the event that ALDF or another animal advocacy group was able to conduct and share the results of an undercover investigation in Kansas. Pltfs SUF #69, 72, A304, A318-19. These uncontroverted facts conclusively demonstrate each's standing. Plaintiff CFS, likewise, has put forth undisputed evidence that it relies upon speech produced by Plaintiff ALDF's and others' similar investigations inside industrialized farms and slaughterhouses to pursue its mission-driven advocacy on matters of public concern, including the treatment of animals, food safety, and the environmental effects of industrialized animal facilities. Pltfs SUF #31, A244-45, A248-99.

### D.   Plaintiffs ALDF and CFS Can Also Establish *Havens* Standing.

Plaintiffs ALDF and CFS also have standing as organizations that have diverted their financial and human resources to identify and combat an alleged unlawful practice. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co*., 160 F.3d 433, 434-35 (8th Cir. 1998). "Self-inflicted" harms do not convey standing, but where an organization incurs expenditures to counter the effects of a defendant's alleged unlawful conduct, an organization sustains an injury in fact. *People for the Ethical Treatment of Animals v. U.S. Dep't. of Agric*., 797 F.3d 1087, 1096-97 (D.C. Cir. 2015). Given the long track record of both ALDF and CFS expending resources to address the impediments to their mission-driven advocacy that Ag-Gag laws impose (Pltfs SUF #73, 77, A022, A245), it is implausible that they have engaged in such work simply to "manufacture" standing.

ALDF's and CFS's missions are both frustrated by the Kansas Ag-Gag law. ALDF's mission is to use education, public outreach, investigations, and other means to protect the lives and advance the interests of animals, including those raised for food. Pltfs SUF #15, A021-22. CFS's mission is to empower people, support farmers, and protect the earth from the harmful impact of industrial agriculture. Pltfs SUF #16, A243. The Ag-Gag law frustrates these missions by criminalizing the undercover investigations that ALDF carries out and that both organizations rely on to carry out those missions. ALDF and CFS have both suffered a consequent drain on their resources from the Ag-Gag law. Pltfs SUF #74-79, A022-23, A245-46. They have each deflected financial and human resources away from their core educational and outreach programs to focus on the social harms of the law. *Id.* As a result, each has less money and time to devote to outreach on topics that are central to their missions, such as animal rescues, educating the public about the harms of industrial farming, and other forms of abuse, neglect, and cruelty to animals. *Id.*

These injuries confer organizational standing. *Havens*, 455 U.S. at 379 (holding that the allegation that an organization "had to devote significant resources to identify and counteract" the defendants' unlawful practices constituted injury in fact, not "simply a setback to the organization's abstract social interest"). And indeed, courts have often recognized ALDF's and other animal protection organizations' standing in analogous situations. *See Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 917 (S.D. Iowa 2018) ("*Reynolds I*") ("ALDF alleges that some of its resources used for promoting animal welfare have been diverted toward advocating for the repeal of § 717A.3A. These are precisely the sort of injuries that suffice to confer organizational standing in this manner"); *see also People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F.Supp.3d 1327, 1337-41 (S.D. Fla. 2016) (finding that

14

PETA had *Havens* standing to challenge ESA violations), *aff'd People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1146 (11th Cir. 2018).

## II.     THE KANSAS AG-GAG LAW UNCONSTITUTIONALLY REGULATES PROTECTED ACTIVITY IN THE PRODUCTION OF SPEECH.

### A.     Deception-Based Undercover Investigations Constitute A Core Form of Protected Speech Because They Produce Speech and Information on Matters of Public Concern.

As several federal courts have recognized, investigative deceptions to gain lawful access to commercial agricultural facilities for the purpose of gathering information, including taking photographs and video recordings, with the intent to later publish such information to inform public discourse, is a form of activity protected by the First Amendment. *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194-95 (9th Cir. 2018); *Reynolds II*, 353 F. Supp. 3d at 827; *Herbert*, 263 F. Supp. 3d at 1205-06.

The Kansas law prohibits speech: using "deception" to gain access to an animal facility with the intent to expose misconduct therein. Deception in its most common form involves pure speech. For example, an investigator might lie to the animal facility owner by denying any affiliation with an animal rights group, which would lead to access by deception. Indeed, one cannot violate the law *without* engaging in speech that leads to the owner's consent to enter the facility. Investigators seek access to animal facilities in order to gather information as part of the process of producing speech. It has long been recognized that the First Amendment protects conduct that is an essential precursor of speech as well as actual speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). *See generally* Ashutosh Bhagwat, *Producing Speech*, 56 WM. & MARY L. REV. 1029 (2015).

And as several federal courts have also recognized, Ag-Gag laws are not beyond First Amendment scrutiny simply because they forbid false speech. *Wasden*, 878 F.3d at 1194-95 (9th Cir. 2018); *Reynolds II*, 353 F.Supp.3d at 821-22; *Herbert*, 263 F. Supp. 3d at 1205-06. In *United States v. Alvarez*, 567 U.S. 709 (2012), the Supreme Court ruled that there is no "general exception to the First Amendment for false statements." *Id.* at 718 (plurality opinion). In that case, the Supreme Court struck down the Stolen Valor Act because it criminalized false statements related to receiving military honors without requiring that any "legally cognizable harm" result from the lie. *Id.* at 719.

The Idaho Ag-Gag law invalidated by the Ninth Circuit in *Wasden*, 878 F.3d at 1194, was virtually identical to three provisions of Kansas's law here, 47-1827(c)(1), (c)(3), and (c)(4). The Idaho law made it a crime to gain entry into an agricultural production facility "by force, threat, misrepresentation or trespass." Idaho Code Ann. § 18-7042(1)(a). The Ninth Circuit flatly rejected the State's claim, like Kansas's here, that the law only regulated conduct rather than speech.  It stated:

> The targeted speech—a false statement made in order to access an agricultural production facility—cannot  . . . be characterized as simply proscribing conduct. Like the statute in *Alvarez*, subsection (a) "seeks to control and suppress all false statements [related to access] in almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain.

*Wasden*, 878 F.3d at 1194–95 (citing *Alvarez* at 722–23 (plurality opinion)). Iowa's first Ag-Gag law also closely tracks the operative provisions of the Kansas Ag-Gag law, prohibiting obtaining "access to an agricultural production facility by false pretenses." Iowa Code § 717A.3A.  In denying a motion to dismiss the plaintiffs' challenge to the Iowa law, the court held "Section 717A.3A on its face regulates what persons 'may or may not say' and thus is a restriction on speech." *Reynolds I*, 297 F.Supp.3d at 918.

Since the Supreme Court's decision in *Alvarez*, there is now a presumption that even false statements of fact (such as, "I have no affiliation with an animal welfare group") are covered by the First Amendment's protection unless the prohibited lies either cause legally cognizable harms or generate unjust material gains for the speaker. *See Alvarez*, 567 U.S. at 719, 722-23 (plurality opinion); *id*. at 734 (Breyer J., concurring)). Because several provisions of the Kansas Ag-Gag law criminalize gaining access to an animal facility through deception, the law directly burdens a category of falsehoods and there is no legally cognizable harm corresponding to such mistruths.

As the Ninth Circuit held in *Wasden*, "[t]he hazard" of a prohibition on gaining access by misrepresentation "is that it criminalizes innocent behavior, that the overbreadth of [that prohibition] is staggering, and that the purpose of the statute was, in large part, targeted at speech and investigative journalists." 878 F.3d at 1195. Furthermore, an entry by misrepresentation "alone does not constitute a material gain, and without more, the lie is pure speech." *Id*.

While Defendants might make vague assertions about some sort of private property interests advanced by the Ag-Gag law, in fact there is no property interest compromised by investigators who gain access to an animal facility by deception. Lying to gain access to an animal facility does not violate any generally applicable trespass laws because when they obtain consent to enter the premises of an animal facility through their deception, investigators are then authorized to be present on the property and such facilities are open to their employees, even when otherwise closed to the general public. *Cf*. K.S.A. 2018 Supp. 21-5808; *see generally Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) ("The fact is that consent to an entry is often given legal effect even though the entrant has intentions that if

17

known to the owner of the property would cause him for perfectly understandable and generally ethical or at least lawful reasons to revoke his consent.").

This is in accord with precedent in this circuit as well. In *Western Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017) ("*Western Watersheds II*"), the Tenth Circuit, in overturning the district court's conclusion that private property boundaries limit the reach of the First Amendment, held "that the statutes [at issue there] regulate protected speech under the First Amendment and that they are *not shielded from constitutional scrutiny merely because they touch upon access to private property*." *Id.* at 1192 (emphasis added). *See also Watchtower Bible & Tract Soc'y of N.Y. v. Village of Stratton*, 536 U.S. 150, 154 (2002) (invalidating regulation prohibiting "going in and upon *private* residential property" without permission, because it applied only to entrants who have the "purpose of promoting a[] cause" when they entered). In *Western Watersheds II*, the court stated that "the fact that one aspect of the challenged statutes concerns private property does not defeat the need for First Amendment scrutiny" 869 F.3d at 1195 (*citing Watchtower Bible*).

The court went on to hold that the district court erred in stating the First Amendment did not apply on private property by incorrectly extending the case law on generally applicable statutes. It explained that while a person has no "right to trespass[,]" that "misstates the issue." *Id.* at 1194. The state's "differential treatment of individuals who create speech" directly implicated the First Amendment no matter where the speech occurred—meaning the law was not "generally applicable." *Id.* at 1197. In fact, because *Western Watersheds II* addressed a statute that chilled the "creation of speech," *id.* at 1196, rather than a statute directly criminalizing speech like the Kansas Ag-Gag law, the First Amendment interests and protections here are even stronger.

C.     **The Kansas Ag-Gag Law is Both Viewpoint and Content Based and Thereby Subject to Strict Scrutiny.**

Under well-settled First Amendment jurisprudence, a law that is *either* viewpoint- or content-based is subject to strict scrutiny, and can be upheld only if the government can demonstrate that the law is necessary to serve a compelling governmental interest that could not be advanced by less restrictive alternatives. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *Alvarez*, 567 U.S. at 729. In several different ways, the Kansas Ag-Gag law is both viewpoint- and content-based.

First, reading the statute in light of the Attorney General Opinion, it punishes those who have the "intent to damage the enterprise," which includes those who intend to expose misconduct at animal facilities, leading to reputational damage and lost profits. Pltfs SUF #12-13, A009-11. In contrast, someone who gains access to an animal facility and publishes information singing the praises of an agricultural enterprise would not be subject to criminal punishment, as they would not bear the requisite intent.

This underscores the statute's purpose, which is to protect the reputation and profits of one of the largest animal agriculture producers in the United States. As Plaintiffs have shown, Kansas is the among the largest animal agriculture producers in the United States, accounting for nearly 11% of commercial red meat production nationwide. Pltfs SUF #1. It has the third most cows of any state in the United States (6.3 million) and is also among the country's largest producers of pigs—with approximately two million pigs raised for slaughter. Pltfs SUF #2-3.

Moreover, legislators in Kansas surely had animal rights groups in mind when they enacted the Ag-Gag law. An article introduced in the Minutes of the Kansas Senate Committee that was studying the Ag-Gag bill that became K.S.A. 14-1827 specifically identified Plaintiff ALDF as one of its concerns. Pltfs SUF #10, Defs' MSJ Ex. 8, AG000102. The article, originally

published in *Drovers Journal*, a beef industry publication, observed that: "There are now several groups that sponsor legal defense funds for animals. One is the Animal Legal Defense Fund, a nationwide network of 250 attorneys. ALDF has fought hot-iron face-branding of dairy cows, veal calf confinement and the patenting of genetically altered farm animals." *Id.* The article goes on, "But right now *the animal rights movement seems to be growing in numbers, clout, zeal, sophistication* and willingness to fight livestock producers." *Id.* (emphasis added).

Furthermore, another article considered by that Senate Committee overtly expressed concern about the *speech* of animal rights groups. In that article, published in *Beef Today* in 1990, the author, speaking of the animal rights movement noted "many of these people are *well spoken and skilled at getting their points out to the general public*." Pltfs SUF #11, Defs' MSJ Ex. 8, AG000107-11 (emphasis added). This article goes on to describe the fact that for another animal rights organization, People for the Ethical Treatment of Animals ("PETA"), "Education plays the key role here. PETA distributes videotapes showing pigs castrated and ear-notched without anesthesia, and pigs in farrowing crates and slaughterhouses, and asks whether this is an ethical society and whether we can endure this treatment." *Id.*

Furthermore, the context in which the law was enacted demonstrates that its proponents were antagonistic toward animal rights activists. In 2012, when the Kansas legislature was debating the amendment to the original act, to prohibit gaining access to an animal facility by deception, the legislative record demonstrates that it was designed to target animal rights activists. In a document produced by the Defendants as part of the official legislative history, it is noted that the law is:

> being amended to specify that 'effective consent' shall not be deemed to include consent induced by fraud, deception, or duress (SB414, Page 27, Section 41 e(1)). In some states, animal rights activists with an anti-agriculture agenda have lied on job applications in order to gain access to farms or ranches and take undercover

video, some of which is believed to be staged.  This amendment is a tool that can
be used against people using fraud to gain access to farms.

DUF #7.b., Defs' MSJ Ex. 14, AG0000208. This evidences the legislature's purpose in enacting

the law "'because of disagreement with the message' [the speech] convey[s]." *Reed*, 135 S. Ct. at

2227 (quoting *Ward v. Rock Against Racism*, 491 U. S. 781, 791 (1989)). *See also id*. at 2222

("strict scrutiny applies *either* when a law is content based on its face *or* when the purpose and

justification for the law are content based." (emphasis added).

The Ag-Gag law's industry-specific scope also reveals its viewpoint-discrimination. Like

other states that have adopted Ag-Gag laws, Kansas focused its criminalization on undercover

investigations in animal industries, reflecting its desire to snuff out only investigations about the

treatment of animals in commercial settings. The law does not prohibit the use of deception to

gain access to nursing homes, child-care facilities, or immigration detention centers for the

purpose of video recording, suggesting that Kansas's interest is in suppressing public discourse

and debate only about animal industries.

Even if the law is not viewpoint based, it is nonetheless content-based and therefore still

subject to strict scrutiny. The law is content based because it overtly discriminates between

truthful and non-truthful speech. *Reynolds II*, 353 F. Supp. 3d at 822. Gaining access to an

animal facility by using truthful statements is not criminalized; gaining access by lying can land

you in prison.

Applying strict scrutiny, there is no possible manner in which the Defendants could meet

their burden to show that the Ag-Gag law serves a compelling purpose, as they introduced no

record evidence of any anticipated harms that might result from an undercover agriculture

investigation. Defendants also failed to produce any record evidence supporting any of their

speculative arguments about any legitimate governmental interest advanced by the Ag-Gag law.

Even where they raise concerns about property or privacy rights, again unsupported by the record, any legitimate interests that Kansas has could be served by less speech restrictive means.

### C.   Even if the Kansas Ag-Gag Law is Content Neutral, it is Not Narrowly Tailored to Serve a Significant Government Interest

Even if the Ag-Gag law could somehow be construed as content neutral, the law would still be subject to a form of heightened, though not strict, scrutiny. For content neutral regulations of speech, the government must show that its laws are "'narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted). Again, Defendants presented no record evidence of any interests it has in closing off undercover investigations, much less a significant one. Furthermore, as the Supreme Court has clarified, while the narrow tailoring requirement under this type of scrutiny does not require the government to show that it adopted the least speech restrictive means to accomplish their objectives, *Ward*, 491 U.S. at 798, "the government *must* demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (emphasis added).

Several circuits have invalidated content neutral laws when the government has failed to present any evidence that it considered less restrictive alternatives under *McCullen*. *Verlo v. Martinez*, 820 F.3d 1113, 1135 (10th Cir. 2016); *Cutting v. City of Portland*, 802 F.3d 79, 91 (1st Cir. 2015); *Reynolds v. Middleton*, 779 F.3d 222, 231-32 (4th Cir. 2015); *accord iMatter Utah v. Njord*, 774 F.3d 1258, 1271 (10th Cir. 2014) (rejecting a parade permitting requirement where Utah "offered no evidence that its existing tort and criminal law [was] insufficient" to address the State's concerns). The Defendants have failed to proffer evidence of any such attempts.

### E.  Plaintiff has Sufficiently Demonstrated that the Kansas Ag-Gag Law is Unconstitutionally Overbroad

The overbreadth doctrine requires that laws be invalidated when they restrict significantly more speech than the First Amendment allows. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). If the law is substantially overbroad in relation to its legitimate applications, it is unconstitutional. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Criminal statutes are especially dangerous from a First Amendment perspective because of their potential to chill important expression and must be examined particularly carefully for overbreadth. *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

Although some applications of the Kansas Ag-Gag law would not violate the Constitution, such as its enforcement against persons who use force to enter an animal facility and cause tangible physical damages to the facility, because it categorizes so much protected speech as "criminal," including the type of undercover investigations conducted by ALDF and described herein, it is substantially overbroad and therefore unconstitutional. In addition to restricting the speech activity of animal rights investigators, the Ag-Gag law sweepingly encompasses undercover investigations by journalists, workers' rights advocates seeking to identify poor working conditions, and labor organizers trying to organize unions. The law as a whole restricts substantially more speech than the First Amendment permits.

### CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request the Court to grant their motion for summary judgment.

Dated this 16th day of September, 2019

/s/ Michael D. Moss
Michael D. Moss, KS Bar #22624
Foley & Mansfield, P.L.L.P.

10740 Nall Avenue, Suite 242
Overland Park, KS 66211
913-232-8767
913-800-7238 (fax)
mmoss@foleymansfield.com

Alan K. Chen (*Pro Hac Vice*)
University of Denver Sturm College of Law
(for identification only)
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6283
achen@law.du.edu

Justin Marceau (*Pro Hac Vice*)
Of Counsel, Animal Legal Defense Fund
University of Denver Sturm College of Law
(for identification only)
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6449
jmarceau@law.du.edu

Matthew Liebman
Kelsey Eberly
Amanda Howell
(*Pro Hac Vice*)
Animal Legal Defense Fund
525 East Cotati Avenue Cotati, CA 94931
(707) 795-2533
mliebman@aldf.org
keberly@aldf.org
ahowell@aldf.org

Matthew Strugar (*Pro Hac Vice*)
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
(213) 252-0091 (fax)
matthew@matthewstrugar.com

David S. Muraskin (*Pro Hac Vice*)
Public Justice, P.C.
1620 L St. NW, Suite 630

Washington, DC 20036
(202) 861-5245
(202) 232-7203 (fax)
dmuraskin@publicjustice.net

George A. Kimbrell (*Pro Hac Vice*)
917 SW Oak St., Suite 300
Portland, OR 97205
(971) 271-7372
(971) 271-7374 (fax)
gkimbrell@centerforfoodsafety.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2019, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing on the following:

Dennis D. Depew
dennis.depew@ag.ks.gov
Arthur S. Chalmers
art.chalmers@ag.ks.gov

*Counsel for Defendants*

/s/ Michael D. Moss