## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANIMAL LEGAL DEFENSE FUND, *et al.*   )
   )
       Plaintiffs,   )
   )
       v.   )      Case No. 18-2657-KHV-JPO
   )
LAURA KELLY, in her official   )
Capacity as Governor of Kansas, and   )
DEREK SCHMIDT, in his official   )
Capacity as Attorney General of Kansas,   )
   )
       Defendants.   )
_____)

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons expressed in this pleading and defendants' opening brief, defendants' motion for summary judgment should be granted and plaintiffs' cross motion for summary judgment must be denied.

### Uncontroverted Facts

### 1.    Reply Concerning Defendants' Statement of Uncontroverted Facts ("UF")

Plaintiffs do not reference or present evidence that establishes a genuine issue of fact that precludes entry of summary judgment. The statements of fact defendants' set out in support of their motion for summary judgment stand uncontroverted in all material respects. However, plaintiffs do quarrel with some of the details of the statements so that the following replies are appropriate.

Paragraph 1.b. and 1.c. accurately report ALDF's mission statement and three largest programs from ALDF's Articles of Incorporation and its Form 990 (2017), both produced by plaintiffs. However, the Court should accept plaintiff's responses to these paragraphs as supplements to the facts defendants had recited.

Paragraph 4.b.i. is not controverted. Plaintiffs' assertion that the quotations in the paragraph are possibly misleading is both unexplained and insufficient to controvert the statement of facts. *See Bruner-McMahon v. Hinshaw*, 846 F.Supp.2d 1177, 1186 (D. Kan. 2012) (claim that statement is "incomplete" and the like is "insufficient to controvert the alleged fact and do not comply with Rule 56(c)").

The typos in paragraphs 4.b.ii., iii., iv., v. should be corrected: insert "interest" as opposed to "policy" in 4.b.ii.; replace "[r]atical" with "[r]adical" and "Livestock" or "Life Stock" in 4.b.iii; substitute "fires" for "fire" in 4.b.iv., and replace "Growers" for "Grower" in 4.b.v. Additionally, the correct citation in paragraph 5.b.iii. is Ex. 10 at AG000188. March 29, 2006 is the correct date for the meeting referenced in paragraph 6.b. The correct citation is § 47-1826(e)(1) in paragraph 7. "Pork" should be substituted for "Port" in paragraph 7.b.iii. Finally, the word "Protection" should be included in the "Farm Animal and Research Facilities Protection Act" in paragraphs 7.b.i and 7.b.ii.[1]

---

[1] The undersigned owns these typos and apologizes for the additional work they created for plaintiffs' attorneys. However, with this level of scrutiny by plaintiffs' attorneys, the Court can be assured that all other citations in defendants' brief, whether to documents or to court decisions, are accurate.

Plaintiffs' implicit objection to paragraphs 4.d., 4.f., 5.a., 6.a., and 6.c., *i.e.*, "Defendants provide no citation to the record by which it might be verified," should be ignored. The citations are to the publications Kansas Session Laws, Kansas Senate Journal, and Kansas House Journal. Asserting these are no support for the information in these paragraphs is akin to objecting to consideration of the statutes and court decisions cited throughout the parties' briefing.[2]

Paragraph 4.b.ix. is uncontroverted. However, plaintiffs make an important point. This history of the KFAFCRF described in paragraphs 4-7 (including their subparts), particularly the committee minutes and their hearings exhibits (ECF 047-7 to 047-14 [Exhibits 7-14]) was "provided against the chance–however slight–that the Court finds it pertinent." ECF 047 (Def. Summary Judgment Brief) at 10, n. 3. However, defendants believe that it is not material. *Id.* The statements in the materials provided to the legislative committees are not offered to proof the truth of the matters asserted in those materials. As inadmissible hearsay and likely on other grounds, the Court should not consider the content of the statements as "facts" for decision on the parties' motions.

The statements in paragraphs 8 and 12 are not controverted. Plaintiffs' commentary regarding the paragraphs does not change that the expressed stated facts are uncontroverted for the purpose of defendants' motion. Plaintiffs state that they have never contended that KFAFCRF is redundant to several Kansas laws of general application in their response to

---

[2] Trying not to be catty: Out-of-state counsel's lack of familiarity with Kansas's legal publications is not justification for the objection plaintiffs make. *Cf. e.g., Van Enterprises, Inc. v. Avemco Ins. Co.*, 231 F.Supp.2d 1071, 1085 (D. Kan. 2002) (citing Kansas House and Senate Journals and its Session laws).

part of paragraph 8. Their Complaint provided, however, "The Kansas legislature's intent to silence a viewpoint critical of animal industry is further evident by ***the utter redundancy*** of the Ag-Gag statute to target trespass and other property crimes." ECF 001, ¶ 69 (emphasis supplied). Paragraph 12 recites plaintiffs' sworn supplemental interrogatory answers of May 25, 2019. *See* ECF 047-1. Plaintiffs reference another "supplement" to these answers[3], but the quote from this "supplement" does not contradict their prior sworn answers.

---

[3] We could not find the second supplement in the summary judgment record. Of course, they are generally not filed with the Court. Furthermore, the supplemental answers of June 28, 2019 have dubious value. What is the basis to withdraw sworn testimony? Fed.R.Civ.P. 26(e) provides for supplementation when a "party learns that in some material respect the disclosure or response is incomplete or incorrect." Moreover, if the second supplement contradicts the prior sworn testimony, the contradiction is a sham presented to respond to problems plaintiffs saw with their position after receipt of defendants' answers to interrogatories. *See Law Co., Inc. v. Mohawk Const. and Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (courts will disregard a contrary affidavit [or we contend supplemental interrogatory answer] when they conclude that it constitutes an attempt to create a sham fact issue). Before the unsolicited supplement of June 28, on June 12, 2019 defendants provided the following answers–separately for each defendant–to plaintiffs' interrogatory which had asked why defendants denied certain allegations in the Complaint, as follows:

> The conclusory allegations that there is a credible threat of criminal prosecution of ALDF for violation of the KFAFCRF were denied because they were conclusory.

> However, plaintiffs are not presently being charged with or prosecuted for violation (actual or alleged) of the provisions of the KFAFCRF. They have never been charged with or prosecuted for violation (actual or alleged) of the provisions of the KFAFCRF. They have never been threatened with charge(s) or prosecution for violation (actual or alleged) of the provisions of the KFAFCRF.

> Further, discovery has developed that the undercover investigation, which ALDF states that it would sponsor, is not a facial violation of subsections (a) or (b) in K.S.A. 47-1827. Plaintiffs say that there will be no physical damage or destruction in their sponsored undercover investigations and owners will not be deprived, as defined in K.S.A. 47-1826(d), of their facilities, animals or property. Discovery also shows that plaintiffs make only speculative claims concerning possible violations of subsections (c) or (d) in K.S.A. 47-1827. ALDF's announced plan is:

Finally, as to paragraph 16, it should be accepted that none of the parties, in particular none of the plaintiffs, know of any charge or prosecution for violation or alleged violation of the KFAFCRF.

### 2.     Response to Plaintiffs' Statements of Fact

1.     Kansas is the among the largest animal agriculture producers in the United States, accounting for nearly 11% of commercial red meat production nationwide.

Uncontroverted for the purpose of plaintiffs' motion.

2.     Kansas has the third most cows of any state in the United States (6.3 million).

Uncontroverted for the purpose of plaintiffs' motion although as of January 2018 Kansas was 3rd in cattle and calves, and 6th in beef cows according the publication plaintiffs have referenced.

---

The investigator would most "likely" apply for and secure a job to gain access to the facility; the investigator–where access is obtained through employment–would either "lie through omission–concealing his or her affiliation with ALDF" or "if necessary, directly, by denying" affiliation to an animal rights organization; and, once gaining access, the investigator would document the conditions by taking pictures (photo, video or other means), but the "exact trajectory of the investigation" cannot be predicted. This plan supports only that the investigator might or might not engage in conduct which violates parts of subsections (c) or (d) if the investigator is successful in getting a job at an animal facility. It also incorrectly assumes just "concealing his or her affiliation with ALDF" is consent "[i]nduced by force, fraud, deception, duress or threat" under the terms of the KFAFCRF.

Furthermore, plaintiffs do not challenge K.S.A. 2018 Supp. 21-5808 which they claim outlaws their intended undercover investigations. Instead, they insist that they will not knowingly violate Kansas' criminal laws.

Exhibit 15, Defendants' Interrogatory Answers, served June 12, 2019.

3.     Kansas  is  among  the  country's  largest  producers  of  pigs—with approximately two million pigs raised for slaughter.

Uncontroverted  for  the  purpose  of  plaintiffs'  motion  that  Kansas  is  among  the country's largest producer of pigs. The publication plaintiffs reference states it ranked 11th in hogs and pigs between December 2016 and November 2017. The publication also states the inventory for all hogs and pigs was 2.02 million in June of 2019. It is not stated that all of these hogs and pigs are raised for slaughter.

4.     Animal  rights  activists  began  picketing  outside  the  University  of  Kansas Medical Center to oppose the unnecessary use of animals in research in 1989, one year before the passage of the farm animal and research facilities protection act, K.S.A. 47-1825 – 47-1828 (hereafter, the "Kansas Ag-Gag law"[4]).

Objection[5]: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article.[6]

---

[4] The KFAFCRF is not an Ag-Gag law. By not repetitively objecting to plaintiffs' and, apparently, other advocates' improper description of the KFAFCRF, the defendants do not agree that is should be labeled pejoratively an "Ag-Gag law."

[5] Objections  are  proper  under  Fed.R.Civ.P.  56(c).  Defendants  follow  Hon.  Julie  Robinson's direction to lodge speaking-like objections. *See Daniels v. United Parcel Service, Inc.*, 797 F.Supp.2d 1163, 1171-72 (D. Kan. 2011); *Green v. Harbor Freight Tools USA, Inc.*, No. 09–CV–2380–JAR–JPO, 2013 WL 4504316 *2-3 (D. Kan. Aug. 23, 2013).

[6] By stipulation, defendants do not claim custodial foundation testimony is required either to authenticate the document or provide the basic grounds for the Courts' consideration of the record itself. *See* ECF 49 (Pretrial Order) at ¶ 2.b.

5.      In signing the bill that became the Kansas Ag-Gag law, then-Governor Mike Hayden publicly stated that the legislation was designed to deal with damage caused by radical elements of the animal-rights movement.

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article.

6.      Newspaper reports at the time stated that the Kansas Ag-Gag law was "aimed at protecting farms, ranches and research operations from animal-rights extremists."

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted that there were the referenced newspaper reports. If offered to prove the intent of KFAFCRF, the articles should not be considered.

7.      Included as an attachment to the Minutes of the Senate Committee on Agriculture meeting held on March 23, 1990, provided by Senator Montgomery (hereafter, the "Minutes"), is an article in The Wichita Eagle entitled "Kansas Farmers Wary of Animal Rights Movement", which reported that Kansas farmers were "concerned about the impact of the [animal rights] movement on livestock production" and that the Kansas Farm Bureau meeting in December 1988 and the Kansas Livestock Association's annual meeting addressed the groups' growing concerns about the movement.

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted that the article was presented, with others, to the Senate Committee on Agriculture. See UF ¶ 4.b., Exhibit 8 (ECF 47-9).

8.    The Wichita Eagle article contains a quote from Steve Kopperud, then-executive director of the Animal Industry Foundation, who pointed to The Humane Society of the United States' "breakfast of cruelty" campaign against pork and egg producers because swine and chickens are held in confinement.

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted that the article was presented, with others, to the Senate Committee on Agriculture. See UF ¶ 4.b., Exhibit 8 (ECF 47-9).

9.    Included as an attachment to the Minutes is an Associated Press article entitled "Animal Rights Debate Invades the Barnyard", containing a quote from Steve Kopperud, executive director of the Animal Industry Foundation, labeled a "pro-agriculture" group, in which he says, of the "animal rights movement": "It is well-funded. It is well-organized. It's a European import. And it's coming to Kansas."

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted that the article was presented, with others, to the Senate Committee on Agriculture. This article is the same the article referenced in paragraphs 7 and 8. See UF ¶ 4.b., Exhibit 8 (ECF 47-9).

10.    Included as an attachment to the Minutes is an article entitled "Animal rights groups plan ongoing national strategy," in Drovers Journal, a beef industry publication, dated July 13, 1989, which specifically references Plaintiff ALDF: "There are now several groups that sponsor legal defense funds for animals. One is the Animal Legal Defense

Fund, a nationwide network of 250 attorneys. ALDF has fought hot-iron face-branding of dairy cows, veal calf confinement and the patenting of genetically altered farm animals." The article goes on, "But right now the animal rights movement seems to be growing in numbers, clout, zeal, sophistication and willingness to fight livestock producers."

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted that the article was presented, with others, to the Senate Committee on Agriculture. See UF ¶ 4.b., Exhibit 8 (ECF 47-9).

11.     Included as another attachment to the Minutes is an article by Karen McMillan in Beef Today dated March 1990, which contains the following statements: "all the [animal-protection] groups have two things in common: plenty of money, and agendas that will have a big impact on the cattle industry in the '90s"; "But many of these people are well spoken and skilled at getting their points out to the general public." The author describes actions of the group, People for the Ethical Treatment of Animals (PETA), as follows: "PETA's main goal is to tell as many people as possible that 'eating animals is bad for the whole ecosystem.' Education plays the key role here. PETA distributes videotapes showing pigs castrated and ear-notched without anesthesia, and pigs in farrowing crates and slaughterhouses, and asks whether this is an ethical society and whether we can endure this treatment."

Objection: The newspaper's account is not sworn and is inadmissible hearsay if offered to prove the truth of matters asserted in the article. However, it is uncontroverted

that that the article was presented, with others, to the Senate Committee on Agriculture.

See UF ¶ 4.b., Exhibit 8 (ECF 47-9).

12.     On June 13, 1990, then-Kansas Attorney General Robert T. Stephan issued

an Attorney General Opinion regarding the Kansas Ag-Gag law, addressed to Kansas State

Representative Sheila Hochhauser.

Uncontroverted. *See* Kan. Att'y Gen. Op. No. 90-72.

13.     In the Opinion, Attorney General Stephan wrote,

You also ask in relation to section (3)(c)(4) of Senate Bill 776 whether the
phrase "intent to damage the enterprise conducted at the animal facility" is
limited to physical damage or whether it also includes damages resulting
from the later publication of a photograph taken at the facility.
…
Upon a conviction for the crime defined in section (3)(c)(4), the sentencing
court has authority to order restitution. K.S.A. 21-4603(2)(c), K.S.A. 21-
4610(4)(a). In a criminal case the measure of damage is that loss suffered by
the victim of the crime; restitution should make the victim whole. Actual loss
suffered is therefore the measure of restitution to be ordered. *State v.
Hinckley*, 13 Kan.App.2d 417 (1989). The actual amount of restitution is a
question of fact for the trial court's determination based on evidence
presented of loss incurred in connection with the crime.

Section 4(a) of Senate Bill 776 provides authority for a civil cause of action
thus:

> "Any person who has been damaged by reason of a violation of section
> (3) may bring an action in the district court against the person causing the
> damage to recover:
> "(1) an amount equal to three times all actual and consequential damages;
> and
> "(2) court costs and reasonable attorney fees."

In such a civil action actual damages, sometimes referred to as compensatory
damages, is also compensation for the actual loss for injuries sustained by
reason of the actor's wrong doing. The term contemplates out-of-pocket
losses and may also include damages for impairment of reputation, personal
humiliation, and loss of profit, both present and future. Compensatory

damages generally must have a money value, and be capable of estimation with a pecuniary standard. 22 Am.Jur.2d Damages, §§ 24 and 28 (1988).

…

The intent to damage the enterprise conducted at the animal facility is a necessary element of a criminal prosecution or a civil action for damages. Upon conviction of the crime defined in a criminal case, or upon a finding of liability in a civil case, actual damages, which include consequential damages, may be assessed. The dollar amount of such order of restitution or assessment of civil damages will depend upon evidence of the amount required to make the injured party whole for losses actually suffered.

Uncontroverted that these quotes come from part of Kan. Att'y Gen. Op. No. 90-72 (*See* ECF 54-1 at 4-14). This is not agreement that the quotations are in proper context.

14.     The Plaintiffs are each 501(c)(3) tax-exempt not-for-profit or non-profit corporations.

Uncontroverted.

15.     Plaintiff Animal Legal Defense Fund (ALDF) is a national animal protection organization that uses education, public outreach, investigations, legislation, and litigation to carry out its work on behalf of animals, including those raised for food and experimented upon in laboratories.

Uncontroverted.

16.     Plaintiff Center for Food Safety (CFS) is a national environmental and consumer advocacy organization that empowers people, supports farmers, and protects the earth from the harmful impact of industrial agriculture. CFS uses legal, scientific, and grassroots action to protect and promote the public's right to safe food and the environment.

Uncontroverted.

17.     Plaintiff Shy 38, Inc.'s mission is to change attitudes about industrialized farm animals by offering a compassionate public humane education program, promoting a cruelty-free, vegan lifestyle, and providing opportunities for the public to interact with its rescued farmed animal residents.

Uncontroverted.

18.     Shy 38 is based in Lawrence, Kansas, where it provides a permanent home to over 30 rescued farm animals.

Uncontroverted.

19.     The mission of Plaintiff Hope Sanctuary, based in Kansas City, Missouri, is to rescue and rehabilitate factory farmed animals, and to raise awareness about their lives, through education and by sharing rescued animals' unique stories of resilience, desire, and will to live. Hope Sanctuary aims to create a sustainable society that invests in the integrity of our environment and our animals, guaranteeing fair and humane treatment for farmed animals worldwide.

Uncontroverted.

20.     Common to the Plaintiffs' missions is a dedication to exposing, addressing, and reforming the harms caused by industrial animal agriculture, including the mistreatment of animals and unsafe and unsustainable food production practices.

Uncontroverted.

21.     Plaintiffs seek out and rely upon whistleblower and investigative employees' undercover investigations inside animal facilities—including industrialized farms and slaughterhouses—to pursue their mission-driven advocacy and educational efforts on

matters of public concern including the treatment of animals, food safety, and the environmental effects of industrialized animal facilities.

It is uncontroverted that all plaintiffs rely, to some degree, upon whistleblower and investigative employees' undercover investigations inside animal facilities—including industrialized farms and slaughterhouses to pursue their stated missions; and it is also uncontroverted that ALDF also seeks to sponsor "whistleblower and investigative employees' undercover investigations." That only ALDR seeks to sponsor the investigations is clarified in paragraph 22 and supported by the affidavits cited by plaintiffs.

22.    Because access to truthful information about the conditions and practices inside facilities that exploit animals is so vital to ALDF fulfilling its mission, ALDF retains investigators to conduct undercover investigations, described further below, at such facilities around the country.

Objection: The initial phrase is based on self-serving, conclusory affidavit testimony which should not be considered in connection with the pending motions. The statement that ALDF retains investigators to conduct undercover investigations is uncontroverted. The descriptions of investigations is responded to in the following paragraphs. Only evidence of some of the investigations is properly before the Court.

23.    For example, in 2016, ALDF conducted an investigation of a Nebraska pig breeding operation owned by The Maschhoffs, the nation's third-largest pig producer and a Hormel Foods supplier. The investigation revealed long-term neglect and lack of appropriate veterinary care, with pigs suffering for days or weeks with grossly prolapsed rectums, intestinal ruptures, large open wounds, and bloody baseball-sized ruptured cysts.

Pigs were denied food for long periods of time, and a botched "euthanasia" resulted in a mother pig slowly dying after being shot in the head multiple times over the course of several minutes.

Objection: Mr. Walden's affidavit does not establish that he possesses the required personal knowledge necessary to testify to these statements. Thus, while it is uncontroverted that ALDF conducted the investigation in Nebraska which resulted in reports of the neglect described in the paragraph, whether the reports were accurate or truthful cannot be accepted as fact for the purposes of the summary judgment motions.

24.     ALDF broadly disseminated the video, photos, and information gained in its Maschhoffs investigation to the media and its supporters, to educate consumers about Hormel's cruel and unnatural sourcing practices.

Uncontroverted with the limited exception that none of the affidavits show required personal knowledge to state more than Hormel's ***alleged*** cruel and unnatural sourcing practices. Furthermore, the cited ALDF press release contains inadmissible multiple hearsay.

25.     ALDF created an action alert to call on its audiences to advocate for supply chain reforms by Hormel, and prepared complaints to the Attorneys General of Illinois (where The Maschhoffs is based) and Nebraska, calling on them to take action to hold The Maschhoffs accountable for its legal violations.

Uncontroverted.

26.     ALDF later relied on the investigation in a false advertising lawsuit against Hormel over the company's "Natural Choice" products. And after ALDF's release of the investigation, Hormel suspended the supplier and promised an internal investigation.

Uncontroverted.

27.     Similarly, in 2015 ALDF conducted an employment-based undercover investigation of a Carthage, Texas-based Tyson Foods chicken slaughterhouse. Over the course of several months, ALDF's investigator documented the atrocious conditions suffered by the birds and workers inside the plant, with birds left to suffocate by the hundreds on overcrowded conveyor belts and discarded, still alive, in heaps of dead and dying chickens, feathers, and filth.

Objection: Mr. Walden's affidavit does not establish that he possesses the required personal knowledge to testify to these statements.

28.     ALDF's investigation further documented the injuries and illnesses the investigator endured working on the chicken-hanging line, including carpal tunnel syndrome from attempting to hang 35 live birds a minute, eye infections from the chicken feces, dirt, dust, and dander that got into her eyes because of inadequate "protective" gear provided by Tyson, and extreme heat abrasion on her arms, which caused a painful, red rash.

Objection: Mr. Walden's affidavit does not establish that he possesses the required personal knowledge to testify to these statements.

29.     ALDF's Tyson chicken slaughter investigation resulted in the filing of complaints—concerning the treatment of chickens, food safety, worker protection, and

false corporate statements—with several federal and state agencies, as well as sustained efforts to engage ALDF's audiences about the suffering of chickens and mistreatment of workers in Tyson facilities like the one ALDF investigated.

Objection: Mr. Walden's affidavit does not establish that he possesses the required personal knowledge to testify to these statements. Furthermore, the cited ALDF press release, letter and associated unsworn documents contain inadmissible multiple hearsay.

30. CFS seeks out and relies upon whistleblower and investigative employees' undercover investigations inside industrialized farms and slaughterhouses to pursue its mission-driven advocacy on matters of public concern, including the treatment of animals, food safety, and the environmental effects of industrialized animal facilities.

See response to paragraph 21.

31. CFS relies on and uses photos, video, and other information obtained during undercover industrial agriculture investigations from a variety of organizations and sources, including ALDF, to write online content accurately depicting the industrial meat industry, so as to educate the public about food safety concerns regarding industrial meat, misleading labels, and animal welfare concerns. Spector Aff. 9, 14, A244-45; Spector Aff. Ex. A-C, A248-99.

Uncontroverted, with the exception that any claim that posted on-line content is accurate is from self-serving and conclusory affidavit testimony which cannot be considered in connection with the summary judgment motions. Furthermore, the cited CFS press release and unsworn documents contain inadmissible multiple hearsay and opinion testimony, lacking foundation and proper Rule 26 disclosure.

32.     From Shy 38's founding, the undercover investigation videos released by groups like ALDF have played a critical role in its mission-driven work to advocate for the humane treatment of factory farmed animals, and to educate the public about the evils of factory farms.

Uncontroverted.

33.     Shy 38 believes that undercover investigation videos and images are crucial to the organization's ability to show the public, in Kansas and beyond, what farmed animals have to endure before becoming meat or producing the milk or eggs people eat.

Uncontroverted.

34.     Shy 38 maintains an active presence on social media, its primary educational and outreach tool, and very frequently shares and posts images and videos gained through undercover investigations of factory farms and slaughterhouses.

Uncontroverted.

35.     By using in its advocacy and sharing video footage and images from undercover investigations, Shy 38 hopes to motivate its followers and audience to adopt a humane, vegan diet, to lobby their elected officials for more humane treatment of farmed animals, and to call on the companies producing and selling meat and other animal products to end their cruel factory farming practices.

Uncontroverted.

36.     For example, in February of 2015, Shy 38 posted on Facebook an undercover video taken by Mercy for Animals at Wiese Brothers Farm in Wisconsin, showing workers viciously kicking, beating, and whipping cows in the face and body, and blood pouring

from a cow's nose; Shy 38 called on viewers to sign a petition opposing Wisconsin's proposed Ag-Gag bill.

Objection, while most of this paragraph is uncontroverted, Ms. Taylor's affidavit does not show personal knowledge of where the video was taken or whether it was an undercover video.

37.     Similarly, in November of 2018, Shy 38 posted on Instagram an image taken by Animal Equality (and posted by the Humane League), showing a person holding a baby piglet by the head and using a metal device to cut the animal's teeth; Shy 38 urged viewers to go vegan.

Uncontroverted.

38.     Images and information made public through undercover investigations are what motivated Hope Sanctuary's founding; if Hope could help consumers and decision-makers see the videos and images gained from undercover investigations, it believed, they would make more humane purchasing choices and demand corporate and legislative change to stop the institutionalized abuse of farmed animals.

Uncontroverted, except the referenced affidavit does not establish the required personal knowledge to support the claim images and information used by the organization come from undercover investigations.

39.     Hope has therefore, for as long as it has operated, relied upon and used in its advocacy the undercover investigation videos of factory farms released by organizations like ALDF.

Uncontroverted, except the referenced affidavit does not establish the required personal knowledge to support the claim images and information used by the organization come from undercover investigations.

40.     Hope engages in its advocacy through its website, on social media, and in person, using and sharing images and information gained through undercover investigations of factory farms and slaughterhouses.

Uncontroverted, except the referenced affidavits do not establish the required personal knowledge to support the claim images and information used by the organization come from undercover investigations.

41.     For example, Hope often uses pamphlets published by the animal advocacy and rescue organization Farm Sanctuary, such as The Truth Behind Pork, which pulls back the curtain on what pigs endure in factory farms and slaughterhouses. Hope has used this pamphlet, showing cruel confinement of pregnant and lactating pigs in body-gripping gestation and farrowing crates, to educate its audiences about cruel practices in the pig industry, such as the use of these crates.

Uncontroverted.

42.     Undercover investigations of animal facilities have resulted in many news stories and have triggered legislative and regulatory changes, corporate reforms, criminal prosecutions, and consumer boycotts.

Objection: The documents cited by plaintiffs are unsworn and contain inadmissible hearsay on the topic expressed in this paragraph.

43.     Plaintiff ALDF conducts such undercover investigations, while CFS, Shy 38, and Hope use and rely upon, but do not themselves conduct, such investigations.

Uncontroverted.

44.     ALDF has the capability to conduct an undercover investigation of an animal facility in Kansas, and would do so but for the Kansas Ag-Gag law. ALDF possess the funds, infrastructure, expertise, and personnel necessary to complete an undercover investigation in Kansas, as well as to share information obtained from such an investigation with the public.

Objection: Mr. Walden's statement that ALDF would conduct undercover investigations "but for" the KFAFCRF is conclusory and self-serving. Therefore, this portion of the paragraph lacks evidentiary support. However, the "but for" proclamation is disputed by the plaintiffs' admission that "none of the plaintiffs intend or have plans, nor would they, to intentionally violate a criminal law in Kansas." *See* UF ¶ 9 and ECF 001 (Complaint), ¶¶ 69, 81 and 99. As described below, ALDF's sponsorship of the desired undercover investigation violate Kansas's criminal law against trespass. Otherwise, the paragraph is uncontroverted.

45.     ALDF also has the current intention to conduct an undercover investigation in Kansas, and would do so but for its fear of criminal prosecution for violating the Kansas Ag-Gag law. This intention is a factor of the great need for undercover investigations to pursue ALDF's advocacy and fulfill its mission, coupled with ALDF's specific interest in Kansas as a site for such investigations, because of its being a major locus of animal agriculture.

Objection: Mr. Walden's statement that ALDF would conduct undercover investigations "but for" the KFAFCRF is conclusory and self-serving. Likewise, the assertion that undercover investigations in Kansas are *needed* for ALDF to pursue its advocacy and mission are conclusory and self-serving. Therefore, these portions in the paragraph lack evidentiary support. Further, to repeat, the "but for" proclamation is disputed by the plaintiffs' admission that "none of the plaintiffs intend or have plans, nor would they, to intentionally violate a criminal law in Kansas." *See* UF ¶ 9 and ECF 001 (Complaint), ¶¶ 69, 81 and 99. As described below, ALDF's sponsorship of the desired undercover investigation violate Kansas's criminal law against trespass. Otherwise, the paragraph is uncontroverted.

46.     The investigation Plaintiff ALDF desires to carry out in Kansas would follow an established practice. ALDF would retain a qualified investigator to obtain photographic and/or video footage documenting the conditions inside a Kansas factory farm, slaughterhouse, or other animal facility. Working with the investigating entity, a target would be identified, and the investigator, or an investigator hired by the investigating entity ALDF retained, would go about gaining access to the facility, mostly likely, as ALDF's investigator did in Texas for the Tyson facility and Nebraska for The Maschhoffs facility, by applying for and securing employment at the facility.

Objection: While most of this paragraph is uncontroverted, there is no showing that Mr. Walden has personal knowledge of the facts necessary to compare ALDF's desired investigation to past investigations–may be with the exception of the Nebraska investigation if the Court finds Mr. Walden, who is the Chief Programs Officer for ALDF

as of 2016, has sufficiently shown personal knowledge of the 2016 investigation in Nebraska. *See* ECF 057-1 at 23-26.

47.     In order to secure such employment, or otherwise to gain access to the non-public parts of the animal facility, the investigator would be forced to conceal his or her true motive for applying for the job or trying to gain access. The investigator would either lie through omission—by concealing his or her affiliation with ALDF—or, if necessary, directly, by denying that she was being sent by an animal rights organization, a commonly-asked question in the application process for animal facility positions.

Objection: Mr. Walden's affidavit testimony that "the investigator would be forced to conceal his or her true motive" is speculative. No foundation has been provided Mr. Walden could express such an opinion. However, it is uncontroverted that the investigator would–as represented by ALDF–, seek employment at an animal facility in Kansas and the investigator would lie, if necessary, about the investigator's background, experience (subject to the statements in paragraph 48) and his or her intention to conduct an investigation, in hopes of getting the job–assuming that this can be done without violating Kansas's general criminal laws.

48.     The investigator would not lie about or misrepresent her qualifications in a way that would implicate safety or their fitness for the position; she would not represent that she has skills or certifications she does not possess. Investigators retained by ALDF are transparent about their relevant work experience and knowledge, only omitting their investigatory goals and affiliation with an animal advocacy organization.

Uncontroverted.

49.     Without deception (either by commission or omission) to conceal their investigatory motives and advocacy organization affiliations, ALDF-contracted investigators could not secure employment at an animal facility to conduct an investigation.

Objection: Mr. Walden's affidavit testimony to the statements in paragraph 49 are speculative. No foundation has been provided Mr. Walden could express such opinions.

50.     Investigators pursuing investigations for ALDF may be hired in supervisory or management roles, or as employees with no supervisory responsibilities. During the course of their employment, ALDF-contracted investigators perform, to the best of their abilities, all aspects of the work they are hired to do. They receive the same training as normal employees, and are directed to carry out all tasks they are lawfully instructed to perform in good faith and to follow all applicable biosecurity and safety protocols.

Objection: Mr. Walden's affidavit testimony to the statements in paragraph 50 are speculative. No foundation has been provided Mr. Walden could express such an opinions. And certainly, Mr. Walden's affidavit has not shown he has personal knowledge of the subjects in this paragraph that purport to address how Kansas employers will act.

51.     The investigators wear a minute camera on their clothing that is operated with no or virtually no effort, with which they covertly take video and audio recordings of what they observe as they perform their job functions inside the facility.

Uncontroverted.

52.     During the course of an investigation, an ALDF-sent investigator may exercise control over animals or parts of the facility, whether by taking a managerial

position, exercising supervisory authority, or temporarily closing off a part of the facility so as not to be observed photographing or videotaping the conditions.

Objection: Mr. Walden's affidavit testimony to the statements in paragraph 52 are speculative. No foundation has been provided Mr. Walden could express such opinions.

53.    During the course of an investigation, the investigator may take minor steps to conceal himself to hide his investigative activities, such as by standing behind a wall or post in order to film a suffering animal undetected.

Objection: Mr. Walden's affidavit testimony to the statements in paragraph 53 are speculative. No foundation has been provided Mr. Walden could express such opinions.

54.    The investigator will frequently be on notice that his investigative activities are forbidden by facility owners, because agricultural facilities commonly post notices forbidding nonconsensual access, photography, or video recording.

Objection: Mr. Walden's affidavit testimony to the statements in paragraph 54 are speculative. No foundation has been provided Mr. Walden could express such opinions.

55.    At the conclusion of the investigation, ALDF publicizes the results of the investigations and uses the investigations to further its advocacy, by disseminating the footage to the media and ALDF's audiences, urging criminal prosecution where warranted, submitting regulatory complaints, and filing civil lawsuits.

Uncontroverted that this is ALDF's intent, which is how the statement must be interpreted. Mr. Walden cannot make this as a statement of fact because, by his admission, no "undercover investigation" has happened. The results of the investigation cannot be known. Thus, his affidavit testimony is speculative as to would happen if an "undercover

investigation" occurred. No foundation has been provided Mr. Walden could express such opinions.

56.     Neither ALDF nor the investigators it sends intend to or would cause physical or tangible damage—actual destruction and theft of property—to any animal facility, animal, research facility, or field crop product.

Uncontroverted.

57.     Neither ALDF nor the investigators intend to or would exercise actual and ongoing physical control over an entire animal facility.

Uncontroverted.

58.     Neither ALDF nor the investigators intend to or would physically conceal themselves until after an agricultural facility is closed for business or otherwise physically conceal themselves in order to be able to do actual physical damage.

Uncontroverted.

59.     Neither ALDF nor the investigators intend to or would enter and remain on the premises of an agricultural facility and refuse to leave after being specifically and directly instructed to do so.

Uncontroverted.

60.     ALDF's undercover investigations are aimed at gaining an unvarnished look at goings on inside industrial farms, slaughterhouses, or other animal facilities.

Objection: This statement is based upon self-servicing, conclusory affidavit testimony.[7]

61.    In directing its investigating entity to document any illegal and unethical practices happening at the animal facility, ALDF acts with the specific goal of exposing to public view animal cruelty, unsafe working conditions, food safety violations, and other misconduct, in the hopes that such exposure will spur reforms.

Uncontroverted.

62.    ALDF proceeds with investigations intending that they have warranted negative consequences for the investigated facility and resulting economic harm, including boycotts, lost business, a plant closure, or other economic harm.

Uncontroverted.

63.    Among these intended consequences are depriving the owner of animals found suffering and mistreated in the facilities by causing them to be removed from the owner and sent to sanctuary, or seized as evidence or to render aid to them as a result of a criminal investigation.

Uncontroverted.

---

[7] In this and a few other instances plaintiffs rely on their interrogatory answers to support their statement of facts; much like quoting themselves. A party's interrogatory answers may contain admissions against interest so that the answer is relevant to summary judgment. *See Champlin v. Oklahoma Furniture Mfg. Co.*, 269 F.2d 918, 920 (10th Cir. 1959) (still good law, *e.g, Lopez v. Edwards*, 2018 WL 2241062 *3 (D. Colo. 2018)). However, an interrogatory answer's use as affirmative support for the position of party answering the interrogatory is limited to when "they satisfy the other requirements in Rule 56 and contain admissible material. WRIGHT, MILLER & KANE, 10A FEDERAL PRACTICE AND PROCEDURE § 2722, at 51-52. Thus, for example interrogatory answers, which are not based on personal knowledge, will not be considered in support or opposition to summary judgment. *E.g., Abbott v. Bragdon*, 912 F.Supp. 580, 588 (D. Me. 1995).

64.     If it were to proceed with an investigation of an animal facility in Kansas, ALDF would fear prosecution under the Kansas Ag-Gag law because of its role in facilitating, funding, supporting, and using the results of the investigation. This is the case even though ALDF does everything in its power to ensure that investigators sent on its behalf follow all applicable protocols and rules, and that the only damage caused is the economic consequences which flow from public and government scrutiny of the conditions and practices they document.

Objection: Defendants incorporate their responses to paragraphs 44 and 45. It is uncontroverted, however, that ALDF would do everything in its power to ensure that investigators sent on its behalf follow all applicable protocols and rules, and that no physical or tangible damage is caused to any "animal facility," "animal," "research facility," or "field crop product that is grown in the context of a product development program" as the quoted terms are used in the KFAFCRF. This excludes damage to reputation, goodwill, lost profits and other intangible damages which is intended. See UF ¶ 13. Whether the investigation facilitated by ALDF would result in intangible damage in addition to "economic consequences from public and government scrutiny" is a legal conclusion that Mr. Walden cannot make. For example, Kansas recognizes injury or damage merely from a trespass.

65.     If the Kansas Ag-Gag law was declared unconstitutional and its enforcement enjoined, ALDF would pursue an undercover investigation of an animal facility in Kansas.

Objection: Defendants incorporate their responses to paragraphs 44 and 45. Defendants understand, however, plaintiffs do not intend to assert the injunction relief must

be complete in the sense it must extend to non-party county or district prosecutors who neither defendant controls.

66.     Just as it has done with its and others' previous undercover investigations, ALDF would use the information, photos, and video gained through its and others' investigations of factory farms, slaughterhouses, and animal research facilities in Kansas to further its advocacy, educational, and programmatic efforts to expose and reform animal industries.

Objection: Defendants incorporate their responses to paragraphs 44, 45 and 55.

67.     If ALDF conducted an undercover investigation in Kansas, it would share and make available the evidence it recovered to Plaintiffs CFS, Shy 38, Hope, and other peer organizations.

Uncontroverted that this is ALDF's intention, but it is speculative that the investigation would establish evidence ALDF would want to share.

68.     CFS would use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansas to further its advocacy, educational, and programmatic efforts to expose and reform industrial farming.

Uncontroverted that this is CFS's intention, but it is speculative that the investigation would establish evidence CFS would want to use.

69.     Shy 38 would jump at the chance to use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansa[n]s to educate its fellow Kansas about how farmed animals are being treated in their home state.

Uncontroverted that this is Shy 38's intention, but it is speculative that the investigation would establish evidence Shy 38 would want to use.

70.     The lack of such investigations in Kansas has been a major obstacle to Shy 38 fulfilling its mission, because Shy 38 is chiefly a Kansas organization trying to tell its fellow Kansans what the farmed animals in the state are experiencing right in their backyards.

Objection: Ms. Taylor's affidavit testimony to the statements in paragraph 49 are speculative. The affidavit is self-serving. No foundation has been provided Ms. Taylor could express such an opinions.

71.     Without undercover investigations taken on factory farms in its home state, Shy 38 believes it cannot fully educate people about what farmed animals in Kansas and beyond need to be protected from.

Uncontroverted. But the degree of an investigation's importance to Shy 38 is speculative. The affidavit is self-serving. No foundation has been provided Ms. Taylor could express such opinions.

72.     Hope would likewise use the information, photos, and video gained through ALDF's and others' investigations of factory farms and slaughterhouses in Kansas in its advocacy, informing its audiences in the Kansas City region what farmed animals there endure, so as to create a rallying point to protect farmed animals in its home region.

Uncontroverted that this is Hope's intention, but it is speculative that the investigation would establish evidence Hope would want to use.

73.     For at least the past seven years, ALDF has devoted substantial organizational resources to countless activities in order to combat Ag-Gag laws around the country, including in Kansas.

Objection: Mr. Walden lacks personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Walden's affidavit or the interrogatory answer. Importantly, no evidence is provided as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 17.

74.     ALDF staff have engaged in numerous activities to publicize and support the organization's legal, legislative, and public advocacy against Ag-Gag, in a variety of settings and to a number of audiences, including: researching, drafting, editing, and disseminating numerous communications pieces, such as press releases, blogs, action alerts, donor communications, newsletters, social media posts, brochures, pamphlets, and other materials; and attorneys and staff speaking to audiences at conferences, symposia, law student events, and ALDF member and supporter events.

Objection: Mr. Walden lacks personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Walden's affidavit or the interrogatory answer. Importantly, no evidence is provided as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 17.

75.     ALDF's Animal Law Program has provided Ag-Gag-related resources, content, Continuing Legal Education sessions, and other programming to legal audiences including attorneys, paralegals, judges, law students and to lay audiences.

Uncontroverted.

76.     Each of these activities has required the expenditure of financial resources, including dozens of hours of paid staff time; payments to communications and operations vendors and contractors, such as designers and direct mail vendors; payments for printing and production of brochures, pamphlets, placards, and other collateral; travel and related costs for events; server upkeep and overhead; and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content).

Objection: Mr. Walden lacks personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Walden's affidavit or the interrogatory answer. Importantly, no evidence is provided as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 17. See also ECF 54-1 at A111-18.

77.     For at least the past six years, CFS has devoted substantial organizational resources to organizational activities in order to combat Ag-Gag laws around the country, including in Kansas. Spector Aff. 12, A245; Defs' MSJ Ex. 1, Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10.

Objection: It has not been shown that Mr. Spector has personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Spector's affidavit or the interrogatory answer. Importantly, no evidence is provided as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 18.

78.     As part of CFS's Animal Factories Reform program, one of the organization's flagship program areas, CFS staff have engaged in numerous activities to publicize and support the organization's legal, policy, and outreach advocacy against Ag-Gag laws, including: researching, drafting, editing, and disseminating communication documents, such as reports, press releases, blogs, social media posts, and action alerts; and attorneys and staff speaking to audiences at conferences and law school events and classes.

Uncontroverted.

79.     CFS's Ag-Gag-related activities have required the expenditure of financial resources, including dozens of hours of salaried or hourly staff time; payments to communications and operation vendors and contractors, such as designers; server upkeep and overhead, and operating expenses (including use of technology platforms to create, communicate about, and publish all of the above-described content).

Objection: It has not been shown that Mr. Spector has personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Spector's affidavit or the interrogatory answer. Importantly, no evidence is provided

as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 18.

80.     Kansas's Ag-Gag law forces CFS to do public outreach and education about Ag-Gag laws generally, including Kansas's, and as such CFS has less money and time to devote to outreach on topics that are central to its mission.

Objection: It has not been shown that Mr. Spector has personal knowledge to make this assertion. It is self-serving and conclusory. The required foundation for the statements in Plaintiffs' Supplemental Response to Defendants' Interrogatory No. 10 is not provided in Mr. Spector's affidavit or the interrogatory answer. Importantly, no evidence is provided as to the expense or resources diverted because of the KFAFCRF. It is uncontroverted, however, that ALDF itemized its expenses as described in UF ¶ 18.

**Argument**

**1.     Plaintiffs lack standing to prosecute their claims.**

> a.     *The sponsored undercover investigations are not facial violations of subsections (a) or (b) in K.S.A. 47-1827.*

To insure that an alleged prospective injury is not too speculative for Article III purposes, the injury must be "certainly impending." *State of Utah v. Babbit*t, 137 F.3d 1193, 1212 (10th Cir. 1998) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2 (1992). The chilling effect of a law can create a judicially cognizable injury, but to qualify, the chilling must arise from an objectively justified fear of consequences; a subjective chill is not enough. *Cole v. Goossen*, ___ F.Supp.3d ___, No. 19-4028, 2019 WL 4141007, *5 (D. Kan. Aug. 30, 2019) (*citing Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1088 (10th Cir. 2006).

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-61 (2014), the Supreme Court outlined some circumstances that amount to a credible threat of enforcement. Many involved plaintiffs who had engaged in the precise conduct targeted by the law in the past, stated an intent or desire to continue doing so, and the circumstances suggested that the threat of future prosecution was credible. *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (on the cases cited by plaintiffs). By contrast, courts generally find no standing where a plaintiff has never been threatened with enforcement of a statute in the past, or future prosecution has been disavowed in some way. *See Cole*, 2019 WL 4141007, *6 (collecting such cases). Moreover, as this Court has pointed out, a credible threat of enforcement, at least when there is no present or past threat of enforcement, requires that

the law "clearly prohibits plaintiff's intended conduct." *Outdoor Systems, Inc. v. Lenexa*, No. 98-2534, 1999 WL 203461 *3 (D. Kan. April 16, 1999) (also cited by plaintiffs).

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014), is an example that an objective reasonable chill is not produced by plaintiff's self-censorship when the law does not clearly prohibit the plaintiff's intended conduct or speech. In *Blum*, plaintiffs sought to challenge the federal Animal Enterprise Terrorism Act ("AETA") on the basis it infringed their First Amendment rights. They said they had refrained from engaging in certain activities protected by the First Amendment for fear AETA may be read to cover their activities and so subject them to future prosecution. However, the government denied that the statute prohibited their voluntarily constrained activities. The court found the plaintiffs failed to establish the needed degree of injury to establish standing based on their proffered interpretation of the provisions of the act because of the government's disavowal of any intention to prosecute on the basis of plaintiffs' interpretation and the AETA's language that rebutted plaintiffs' interpretation.

The undercover investigations ALDF says it would sponsor are not a violation of subsections (a) or (b) of K.S.A. 47-1827. Its asserted fear of prosecution under these sections is not objectively justified.

Addressing subsection (a), defendants will not prosecute ALDF under the provision absent physical damage or destruction. *See* ECF 047 at 26. The explanation as to why physical damage or destruction is required is recited in the opening brief. *Id.* at 26-27. Plaintiffs provide no meaningful rebuttal.

2

They do assert that the word "damage" must be given different meanings if economic damage, without physical damage or destruction, is not criminalized by subsection (a). Not so. The word damage is not read differently; it is the object of the clause in which the word damage appears which varies. Subsection (a) states that [1] the offender must intend to "damage the enterprise conducted at the animal facility" and [2] "damage or destroy an animal facility[8], or any animal[9] or property in or on an animal facility." An enterprise can be an economic entity which is damaged by inflicting harm to its value, usefulness or normal function. While damage, inflicting harm, on an animal facility, animal or property, necessarily requires physical damage. Plaintiffs' interpretation is unreasonable for a number of reasons, but including that it would give the same meaning to two very different grammatical objects.

Plaintiffs' reference to the 1990 Kansas attorney general opinion, Kan. Att'y Gen. Op. No. 90-72, does not support an objective probability of prosecution under subsection (a) for at least two reasons. First, the attorney general's opinion does not control how the KFAFCRF must be interpreted. *Willis v. Kansas Highway Patrol*, 273 Kan. 123, 130-31, 41 P.3d 824 (2002). Second, General Stephan did not directly answer whether "intent to damage the enterprise conducted at the animal facility" is limited to physical damage or whether it also includes damages resulting from the later publication of a photograph taken at the facility. Concerning this, his opinion provides:

---

[8] Which is defined as physical premises or structures. K.S.A. 47-1826(b).

[9] Which is also defined in the KFAFCRF as tangible not intangible creatures. *See* K.S.A. 47-1826(a).

The intent to damage the enterprise conducted at the animal facility is a necessary element of a criminal prosecution or a civil action for damages. Upon conviction of the crime defined in a criminal case, or upon a finding of liability in a civil case, actual damages, which include consequential damages, may be assessed. The dollar amount of such order of restitution or assessment of civil damages will depend upon evidence of the amount required to make the injured party whole for losses actually suffered.

ECF 054-1 at 13. His reasoning seems to imply that intent to cause consequential damages to the enterprise satisfies the specific intent element.[10] His opinion does not, at all, concern whether physical damage or destruction is necessary for conviction under subsection (a).[11]

---

[10] It is also proper to note that the consequential damages provision in the private cause of action under K.S.A. 47-1828(a)(1) was amended after General Stephan's opinion was issued. UF ¶ 5. Furthermore, Kansas law on what can be ordered in restitution evolved after the United State Supreme Court's opinion in *Paroline v. United States*, 134 S.Ct. 1710, 1716 (2014). *See e.g., State v. Arnett*, 307 Kan. 648, 413 P.3d 787 (2018). Also, General Stephan was not asked to and did not comment upon any limitation on recovery of non-economic damages or award of restitution by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), or their progeny. Of course, Kansas construes its statutes in such a way as to uphold the statute's constitutionality by reading the necessary judicial requirements into the statute. *E.g., In re Adoption of Baby Boy L.*, 231 Kan. 199, 223, 643 P.2d 168 (1982). *See also Phelps v. Hamilton*, 59 F.3d 1058, 1070-71 (10th Cir. 1995) (applying same rule).

[11] Plaintiffs' misinterpretation of subsection (a) is not limited to the language in that section. They doubles down of their flawed interpretation of the section to when the try to describe its possible sanctions. See ECF 054 at 22. They assume their conduct would be a level 7 nonperson felony – the offense classification when "facility [or], animals [ ] is damaged or destroyed to the extent of $25,000 or more." *See* subsection (g)(1). When the damage or destruction is of the facility or animals is less than $1,000 the offense is a Class A nonperson misdemeanor. *Id.* Jail time is irrelevant to ALDF as a corporation. The misdemeanor fine can be up to $2,500. K.S.A. 2019 Supp. 21-6611(b)(1). And the felony fine may be up to $100,000. *Id.* at §(a)(3). Fines, which may be awarded under either circumstance are, subject to the restrictions in K.S.A. 2019 Supp. 21-6612.

Further, calling it "remarkable," plaintiffs attempt to contrast the potential penalties for a subsection (c) offense [although mis-describing this offense as the "inten[t] to take a picture without reference to all of its elements] with a person who knowingly kills or injures an animal which are both Class A nonperson misdemeanors [at least for the first cruelty to animal offense]. ECF 055 at 22, n. 10. Actually, plaintiffs contrast the penalty for "knowingly but not maliciously killing or injuring any animal." *See* K.S.A. 2019 Supp. 21-6412(a)(6) & 21-6412(b)(2)(A). A malicious killing or injury is a nonperson felony. *Id.*

As to subsection (b), there is no reasonable fear of prosecution from a third party's possible reaction to publication of the ALDF operative's photographs at or from an animal facility or the operative's findings, if the operative temporarily closes off part of the facility. While plaintiffs claim this possibility in order to assert the standing needed to challenge subsection (b), and setting aside its speculative nature, the very language of the subsection refutes that it prohibits plaintiff's intended conduct, much less clearly prohibits the conduct.

Under subsection (b), "no person shall" "acquire or otherwise exercise control" "with the intent to deprive the owner" and "to damage the enterprise." K.S.A. 47-1827(b). "Deprive" is defined to include withholding the animal or property permanently or for such an extended period of time to deny the owner the major portion of the animal or property's value; holding the animal or property for ransom; or to dispose of the animal or property. K.S.A. 47-1826(d). Yet, under plaintiffs' scenario, the ALDF operative intends to gather information or take photographs or videos. This does not damage the enterprise in and of itself. The exercise of control does no injury and is not intended to cause injury according to their claim. Stated another way, the person exercising control must also be the depriving party to have criminal responsibility under Subsection (c).

b. *Similarly, plaintiffs lack standing to challenge the private cause of action codified in K.S.A. 47-1828*

Plaintiffs do not dispute that they lack standing to challenge K.S.A. 47-1828.

c. *Plaintiffs make only speculative claims concerning possible violations of subsections (c) or (d) in K.S.A. 47-1827 and fail to challenge a separately enforceable legal obstacle to their demanded relief.*

Plaintiffs maintain that ALDF has standing to challenge the constitutionality of Subsections (c) and (d) on the theory its exercise of First Amendment rights is chilled by an objectively justified fear of consequences if it sponsors certain undercover operations at animal facilities. They say it is sufficient that they demonstrate "a present desire, though no specific plans, to engage in" protected speech facially proscribed by the challenged parts of the KFAFCRF. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

However, plaintiffs have the burden of establishing the elements of standing. *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006). When plaintiffs' self-serving and conclusory statements are trimmed away, plaintiffs have presented only allegations of possible future injury which are insufficient to convey standing.

First, plaintiffs cannot rely on affidavit testimony which is not based upon personal knowledge or which is conclusory and self-serving. However, plaintiffs argument that they have standing to challenge Subsection (c) and (d) is based on this very kind of affidavit testimony.

Information presented in an affidavit must be "based on personal knowledge and [must set] forth facts that would be admissible in evidence"; Courts "do not consider conclusory and self-serving affidavits." *Garrett v. Hewlett–Packard Co*., 305 F.3d 1210, 1213 (10th Cir. 2002). *Accord, Conley v. Pryo*r, No. 11-3200, 2015 WL 413638 *6, n. 4. (D. Kan. Jan. 30, 2015). "Thus, an affidavit 'asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge,' meaning that the affiant must 'affirmatively set forth the bases upon which [he or she] relies ... in making

the statements asserted,'" *Griddine v. GP1 KS-SB, Inc.*, No. 2:17-CV-02138-JAR, 2019 WL 1002049 *3 (D. Kan. Feb. 28, 2019), and "statements of mere belief" in an affidavit must be disregarded." *Id.* at 1200 (*quoting Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)). "Affidavit testimony prefaced by phrases such as 'to the best of my knowledge' and 'on information and belief' is not sufficient." *Bruner-McMahon v. Hinshaw*, 846 F.Supp.2d 1177, 1186, n. 6 (D. Kan. 2012). And "at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006). In particular, "conclusory allegations without specific supporting facts have no probative value." *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1143 (10th Cir. 2005).

The affidavits from representatives of ALDF, Shy 38 and Hope each suffers from the failure to affirmatively set forth the bases upon which he or she relies to show personal knowledge necessary to make many of the statements in the affidavits. Three of the affidavits conclude:

> That I am the [sic] an officer or agent of [plaintiff] in the above and foregoing action; that I have read this affidavit and know the contents thereof; and that all of the facts and ***statements therein are true and correct to the best of my knowledge and belief***.

ECF 54-1 at 32, 307, 320 (emphasis supplies). This is particularly concerning in connection with ALDF's representative. He states that he has served as the Chief Programs Officer at ALDF since 2016. ECF 54-1 at 23. His affidavit then reports, without explanation, events that happened before 2016, including ALDF undercover activities in Texas. It is unknown

whether the 2016 Nebraska investigation that he references happened before he came to ALDF; no detail is provided on how he knows about the investigation or its purported results. ECF 54-1 at 23-32.

Furthermore, all of the affidavits contain conclusory statements without providing supporting facts. They frequently attach unsworn documents which, in turn, contain inadmissible multiple hearsay.

In sum, the evidence left about the undercover operation that ALDF would like to conduct leaves to speculation the possibility of future injury. While ALDF would retain an operative, he would likely apply for a job with an animal facility owner; possibly obtain a job with the owner careless enough not to check out the operative's resume or interview statements; might if necessary lie by omission or affirmatively; and then "the exact trajectory of the investigation" is unknown. UF ¶ 12. Furthermore, a point not emphasized before, is that the operative apparently intends to damage the animal facility enterprise through reporting/documenting misconduct only if he/she finds it. If nothing is found–for instance if the operative finds the University of Kansas Medical Center is not abusing animals–there had been no violation of most of Subsections (c) and (d).

In summary, the speculative nature about what the ALDF operative might do, how representatives of animal facility might react, and what the operative might see at a given animal facility deny plaintiffs a path for receipt of what amounts to an advisory opinion.

However, even if ALDF's claims could overcome the speculation upon which they are based, its failure to challenge the separately enforceable legal obstacle to the relief it seeks, in K.S.A. 2019 Supp. 21-5808(a)(1), means that its challenges to Subsections (c)

and (d) cannot satisfy constitutional standing's causal link and redressability elements. In the defendants' opening brief it is established that the undercover operation ADLF would sponsor is criminal trespass. ECF 047 at 31-32.

Plaintiffs argue that the undercover operation would not violate K.S.A. 2019 Supp. 21-5808 because ALDF's operative will obtain consent to enter the premises by deception. They cite *Desnick v. Am. Broad. Companies, Inc*., 44 F.3d 1345, 1351 (7th Cir. 1995) (applying Wisconsin, Indiana and/or Illinois state law tort), which has nothing to do with the Kansas trespass statute, and they offer no analysis of the language in the Kansas criminal trespass statute.

Turning to the Kansas statute, the element of criminal trespass at issue is whether the accused "knows such person is not authorized or privileged." *See* K.S.A. 2019 Supp. 21-5808(a)(1). A lie or something short of an affirmative lie, if we assume deception includes fraudulent omissions, is antithetical with authorization or privilege. While discussing aggravated burglary, *State v. Maxwell*, 234 Kan. 393, 672 P.2d 590 (1983), is instructive. The aggravated burglary statute, K.S.A. 21-3716[12], provided:

> Aggravated burglary is ***knowingly and without authority entering*** into or remaining within any building, mobile home, tent or other structure, or any motor vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property in which there is some human being, with intent to commit a felony or theft therein.

---

[12] Now K.S.A. 2019 Supp. 21-5807.

*Id.* at 396 (emphasis supplied). Rejecting the claim of insufficient evidence to support an aggravated burglary conviction because the victim voluntarily allowed the defendant into the home through a lie, the court explained:

> [W]here the consent to enter ... is obtained by fraud, deceit or pretense the entry is not an authorized entry under the statute in that it is based on an erroneous or mistaken consent. Any such entry is unauthorized, and when accompanied by the requisite intent is sufficient to support a burglary or aggravated burglary conviction.

*Id.* at 397. *Accord, State v. Smith*, 36 Kan.App.2d 606, 615, 142 P.3d 739, *rev. denied* 282 Kan. 795 (2006).

Plaintiffs also say that they have standing to challenge the KFAFCRF as government action that could be a "contributing factor" to their injury. The cite *Nat. Res. Def. Council, Inc. v. U.S. FDA*, 710 F.3d 71, 85 (2nd Cir. 2013)[13], and *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 944, n. 2 (1982).[14] These cases discuss standing, but not impact on causation and redressability from the failure to challenge a separately enforceable legal obstacle.

    d.   *Plaintiffs do not rescue standing by alleging that they are required to divert resources.*

---

[13] The court held standing existed to challenge the FDA's regulation of triclosan, but not its regulation of triclocarban. As to triclosan, the court determined the required causal link was not broken by plaintiff's failure to purchase triclosan-free soap, nor her failure to advocate more forcefully to her employer for use of triclosan-free soap.

[14] The court held standing existed for a challenge to permitting. The court stated: "Because of the reciprocity requirement of § 46–613.01, appellants would not have been granted a permit had they applied for one. Their failure to submit an application therefore does not deprive them of standing to challenge the legality of the reciprocity requirement."

ALDF and CFS state that they have diverted resources to identify and combat "harms to their mission" from the KFAFCRF. ECF 055 at 26. To support their position that this provides standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), they present self-serving and conclusory statements in their representatives' affidavits. These statements must be ignored so that the organizational standing claims, under *Havens Realty,* are tested against the facts expressed in UF ¶¶ 16 & 17.

The courts have split on the reach of standing approved in *Havens Realty*. *Compare* decisions discussed at ECF 047 at 34-36 *with* those cited by plaintiffs at ECF 055 at 26-27. *See also Buckland v. Threshold Enterprises, Ltd.*, 66 Cal.Rptr.3d 543, 155 Cal.App.4th 798 (2007) (collecting varying case law as of 2007). The United States Supreme Court's later decisions appear to have cabined *Havens Realty* to invasion of a legally protected interest created by federal statute, *i.e.*, the [Fair Housing] Act allow[ed] suits by … a nonprofit organization that spent money to combat housing discrimination." *Bank of America Corp. v. City of Miami, Fla.*, 137 S.Ct. 1296, 1303 (2017); *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1553 (2016).

However, the facts offered by ALDF and CFS do not support standing even under the most expansive [and we think wrong] applications of *Havens Realty*. *See Am. Diabetes Assoc. v U. S. Depart. of the Army*, ___ F.3d ___, No. 18-15242, 2019 WL 4463289 * 5-6 (9th Cir. Sept. 18, 2019) (applying Ninth Circuit's interpretation) (Association lacked standing as its alleged diversion of resources were merely going about its business as usual; the Association did not show that, at the time the operative complaint was filed and as a result of the New Policy, the Association altered or intended to alter its resource allocation);

*Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co*., 160 F.3d 433, 434-35 (8th Cir. 1998) (applying the Eighth Circuit's interpretation) (ACORN lacked standing ACORN providing general information concerning the resources spent each month monitoring advertisements of a broad base of housing providers and working to counteract the effects of discriminatory advertising; it presents no facts to quantify the resources, if any, that were expended to counteract the effects of a single, allegedly discriminatory advertisement). *Cf. People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F.Supp.3d 1327, 1338 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1142 (11th Cir. 2018) (concluding standing under *Havens Realty*, with respect to diversion of resources, from extensive evidence of PETA's actions attempting to address Lolita's, a Killer Whale, conditions of captivity.

Thus, applying even the Ninth, Eighth and DC Circuits' expansive applications of *Havens Realty*, while plaintiffs may have political objections to traditional food production, which they press as part of their missions, they do not present any evidence that they suffered a distinct and concrete injury because of the KFAFCRF and lack standing as result. *See* UF ¶¶ 17-19. *See also* ECF 047 at 35-36.

Finally, the interpretation of standing allegedly produced from diversion of resources, i.e., that championed by plaintiffs in this case, has no real limitations. For example, any law professor may challenge the constitutionally of any statute that she or he may question if the professor claims strong feelings on the topic and may have written an article or two, in the past, on the general subject.

e. *Additionally, plaintiffs suffer no redressable injury from an alleged denial of receipt of speech.*

12

Plaintiffs claim standing on the basis that they rely on information produced by ALDF. This only has merit if there is a willing speaker. The only potentially willing speaker that plaintiffs have identified is ALDF. ALDF says that it has no information to communicate because its speech is objectively chilled. The consequence is that plaintiffs' asserted standing as listeners collapses because ALDF has not shown standing to challenge any part of the KFAFCRF. Otherwise, standing under a right to receive speech has no boundaries; and standing would be present in every case where an abridgment of speech is alleged.

      f.   *Even if plaintiffs' claims satisfy the standing concerns discussed, the governor should be dismissed.*

Disputing the governor should be dismissed plaintiffs cite *Petrella v. Brownback*, 697 F.3d 1285, 1293–94 (10th Cir. 2012) (finding standing in suit against the Governor and attorney general) and ignore the decisions these defendants cited, which hold the Governor must be dismissed because she has no specific statutory or constitutional duty to enforce the KFAFCRF. *See* ECF 047 at 36-55. There is no split in the Circuit. Instead, *Petrella* involved funding and enforcement of the funding system for Kansas' public elementary schools. The Governor has and had direct involvement with those statutes and Kansas' public school appropriations. The language in *Petrella* must be read in the context of its facts. Otherwise, the Governor is subject to defend every suit challenging the constitutionally of any of the State's statutes even when she cannot control whether anyone can be prosecuted for KFAFCRF offenses. Local county and district prosecutors, judges and even the attorney general are independent.

13

2.    **Assuming standing, summary judgment against plaintiffs' claims is proper because the KFAFCRF does not regulate constitutionally protected activity.**

The Supreme Court has refused to accept the view "that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

In defendants opening brief they note that the KFAFCRF does not gag anything. ECF 047 at 37. An ALDF operative can lie in a job application-assuming that is speech-and the lie is not a criminal offense unlike under the Iowa statute challenged in *Animal Legal Defense Fund v. Reynolds*, 297 F.Supp.3d 901 (S.D. Iowa 2018) (appeal pending).[15] The KFAFCRF does not punish collecting information or taking of photos, videos, unlike the Utah statute challenged in *Animal Legal Defense Fund v. Herbert*, 263 F.Supp.3d 1193 (D. Utah 2017).[16] *See* ECF 047 at 44-45. The opening brief also sets out well-accepted principles, which are controlling here, that plaintiffs want the Court to overlook: The First Amendment only protects conduct that is inherently expressive; not all creation of speech is protected activity; and a First Amendment right to create speech does not carry with it

---

[15] The challenged parts of Iowa Statute § 717A.3A(1) made a person guilty of "agricultural production facility fraud" "if the person willfully" "obtain[ed] access" "by false pretenses" or "makes a false statement or representation" in an employment application or agreement "with an intent to commit an act not authorized by the owner of the agricultural production facility." *Id*.

[16] The Utah Code § 76-6-112 provided a person is guilty of agricultural operation interference if the person "knowingly or intentionally records" an image or sound "by leaving a recording device on the agricultural operation; obtains access to an agricultural operation "under false pretenses;" becomes employed and "while present on, the agricultural operation, records an image of, or sound from, the agricultural operation;" or "knowingly or intentionally records an image of, or sound from, an agricultural operation while the person is committing criminal trespass." *Id*.

an exemption from other principles of law or legal rights of others (the right to create speech is protected activity only if conducted by means within the law). ECF 047 at 38-42.

Yet, plaintiffs ask the Court to accept that the KFAFCRF is aimed at speech, ECF 055 at 30. They focus on part of the act's definition of "effective consent," *i.e.*, "consent is not effective if" "induced by force, fraud, deception, duress or threat,"  K.S.A. 47-1826(d)(1)[17], and part of Subsection (c) which prohibits entry "to take pictures…," K.S.A. 47-1826(c)(4). Nevertheless, they admit that "[p]laintiffs do not seek access to animal facilities to speak, but to gather information," which they say, "is part of the process of producing speech." ECF 055 at 31.

Of course, "[a]ll human conduct is a precursor of speech." Andrew Koppelman, "Should Noncommercial Associations Have an Absolute Right to Discriminate?" 67-*AUT Law & Contemp. Probs*. 27 (Autumn 2004). But, while the cases cited by plaintiffs that address when there is protected creation of speech concern very different statutory provisions from those in our case[18], how can a desire to collect information be reconciled with the well-accepted principles set out in defendants' opening brief?

There are two interrelated answers. First, by the plaintiffs' admission, neither a possible lie made in order to trespass, with an intent to cause damage; nor trespass, with an

---

[17] They misrepresent that "[o]ne cannot violate the law *without* engaging in speech that leads to the owner's consent to enter the facility." ECF 055 at 31.

[18] *See Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 339 (2010) (funding of political speech); *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) (eavesdropping statute, which included a plan to openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) (municipal ordinance effectively totally banning tattoo parlors).

intent to cause damage and to take pictures, are expressive conduct. Again, they say that they "do not seek access to animal facilities to speak, but to gather information." Yet, in deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, courts ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). *Compare, Cressman v. Thompson*, 719 F.3d 1139, 1149-50 (10th Cir. 2013) (finds display of image on vehicle's license plate was sufficiently imbued); *Garcia v. Jaramillo*, No. 05–1212, 2006 WL 4079681, *15 (D. N.M. Nov. 27, 2006) (refusal to show driver's license was not sufficiently imbued). "United States Supreme Court decisions that accord free speech protections to conduct under the First Amendment have all dealt with conduct that is clearly expressive, in and of itself, without further explanation." *Accord*, *State v. Arlene's Flowers, Inc.,* 193 Wash.2d 469, 441 P.3d 1203, 1227 (2019) (holding commercial sale of floral wedding arrangements was not expression protected by First Amendment).[19]

Second, on the principles described in defendants' opening brief, when speech and nonspeech elements are combined, and the nonspeech element (*e.g.*, trespass) triggers the

---

[19] There is no authority for all encompassing protection of every act of photography or videography. *Center for Bio-Ethical Reform, Inc. v. Irvine Co., LLC*, 37 Cal.App.5th 97, 249 Cal.Rptr.3d 391, 405-06 (2019) (finding the case law supporting a constitutional right to photograph and record is limited to matters like law enforcement officers exercise of their official duties). Even then, the right appears limited to photos or video taken in areas open to the public. *Cf. Estes v. Texas,* 381 U.S. 532, 539-42 (1965); *McKay v. Federspeil*, 22 F.Supp.3d 731 (E.D. Mich. 2014) (no First Amendment right to record or video in courtroom). *See also, Sandberg v. Englewood, Colorado*, 727 Fed.Appx. 950, 963 (10th Cir. 2018) (*unpub.*) (holding it is not clearly established that officers violate the First Amendment when they prevent a person who is the subject of the police action from filming the police).

legal sanction, the incidental effect on speech rights does not raise First Amendment concerns. *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) (one of the cases cited by plaintiffs). *See e.g., Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-03522, 2018 WL 5879786, *6 (N.D. Cal. Nov. 7, 2018) (appeal pending).

Plaintiffs would label this second point as something like "generally applicable laws may be enforced even if they incidentally burden speech." ECF 055 at 29. This description seems too limiting, and it could cause mischief in another case. Not here. A generally applicable statute is one where the non-speech elements trigger the legal sanction. That is not the case with the KFAFCRF. Each of the offenses, under the act, are triggered by unconsented entry onto property with intent to cause damage. The fraudulent lie about an operative's prior employment or the like, the taking of photographs or videos, and the publication of anything are not criminalized.

We discussed *Western Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017), in defendants' opening brief. We revisit it. *Western Watersheds* held plaintiffs' collection of resource data on public property constituted protected creation of speech. However, the panel cautioned:

> This is not to say that all regulations incidentally restricting access to information trigger First Amendment analysis. In *Zemel v. Rusk*, 381 (U.S. 1 [ ] (1965), the Court explained that the "right to speak and publish does not carry with it the unrestrained right to gather information." [In *Zemel*], [t]he Court held that the restriction did not implicate the First Amendment because "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."[20] Had plaintiffs

---

[20] *See also Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) ("the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations"); *Smith v. Plati*, 258 F.3d 1167, 1178

challenged Wyoming's general trespass statute as impairing their right to gather information, *Zemel* might control.

*Id.* at 1195-96 (citations in *Zemel* omitted).

Plaintiffs also argue that individuals may exclude persons who would speak or gather information on that person's private property, but urges that government invades First Amendment rights if it intercedes, by its laws, to prevent such activities. This position is anchored on plaintiffs' misreading of *Herbert,* in which the Utah District Court stated: "If a person's First Amendment rights were extinguished the moment she stepped foot on private property, the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on private property." 263 F. Supp. 3d at 1208. But *Herbert* was addressing criminalization of speech wherever it was expressed; this case concerns criminalization of trespass whether to gather information or to physically damage property or injure persons.

Government may punish criminal trespass and is not burdened, in doing so, to prove any incidental effect on speech passes strict scrutiny. *E.g., Adderley v. State of Fla.*, 385 U.S. 39 (1966) (convictions for criminal trespass at nonpublic parts of and around jail were upheld); *Hudgens v. NLRB*, 424 U.S. 507 (1976) (suit by a group of labor union members who were threatened with arrest for criminal trespass, where Supreme Court held that the union's warehouse employees had no First Amendment right to enter the private shopping

---

(10th Cir. 2001) ("no general First Amendment right of access to all sources of information within governmental control"); *Oklahoma Hosp. Ass'n v. Oklahoma Pub. Co.*, 748 F.2d 1421, 1425 (10th Cir. 1984) ("right to speak and publish does not carry with it the unrestrained right to gather information," quoting *Zemel*).

center for the purpose of advertising their strike against the employer). On the flipside of the coin, although civil lawsuits are between private parties, courts' application of the state law is an exercise of state power which implicates First Amendment rights through the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). As a result, consideration of the multiple decisions, which find First Amendment rights are not defense in tort cases, cannot be devalued.

### 3. Even assuming KFAFCRF restricts some expressive activity, it does not impermissibly infringe First Amendment rights.

#### a. *A lie to damage the enterprise conducted at an animal facility is "proscribable speech."*

If a lie that fraudulently induces consent to trespass, made with the specific intent to cause damage, is in fact speech, it is constitutionally proscribable speech. *See* ECF 047 at 47-48.

In attempted response to this, plaintiffs advance an indefensible position. They claim that ALDF's operative's desired undercover operation causes no legally cognizable harm because, they say, their good intentions [combined with no plan to cause physical damage] trump the animal facility owners' privacy and property interests even when damage to the facility's enterprise is planned. This argument improperly narrows *United States v. Alvarez*, 567 U.S. 709, 723 (2012) ("Where false claims are made to effect a fraud or secure moneys or other valuable considerations, ... it is well established that the Government may restrict speech without affronting the First Amendment"). In *United States v. Glaub*, 910 F.3d 1334, 1337 (10th Cir. 2018), our Circuit also noted that speech

used as an integral part of conduct in violation of a valid criminal statute is also not protected.

Plaintiffs' reliance on *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995), and *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999), as discussed by the Ninth Circuit's *Wasden* majority, 878 F.3d at 1194, is unpersuasive. The point that plaintiffs hope to make is that consent to enter private property obtained by deception is not itself a trespass, supposedly meaning a lie told by ALDF's operative causes no cognizable harm. In *Wasden*, the majority found the Idaho misrepresentation provisions targeted "falsity and nothing more," mostly following the *Desnick/Food Lion* logic, so that the speech could not be proscribed absent First Amendment scrutiny. *Id.* at 1196.

The consent by deception analysis in *Desnick/Food Lion* is dubious.[21] Under Kansas law, legal injury is presumed from a trespass; and consent to entry secured by misrepresentation is no consent at all. *Belluomo v. KAKE TV & Radio, Inc.*, 3 Kan.App.2d 461, 469, 474, 596 P.2d 832 (1979). *See also, S. v. Alexander*, 802 F.3d 1134, 1140 (10th Cir. 2015) ("We see no principled reason to distinguish between a perpetrator who places another person in fear by brandishing a weapon and one who induces fear by deception").

---

[21] Cases rejecting *Desnick's* reasoning include: *Planned Parenthood Federation of Amer., Inc. v. Ctr. for Medical Progress*, 214 F.Supp.3d 808 (N.D. Cal. 2016) (consent not effective if induced by fraud, distinguishing *Desnick* as a trespass claim which failed because recorded activity was in publicly accessible places); *Pitts Sales, Inc. v. King World Productions., Inc.*, 383 F.Supp.2d 1354 (S.D. Fla. 2005) (consent not effective if induced by fraud, distinguishing *Desnick* as a trespass claim which failed because recorded activity was in publicly accessible places); *Medical Laboratory Man. Consul. v. Am. Broadcasting Co(s).*, 30 F.Supp.2d 1182 (D. Ariz. 1998) (consent not effective if induced by fraud).

And the distinction plaintiffs assert was cogently rejected by Judge Beas' dissent/concurrence in *Wasden*, 878 F.3d at 1208-09.

However, under the KFAFCRF, there is no criminal offense absent specific intent to cause damage to the animal or crop enterprise. This moots the *Desnick/Food Lion* distinction. That is precisely what the Eighth Circuit majority held in *Wasden* to which Judge Beas concurred. It found, where the Idaho statute precluded misrepresentation to obtain records or to secure employment with the "intent to cause economic or other injury," the lie caused actual or potential harm on a facility and bestowed material gain so that it was proscribable. *Wasden*, 878 F.3d at 1200, 1201-02.[22]

> b. *Reasonable regulation prohibiting entry to photograph, film, or otherwise record on nonpublic governmental and private property does not abridge the First Amendment.*

Defendants did not mistakenly raise the constitutional forum doctrine. Plaintiffs say that the doctrine only applies when a statute regulates "only in a specific location," on "*government … property.*" ECF 055 at 34 (*quoting Minnesota Voters All. v. Mansky*, 138

---

[22] Plaintiffs' attempt to distinguish *Wasden* on this issue is illusory. They represent that *Wasden* only rejected plaintiffs' challenge because it found the law's restitution clause did not allow compensation for reputational and publication damages. ECF 055 at 33. Actually, the majority rejected the argument that the Idaho statute discriminated by viewpoint on this basis after concluding the speech was not protected if viewpoint neutral. 878 F.3d at 1202.

Viewpoint neutrality is discussed below. However, the Court should not need to reach whether KFAFCRF allows compensation for reputational and publication damages to find it is viewpoint neutral. Plaintiffs do not make argue viewpoint discrimination on the basis of compensation awardable under the act. Further, publication is not prohibited by the act; and compensation for pure reputational damages does not appear to be available under the act's private cause of action or by restitution. *See, infra*, n. 10. Finally, *Wasden* does not stand for the proposition that the Idaho act would have been viewpoint discriminatory in any event even if recovery of such damages were recoverable. The panel's majority simply rejected the predicate of plaintiffs' argument in that case.

S.Ct. 1876, 1885 (2018)) (plaintiffs' emphasis). They also argue regulation must be content neutral under the doctrine. ECF 055 at 34-35. Each position must be rejected. However, what plaintiffs do not contest is that prohibition of unconsented entry onto an animal facility and hiding after entry in order to make recordings is reasonable to preserve the lawful KFAFCRF dedicated purposes when tested under the limited public or nonpublic fora constitutional analysis. *See* ECF 047 at 49-51.

Answering plaintiffs' arguments in reverse: It is settled that "some types of content discrimination [do] not violate the First Amendment." *Virginia v. Black*, 538 U.S. 343 (2003). *Black* states, "[t]he First Amendment permits content discrimination "based on the very reasons why the particular class of speech at issue ... is proscribable." *Id.* at 362 (*quoting R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). *See also, Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007) ("Similarly, content discrimination among various instances of a class of proscribable speech does not pose a threat to the marketplace of ideas when the selected subclass is chosen for the very reason that the entire class can be proscribed"). *Accord, U.S. v. Magleby*, 420 F.3d 1136, 1144 (10th Cir. 2005) ("content-based distinction within a class of proscribable speech is permissible when the basis of the distinction is the same as the basis for proscribing the class of speech as a whole").

Further, regulation governing speech in such nonpublic fora is evaluated against the low bar of reasonableness of the restriction in light of the purpose of the forum. *McDonnell v. Denver*, 878 F.3d 1247, 1254 (10th Cir. 2018). "[T]he state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is

reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). In other words, in nonpublic *fora* the Court "need not address whether [regulation of speech] is content-based or content-neutral." "All [it] must consider is whether the policy … is viewpoint-neutral and reasonable in light of the forum's purpose." *Hawkins v. City and County of Denver*, 170 F.3d 1281, 1288 (10th Cir. 1999). Thus, government can impose, subject only to reasonableness and viewpoint neutrality, "content-based restrictions on speech in nonpublic forums, including restrictions that exclude [even] political advocates and forms of political advocacy." *Minnesota Voters All. v. Mansky*, 138 S.Ct. 1876, 1886-87 (2018).

Then as to plaintiffs' claim that the forum analysis applies "only in a specific location," on "*government* … property," it is front loaded on a misquotation of *Mansky*. *Mansky* actually stated, "But the ban [on wearing political badge, button or other insignia] applies only in a specific location: the interior of a polling place. It therefore implicates our "'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." 138 S.Ct. at 1885 (*quoting International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). The Court does not limit the forum analysis to public property by this statement. [23] And it is worthy of some note that the

---

[23] Furthermore, the doctrine is not tethered to a physical location. *See Iancu v. Brunetti*, 139 S.Ct. 2294, 2326 (2019) (governmental initiatives are treated as a limited public (or nonpublic) forum).

polling place in *Mansky* was privately owned property government-controlled for the purpose of voting. *Id.* at 1886.

At play in this case is that the KFAFCRF applies to both private and governmental property, albeit nonpublic fora. *See e.g.*, K.S.A. 47-1826(i) (research facility, part of the definition of animal facility, includes "elementary school, secondary school, college or university"). Therefore, what the plaintiffs demand is greater scrutiny of regulation of speech at private property, then speech on government owned property. This spins the forum analysis on its head.

In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), the Court said:

> Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Ass'n,* [453 U.S. 114], 129 [] [(1981)]. In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Id.*, 453 U.S., at 131, n. 7 [ ]. As we have stated on several occasions, "*the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.*" *Id.*, 453 U.S., at 129, [ ]; *Greer v. Spock*, 424 U.S. 828, 836 [ ] (1976); *Adderley v. Florida*, 385 U.S. 39, 48 [ ] (1966).").

*Id.* at 46 (emphasis supplied). *See also Mansky,* 138 S.Ct. at 1886-87 ("This Court employs a distinct standard of review to assess speech restrictions in nonpublic forums because the government, 'no less than a private owner of property,' retains

the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'") (*quoting Adderley v. Florida*, 385 U.S. 39, 47 (1966)).

The Fourteenth Amendment's state action element explains, in some measure, why constitutional fora analysis does not come up in response to a restriction of expressive conduct on private property. However, the broader explanation is that a First Amendment right to create speech does not carry with it an exemption from other principles of law or legal rights of others. *See infra*, at 14-19; ECF 047 at 38-42. It is, therefore, an unusual case where a court must apply the nonpublic fora analysis to private property. Yet, there is no conceptual justification that the analysis is inapplicable.

c. *The KFAFCRF is viewpoint neutral.*[24]

Viewpoint discrimination is a subset of content discrimination. *Rosenberger v. Rector*, 515 U.S. 819, 828-29 (1995). A viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the

---

[24] Defendants do not concede that the offense of unconsented entry, with intent to cause damage, to photograph, film, or otherwise record, Subsection (c), has content discrimination. If it regulates speech at all, it is not content based regulation because the subsection addresses no topic discussed or the idea or message expressed by the conduct. *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2222 (2015). Subsection (c) draws no distinctions based on the message a speaker conveys. *Id.* The purposes for the regulation are described in defendants' opening brief, ECF 047 at 49-50, and are unrelated to the content of expression. They remain neutral even there is an incidental effect on some speakers or messages but not others. *McCullen v. Coakley*, 573 U.S. 464, 480 (2014); *Golan v. Holder*, 609 F.3d 1076, 1083 (10th Cir. 2010). Furthermore, the "facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen,* at 480. For example, while a questioned ordinance was obviously enacted in response to the activities of antiabortion protesters who wanted to protest at the home of a particular doctor to persuade him and others that they viewed his practice of performing abortions to be murder, it was held content neutral. *Hill v. Colorado*, 530 U.S. 703, 724 (2000) (J. Stevens) (summarizing *Frisby v. Schultz*, 487 U.S. 474, 482-84 (1988)).

particular position the speaker wishes to express." 1 Smolla & Nimmer on Freedom of Speech § 3:9 (*citing Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 176 (1976)). Viewpoint discrimination occurs when the government favors "one speaker over another." *Rosenberger*, 515 U.S. at 828.

However, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of viewpoint discrimination exists." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (emphasis added). As a result, there is no valid viewpoint discrimination question about the lies ALDF's operative might tell to gain unauthorized entry to an animal facility.

Furthermore, as defendants' opening brief explained, if the KFAFCRF indirectly prohibits the taking of photographic or video footage, the regulation does not take sides on either how the recording is made or what images are recorded, and it is explained K.S.A. 47-1827(c)(4) applies equally to all potential recordings. *See* ECF 047 at 51-52.

Plaintiffs argue that the purpose of enacting the KFAFCRF was disagreement with their message. ECF 054, at 38-40. No reasoned interpretation of the legislative history of the KFAFCRF supports this assertion. Rather, the apparent intent is to stop entry upon animal and crop facility property to prevent personal injury and property damage. See UF ¶¶ 4-7. Moreover, the isolated excerpts from articles provided to legislative committees, which plaintiffs rely upon, are no evidence of legislative intent. *See* ECF 047 at 10, n. 3.

Plaintiffs assert viewpoint discrimination is apparent because there are no special statutes criminalizing unauthorized entries at nursing homes, child-care facilities[25] or immigration centers.[26] ECF 054 at 40. But a "legislature may address a problem one step at a time, and even select one phase of one field and apply a remedy there, neglecting the others." *Moritz v. C. I. R.*, 469 F.2d 466 (10th Cir. 1972) (*citing Jefferson v. Hackney*, 406 U.S. 535, 546 (1972)).[27]

### 4.    Finally, plaintiffs' overbreadth challenge must be rejected.

Plaintiffs' overbreadth challenge seems an afterthought. One of the two cases they cite as support for their claim is *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). There the Supreme Court held Oklahoma's Merit System of Personnel Administration Act, that restricts the political activities of the State's classified civil servants was not unconstitutionally substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which the Acts sanctions, assertedly, may not be applied.

The Supreme Court has explained that a statute may be struck down if it is "susceptible of regular application to protected expression." *City of Houston v. Hill*, 482

---

[25] Nursing homes and child-care facilities are both regulated entities. It is likely regulations address how those entities protect their residents from unauthorized trespassers.

[26] If Kansas has such centers, it is reasonable to suppose that federal law would apply to unauthorized entries at those locations.

[27] Furthermore, animal and crop facilities are not the only locations at which unauthorized entry is a criminal offense under Kansas law. Setting aside general trespass laws, *see e.g.*, K.S.A. 2018 Supp. 21-5808(c) (health care facility); K.S.A. 2018 Supp. 21-5809 (railroad); K.S.A. 2018 Supp. 21-5810 (criminal hunting); K.S.A. 2018 Supp. 21-5811 (commercial fossil hunting); K.S.A. 2018 Supp. 21-5839 (computer); K.S.A. 8-1102 (motor vehicle abandonment).

U.S. 451, 467 (1987). In other words, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Then, the statute is judged in relation to the statute's plainly legitimate sweep. See ECF 047 at 53. And the overbreadth challenge is disfavored. *Id.*

Against this, plaintiffs assert, without providing any analysis, that the KFAFCRF's supposed unconstitutional sweep encompasses workers' right advocates seeking to identify poor working conditions and labor organizers trying to organize unions, in addition to undercover journalists of the ALDF operative's ilk. ECF 055 at 38. How there is a realistic danger that the KFAFCRF criminalizes their constitutional behavior, if it does at all, is unclear. What is certain is that any hypothetical constitutional issues concerning such advocates can and, if present, should be cured through case-by-case analysis of the facts.

## Conclusion

In defendants' motion Under plaintiffs' logic, a person's First Amendment rights are infringed if the person is prohibited by criminal statute from entering private property (say the bedroom of a star quarterback) with the intent of causing damage to the private property's owner (the quarterback) so long as either the access to the private property was secured by the person's lie or the person wants to take some pictures.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

28

s/ Arthur S. Chalmers
Arthur S. Chalmers, KS S. Ct. #11088
Assistant Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612
Ph: (785) 368-8426
Fax: (785) 291-3707
Email:  art.chalmers@ag.ks.gov
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that on this 15th day of October, 2019, I electronically filed the

above and foregoing with the Clerk of the Court using the Court's Electronic Filing

System, which will send a notice of electronic filing to all counsel of record:

Amanda Howell
ahowell@aldf.org
David Muraskin
dmuraskin@publicjustice.net
George Kimbrell
gkimbrell@centerforfoodsafety.org
Kelsey Eberly
keberly@aldf.org
Matthew Liebman
mliebman@aldf.org
Michael Moss
mmoss@foleymansfield.com
Alan Chen
achen@law.du.edu
Justin Marceau
jmarceau@law.du.edu
Matthew Strugar
Matthew@matthewstrugar.com

*Attorneys for Plaintiffs*

s/ Arthur S. Chalmers

Arthur S. Chalmers