# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANIMAL LEGAL DEFENSE FUND,　　　)
CENTER FOR FOOD SAFETY, SHY 38, INC.　)
and HOPE SANCTUARY,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　　)　　　CIVIL ACTION
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　No. 18-2657-KHV
　　　　　　　　　　　　　　　　)
LAURA KELLY and　　　　　　　　　)
DEREK SCHMIDT,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　)
_____)

## MEMORANDUM AND ORDER

Animal Legal Defense Fund ("ALDF"), Center for Food Safety ("CFS"), Shy 38, Inc. and Hope Sanctuary are interest groups aimed at protecting and advocating for animals and the environment. On December 4, 2018, they filed suit under 42 U.S.C. § 1983 against the Governor and Attorney General of Kansas in their official capacities. Plaintiffs seek a declaratory judgment that the Kansas Farm Animal and Field Crop and Research Facilities Protect Act, K.S.A. §§ 47-1825 et seq., is unconstitutional. This matter is before the Court on cross-motions for summary judgment: Defendants' Motion For Summary Judgment (Doc. #46) filed July 25, 2019 and Plaintiffs' Motion For Summary Judgment (Doc. #53) filed September 16, 2019. For reasons stated below, the Court sustains each motion in part.

**Factual Background**

The following facts are uncontroverted or, where disputed, the positions of the parties are noted.[1]

## I.     K.S.A. §§ 47-1825 through 47-1828

In 1990, Kansas enacted the Kansas Farm Animal and Field Crop and Research Facilities Protect Act, K.S.A. §§ 47-1825 et seq.  Broadly speaking, in relevant part, the Act makes it a crime to commit the following acts without the effective consent of the owner and with the intent to damage an enterprise conducted at the animal facility: (1) damage or destroy an animal facility or an animal or property at an animal facility; (2) exercise control over an animal facility, an animal from an animal facility or animal facility property with the intent to deprive the owner of it; (3) enter an animal facility that is not open to the public to take photographs or recordings; and (4) remain at an animal facility against the owner's wishes.  K.S.A. § 47-1827(a)-(d).[2]   In

---

[1]      The Court includes only those facts which are relevant and supported by evidence which would be admissible at trial.   See Fed. R. Civ. P. 56(c).

[2]      In relevant part, K.S.A. § 47-1827 provides as follows:

(a) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, damage or destroy an animal facility or any animal or property in or on an animal facility.

(b) No person shall, without the effective consent of the owner, acquire or otherwise exercise control over an animal facility, an animal from an animal facility or other property from an animal facility, with the intent to deprive the owner of such facility, animal or property and to damage the enterprise conducted at the animal facility.

(c) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility: (1) Enter an animal facility, not then open to the public, with intent to commit an act prohibited by this

(Continued . . .)

addition, K.S.A. § 47-1828 provides a private right of action for "[a]ny person who has been damaged by reason of a violation of K.S.A. § 47-1827 against the person who caused the damage."[3]

---

[2] (. . . Continued)

section; (2) remain concealed, with intent to commit an act prohibited by this section, in an animal facility; (3) enter an animal facility and commit or attempt to commit an act prohibited by this section; or (4) enter an animal facility to take pictures by photograph, video camera or by any other means.

(d)(1) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, enter or remain on an animal facility if the person: (A) Had notice that the entry was forbidden; or (B) received notice to depart but failed to do so. (2) For purposes of this subsection (d), "notice" means: (A) Oral or written communication by the owner or someone with apparent authority to act for the owner; (B) fencing or other enclosure obviously designed to exclude intruders or to contain animals; or (C) a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden.

K.S.A. § 47-1827(a)-(d) (2019).

[3] On June 13, 1990, then-Kansas Attorney General Robert T. Stephan issued an opinion letter addressed to Kansas State Representative Shelia Hochhauser regarding the meaning of various provisions in the Act. Attorney General Opinion No. 90-72 (June 13, 1990) (Doc. #1-1) filed December 4, 2018. Rep. Hochhauser had asked whether, under K.S.A. § 47-1827(c)(4), the phrase "intent to damage the enterprise conducted at the animal facility" was limited to physical damage or also included damages resulting from later publication of a photograph taken at the facility.

Stephan, who apparently did not understand the question, responded that in a criminal prosecution under subsection (c)(4), the sentencing court could order restitution for the full amount of the victim's losses. Stephan also opined that in a civil suit under K.S.A. § 47-1828, plaintiffs could recover an amount equal to three times all actual and consequential damages, court costs and reasonable attorney fees. In his opinion, actual damages included damages for impairment of reputation, personal humiliation and loss of profit, both present and future.

Plaintiffs assert that Stephan's letter unequivocally supports their view that "intent to damage the enterprise conducted at the animal facility" includes intent to cause reputational harm and is not limited to physical damage. Defendants assert that Stephan did not answer the question whether "intent to damage the enterprise conducted at the animal facility" is limited to physical

(Continued . . .)

As initially enacted, the Act provided that consent was not effective if induced by force or threat.   In 2012, Kansas amended the definition of "effective consent" to provide that consent is also ineffective if "[i]nduced by force, fraud, deception, duress or threat." K.S.A. § 47-1826(e).

## II.   Undercover Investigations

ALDF is a national non-profit animal protection organization that uses education, public outreach, investigations, legislation and litigation to carry out its work on behalf of animals, including those raised for food and subject to laboratory experiments.   To expose potential mistreatment of animals and other wrongdoing, ALDF engages in undercover investigations of animal facilities throughout the country.   ADLF's co-plaintiffs – CFS, Hope Sanctuary and Shy 38 – are non-profit animal rights and food safety groups.   CFS is a national environmental and consumer advocacy non-profit organization; Hope Sanctuary is a farm animal rescue non-profit organization; and Shy 38 is a non-profit farm animal rescue home.   They do not conduct undercover investigations but rely upon information from whistleblowers and ALDF undercover investigations.[4]

---

[3]         (. . . Continued)

damage, and the Court agrees.   Stephan's opinion on recoverable damages in a civil lawsuit has no bearing on this Court's analysis.     In Kansas, an Attorney General opinion is persuasive authority only; it binds neither this Court nor county or district prosecutors.   Aid for Women v. Foulston, 441 F.3d 1101, 1108 n.6 (10th Cir. 2006) (citing Willis v. Kan. Highway Patrol, 273 Kan. 123, 130, 41 P.3d 824, 829 (2002)).   An Attorney General opinion which is not on point and is 30 years old does not shed light on any issue that is properly before the Court.

[4]         Their missions are as follows:

CFS empowers people, supports farmers and protects the earth from the harmful impact of industrial agriculture using legal, scientific and grassroots action to protect and promote the public's right to safe food and the environment.

(Continued . . .)

ALDF has conducted undercover investigations of animal facilities in states other than Kansas. Such investigations typically proceed as follows: ALDF retains an investigator to gain access to an animal facility by obtaining employment there. The investigator does not misrepresent his or her qualifications, but conceals his or her affiliation with ALDF and, if asked, directly denies that an animal rights organization sent him or her to apply for a job.

While performing his or her job functions, the investigator wears a hidden camera. Because agricultural facilities commonly post notices that forbid nonconsensual access, photography or video recording, the investigator is usually on notice that the facility owner forbids such investigative activities.

At times, the investigator may exercise control over animals or parts of a facility by taking a managerial position, exercising supervisory authority or temporarily closing off part of a facility to avoid detection while photographing or recording the conditions. The investigator does not exercise or intend to exercise actual, ongoing physical control over an entire animal facility.

During an investigation, if an investigator discovers suffering or mistreatment of animals, the investigator hopes to persuade public officials to remove the animals from the owner and send

---

Shy 38, based in Lawrence, Kansas, provides a permanent home to over 30 rescued farm animals. It aims to change attitudes about industrialized farm animals by offering a compassionate public humane education program, promoting a cruelty-free, vegan lifestyle and providing opportunities for the public to interact with rescued farmed animals.

Hope Sanctuary is based in Kansas City, Missouri and aims to rescue and rehabilitate factory farmed animals and raise awareness about their lives through education and sharing the animals' unique stories of resilience, desire and will to live. Hope Sanctuary seeks to create a sustainable society that invests in the integrity of the environment and animals, guaranteeing fair and humane treatment for farmed animals worldwide.

them to a sanctuary or seize them as evidence for a criminal investigation. The investigator will not remove animals or property, but ALDF's disclosure "could lead public officials to seize animals during a pending criminal investigation, or remove them to a sanctuary in order to protect their welfare – consequences ALDF fully intends, if the situation warrants." <u>Plaintiffs' Memorandum In Opposition To Summary Judgment</u> (Doc. #55) filed September 16, 2019 at 14. Neither ALDF nor its investigators intend to cause physical or tangible damage to any animal facility, animal or animal research facility.

Although an investigator may take minor steps to hide his or her investigative activities, such as standing behind a wall to covertly film a suffering animal, an investigator does not intend to physically conceal himself after an agricultural facility is closed for business. An investigator does not physically conceal himself to cause actual physical damage and does not remain at an animal facility if an owner specifically directs him to leave.

After an investigation, ALDF publicizes the results and circulates video footage to media and ALDF audiences. ALDF may then urge criminal prosecution, submit regulatory complaints and file civil lawsuits.

In investigating animal facilities, ALDF's specific goal is to expose animal cruelty, unsafe working conditions, food safety violations and other misconduct, in hope that such exposure will inspire reform. ALDF intends for the animal facilities which it investigates to experience negative consequences and resulting economic harm, including boycotts, lost business, plant closure or other economic harm. That said, ALDF does everything in its power to ensure that investigators follow all applicable protocols and rules, and that they cause no physical or tangible damage to any animal facility, animal or research facility, as defined in the Act. ALDF only

intends the economic consequences which flow from public and government scrutiny of the conditions and practices that it documents.

ALDF wishes to conduct an undercover investigation in Kansas but has refrained from doing so out of fear of criminal prosecution under the Act. If the Court finds that the Act is unconstitutional, ALDF will commence an undercover investigation in Kansas.

Defendants have never prosecuted plaintiffs, or threatened plaintiffs with prosecution, under the Act. Indeed, the parties are not aware that the State of Kansas has ever prosecuted anyone under the Act.

## III. Use Of ALDF Undercover Investigations By CFS, Shy 38 And Hope Sanctuary

If ALDF conducts an undercover investigation in Kansas, it will share its findings with CFS, Shy 38, Hope Sanctuary and other peer organizations. CFS, Shy 38 and Hope Sanctuary rely on ALDF to conduct undercover investigations and do not intend to conduct their own undercover investigations, or to engage in conduct which could potentially violate the Act. Their interest in this lawsuit is in information which ALDF may provide them, i.e. photos and videos, to further their advocacy efforts. They believe that they cannot accomplish their missions without an ALDF undercover investigation in Kansas. See supra, note 4.

## IV. Expense Of Fighting The Act And Similar Laws

ALDF and CFS assert that they have incurred significant organizational expenses combatting the Act and similar laws in other states. Shy 38 and Hope Sanctuary do not allege that they have expended resources because of the Act.

## V. Procedural Background

On December 4, 2018, plaintiffs filed a complaint alleging that the Act is unconstitutional. Complaint (Doc. #1). Specifically, in Count 1, plaintiffs allege that the Act violates their First

Amendment right to freedom of speech, both on its face and as applied to plaintiffs, because it imposes a viewpoint-based and content-based restriction on their ability to engage in speech and speech-producing conduct on a matter of public concern, and defendants cannot meet their burden of justifying this speech restriction under either strict or intermediate scrutiny. Pretrial Order (Doc. #49) filed July 31, 2019 at 15. In Count 2, plaintiffs allege that the Act violates their First Amendment right to freedom of speech because it is unconstitutionally overbroad in that while it restricts some forms of conduct that are not protected speech, its reach also extends to a substantial amount of constitutionally protected speech. Id.

In response, defendants assert that plaintiffs lack standing to prosecute some or all of their claims. Specifically, defendants assert as follows: (1) as to K.S.A. § 47-1827(a) and (b), plaintiffs cannot show injury based on a credible threat of prosecution because those provisions do not proscribe the conduct in which plaintiffs wish to engage; (2) as to K.S.A. § 47-1827(c) and (d), plaintiffs cannot show injury based on a credible threat of prosecution because their desire to violate those provisions is too speculative, and they cannot show redressability because they fail to challenge a separately enforceable legal obstacle – criminal trespass law – which bars the conduct in which they do wish to engage; (3) as to the private right of action in K.S.A. § 47-1828, plaintiffs cannot show causation because defendants are not responsible for enforcing that provision; (4) plaintiffs cannot establish injury based on diversion of organizational resources; and (5) plaintiffs do not suffer a redressable injury from an alleged denial of receipt of speech.

Alternatively, if the Court finds that plaintiffs have standing, defendants assert that the Act does not violate the First Amendment for the following reasons: (1) lying to damage the enterprise conducted at an animal facility is not protected speech; (2) reasonable regulations that prohibit photographing, filming or otherwise recording on nonpublic government and private property do

not infringe First Amendment rights; (3) the Act is viewpoint-neutral; (4) the Act is content-neutral; and (5) the Act is not overbroad. In addition, defendants assert that the Court should dismiss the Governor because she is not a proper defendant.[5] Pretrial Order (Doc. #49) at 16.

The parties have filed cross-motions for summary judgment on all claims.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252. To determine if a dispute about a material fact is genuine, the Court must decide whether the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. Id. The Court views the record in the light most favorable to the nonmoving party and considers only evidence which would be admissible at trial. See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991); see also Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995).

When parties file cross-motions for summary judgment, they do not necessarily concede the absence of a genuine issue of material fact. Nafco Oil & Gas, Inc. v. Appleman, 380 F.2d

---

[5] In the Pretrial Order (Doc. #49), defendants also assert that the Eleventh Amendment limits plaintiffs' claims. They do not mention the Eleventh Amendment in their motion for summary judgment, however, and they accordingly have waived any summary judgment argument based on the Eleventh Amendment.

323, 324-25 (10th Cir. 1967). By filing a summary judgment motion, a party concedes that no issue of fact exists under the theory it is advancing, but it does not concede that no issues remain if the Court adopts its opponent's theory. Id. at 325; see also Eagle v. Louisiana & S. Life Ins. Co., 464 F.2d 607, 608 (10th Cir. 1972). Accordingly, the Court treats cross-motions for summary judgment separately; the denial of one does not require the grant of another. Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007). Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts. Id. If the parties do not dispute the facts and only disagree about whether the challenged action is constitutional, summary disposition is appropriate. Id.

Where, as here, the Court addresses the issue of standing on cross-motions for summary judgment, the burden is on plaintiffs to set forth specific facts, by affidavit or other evidence, which demonstrate a genuine issue of material fact concerning standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 590 (1992) (Blackmun, J., dissenting); Munoz-Mendoza v. Pierce, 711 F.2d 421, 425 (1st Cir. 1983).

## Analysis

Plaintiffs argue that the Act is unconstitutional because it restricts protected speech in violation of the First Amendment. Defendants assert that some or all plaintiffs lack standing to challenge the Act, and that even if some have standing, the Act is constitutional because it essentially prohibits conduct – trespass – not protected speech. The Court first addresses whether plaintiffs have standing, and then turns to the merits of the Act.

## I. Standing

Federal courts are not "free-wheeling enforcers of the Constitution and laws" – Article III of the U.S. Constitution limits their jurisdiction to cases and controversies. Initiative &

Referendum Inst. v. Walker, 450 F.3d 1082, 1087 (10th Cir. 2006) (en banc). To maintain suit in federal court, plaintiffs must demonstrate (1) injury, (2) caused by the conduct about which they complain, (3) that is redressable. Lujan, 504 U.S. at 560-61.

As to the first element, plaintiffs must have suffered an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Lujan, 504 U.S. at 560. In a pre-enforcement constitutional challenge to a criminal statute,[6] plaintiffs satisfy the injury-in-fact requirement if they show an intention to engage in conduct arguably affected with a constitutional interest but that the statute proscribes, and there exists a credible threat of prosecution under the statute. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-59 (2014) (citing Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979)). The threat of prosecution is generally credible where a challenged provision on its face prohibits the conduct in which plaintiffs wish to engage, and the state has not disavowed any intention of invoking the provision against them. United States v. Supreme Court of New Mexico, 839 F.3d 888, 901 (10th Cir. 2016); Babbitt, 442 U.S. at 302; see, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 16 (2010) (plaintiffs alleged credible threat of prosecution where government did not argue plaintiffs would not be prosecuted if "they do what they say they wish to do"); Cressman v. Thompson, 719 F.3d 1139, 1145 (10th Cir. 2013) (threat of prosecution credible where state officials informed plaintiff he could be prosecuted for disobeying challenged statute); cf. Stern v. U.S. Dist. Court for the Dist. of Mass., 214 F.3d 4, 10 (1st Cir. 2000) (U.S.

---

[6] Although K.S.A. § 47-1828 imposes civil liability, the Act primarily imposes criminal liability and plaintiffs' argument centers on what the Act *criminalizes*. Furthermore, plaintiffs do not meaningfully challenge Section 47-1828, which creates a private right of action for persons who are damaged by violation of the Act's criminal provisions.

-11-

Attorney's suit ripe where rule imposed new requirements on federal prosecutors and Bar Counsel stated unequivocally that he would enforce requirements).[7]

The second element of the standing inquiry is causation – whether the conduct complained of is fairly traceable to the challenged action of defendants, and not the result of independent action by some third party that is not before the Court. Lujan, 504 U.S. at 560.

The third element is redressability – it must be likely, and not merely speculative, that a decision in plaintiffs' favor will redress their injury. Id. at 561. If a separate statute which plaintiffs' do not challenge prohibits their conduct, a decision in plaintiffs' favor may not redress their injury. See Bishop v. Smith, 760 F.3d 1070, 1078 (10th Cir. 2014) (injury not redressable when unchallenged legal obstacle is enforceable separately and distinctly from challenged provision); see also Maverick Media Grp., Inc. v. Hillsborough Cty., Fla., 528 F.3d 817, 820 (11th Cir. 2008). Plaintiffs do not have to show that a favorable decision will completely redress their injury; they only need to show that a favorable decision will reduce their injury to some degree. See Massachusetts v. EPA, 549 U.S. 497, 526 (2007).

As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing

---

[7]     In Initiative & Referendum Inst., the Tenth Circuit elaborated on the injury-in-fact requirement as follows:

> [I]n a suit for prospective relief based on a "chilling effect" on speech[,] [plaintiffs] can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

450 F.3d at 1089.

standing.  <u>Lujan</u>, 504 U.S. at 561; <u>Utah Ass'n of Counties v. Bush</u>, 455 F.3d 1094, 1100 (10th Cir. 2006).  Plaintiffs must establish each element of standing in the same way they establish any other matter on which they bear the burden of proof, <u>i.e.</u> "with the manner and degree of evidence required at the successive stages of the litigation."  <u>Lujan</u>, 504 U.S. at 561.

Plaintiffs assert more than one theory of standing.  ALDF asserts standing based on the chilling effect on First Amendment speech and a credible threat of prosecution under the Act.  CFS, Hope Sanctuary and Shy 38 assert standing based on denial of information that they seek to obtain from ALDF.  Finally, ALDF and CFS assert injury due to diversion of organizational resources to combat the Act.

For reasons explained below, the Court finds that plaintiffs lack standing to challenge K.S.A. § 47-1827(a) and § 47-1828 but do have standing to challenge K.S.A. § 47-1827(b), (c) and (d).

### A.     ALDF's Standing To Challenge K.S.A. § 47-1827(a)

Subsection (a) prohibits "damag[ing] or destroy[ing] an animal facility or any animal or property in or on an animal facility," without the "effective consent" of the owner, with the "intent to damage the enterprise conducted at the animal facility."[8]  K.S.A. § 47-1827(a).  "Effective consent" means consent obtained without force, fraud, deception, duress or threat.  K.S.A. § 47-

---

[8]     The full text of subsection (a) is as follows:

No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, damage or destroy an animal facility or any animal or property in or on an animal facility.

K.S.A. § 47-1827(a).

1826(e).   The Act does not define "damage."   K.S.A. § 47-1826.

Defendants assert that ALDF lacks standing to challenge subsection (a) because an undercover investigation would not violate subsection (a) and thus ALDF cannot demonstrate injury.   More specifically, defendants assert that a matter of law, the "damage" that subsection (a) criminalizes refers only to *physical* damage, and because an ALDF investigator will not cause physical damage, it will not violate subsection (a).   Defendants' Memorandum In Support Of Summary Judgment (Doc. #47) at 26.   According to defendants, physical damage is a necessary element of criminal prosecution under subsection (a) and because plaintiffs claim that ALDF investigations will not cause physical damage, it lacks standing to challenge K.S.A. § 47-1827(a).

In response, plaintiffs assert that subsection (a) does not explicitly limit "damage" to physical damage, and that it could cover reputational harm, economic consequences and other intangible losses, which an ALDF investigator would intend.   According to plaintiffs, if an ALDF investigation reveals misconduct, it could "damage" an animal facility by putting it out of business or causing it to lose customers or suppliers.   Plaintiffs' Memorandum In Opposition To Summary Judgment (Doc. #55) at 19.   Plaintiffs further assert that to interpret "damage" to an enterprise as distinct from "damage" to an animal facility would be to suggest that "damage" has two meanings in the same sentence.   They argue that this conflicts with the principle that the Court should avoid "interpretations that would attribute different meanings to the same phrase."   Plaintiffs' Memorandum In Opposition (Doc. #55) at 13 (citing Conchise Consultancy, Inc. v. United States ex rel. Hunt, 139 S. Ct. 1507, 1512 (2019)).

To interpret a term in a statute, the Court begins by "examining the plain language of the text, giving each word its ordinary and customary meaning."   Mitchell v. C.I.R., 775 F.3d 1243, 1249 (10th Cir. 2015).   If a term has a plain and ordinary meaning, the Court applies it as written,

considering the broader context of the statute as a whole. Conrad v. Phone Directories Co., Inc., 585 F.3d 1376, 1381 (10th Cir. 2009). If a statute is ambiguous, the Court applies canons of construction as rules of thumb to aid in interpretation. Conn. Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1992).

A plain reading of subsection (a) establishes that it only prohibits physical damage to an animal facility or any animal or property. "Damage" applies to the animal facility, its animals and its property. An "animal facility" is "any vehicle, building, structure, research facility or premises where an animal is kept, handled, housed, exhibited, bred or offered for sale." K.S.A. § 47-1826(b). The prohibition of damaging or destroying an animal facility or any animal or property in or on an animal facility refers to places, animals and tangible things which are only susceptible to *physical* damage. See Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps (the doctrine of *noscitur a sociis*).") . Indeed, plaintiffs' expansive definition of "damage" makes little sense. If "damage" includes reputational harm or economic consequences, subsection (a) would prohibit a person from causing reputational harm or economic consequences to an "animal" or "any vehicle." See United States v. Brown, 333 U.S. 18, 27 (1948) (reject interpretation that produces absurd results).

Plaintiffs' argument that "damage" must mean the same thing in "damage the enterprise" and "damage . . . an animal facility" is unpersuasive. Given the context in which those phrases appear, it is not unreasonable to assume that they have distinct meanings. Cf. Conchise Consultancy, 139 S. Ct. at 1512. In addition, as the Supreme Court has explained, a word may bear more than one meaning in a statute:

> Where the subject-matter to which the words refer is not the same in the several
> places where they are used, or the conditions are different . . . the meaning well
> may vary to meet the purposes of the law, to be arrived at by a consideration of the

language in which those purposes are expressed, and of the circumstances under which the language was employed.

It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance.

Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 433 (1932) (internal citations omitted).

Here, "damage" in the phrase "damage the enterprise" bears a broader meaning than in the phrase "damage . . . an animal facility" because an enterprise may be damaged in more ways than an animal facility can be damaged. K.S.A. § 47-1826(b). While an enterprise may experience reputational or economic harm, a vehicle, building or animal may not.

To be subject to criminal prosecution under subsection (a), an ALDF investigator must cause physical damage to an animal, animal facility or animal facility property. Because plaintiffs do not allege that an ALDF investigator intends to do so, they have not alleged an intention to engage in conduct which K.S.A. § 47-1827(a) proscribes. See ALDF v. Otter, 44 F. Supp. 3d 1009, 1018 (D. Idaho 2014) (under similar statute, no standing as to provision involving physical damage). An ALDF investigator is not at risk of prosecution under this provision. Accordingly, ALDF has not demonstrated standing to challenge K.S.A. § 47-1827(a).

**B.     ALDF's Standing To Challenge K.S.A. § 47-1827(b)**

Subsection (b) makes it a crime to "acquire or otherwise exercise control over an animal facility, an animal from an animal facility or other property from an animal facility, with the intent to deprive the owner of such facility, animal or property and to damage the enterprise conducted

at the animal facility."[9]   K.S.A. § 47-1827(b).   Under the Act, to "deprive" is to (1) withhold an animal or other property from the owner permanently or for so extended a period of time that the owner loses a major portion of the value or enjoyment of the animal or property; (2) restore the animal or other property only upon payment of reward or other compensation; or (3) dispose of an animal or other property in a manner that makes recovery unlikely.   K.S.A. § 47-1826(d).

Plaintiffs state that ALDF investigators will not physically remove an animal or an animal facility's property, but they could exercise control over an animal facility by accepting a supervisory role or closing off part of a facility to covertly take photographs.   They assert that such photographs could lead public officials or law enforcement to seize or remove them to animal sanctuaries, and that ALDF intends those consequences, if warranted.

Defendants assert that plaintiffs lack standing because ALDF has no intention of engaging in conduct which subsection (b) proscribes, i.e. depriving owners of their facilities, animals or property.

To be subject to prosecution under subsection (b), a person must exercise control over an animal facility, animal or property with the intent to deprive the owner of the facility, animals or property and to damage the enterprise.   Here, an ALDF alleges that its investigators intend to exercise control over an animal facility by accepting a supervisory position or by blocking off

---

[9]      The full text of subsection (b) is as follows:

No person shall, without the effective consent of the owner, acquire or otherwise exercise control over an animal facility, an animal from an animal facility or other property from an animal facility, with the intent to deprive the owner of such facility, animal or property and to damage the enterprise conducted at the animal facility.

K.S.A. § 47-1827(b).

areas of the facility to covertly take photographs, all with the intent that public officials or law enforcement permanently remove animals. Based on the plain language of subsection (b), ALDF has stated a desire to engage in conduct which subsection (b) proscribes and faces a credible threat of prosecution under that subsection. ALDF has alleged sufficient injury to support standing to challenge K.S.A. § 47-1827(b).

**C.    ALDF's Standing To Challenge K.S.A. § 47-1827(c)**

Generally, subsection (c) makes it a crime to enter an animal facility or remain concealed there with intent to take pictures or to otherwise violate the Act, without effective consent of the owner and with intent to damage the enterprise conducted at the animal facility.[10] K.S.A. § 47-1827(c). Consent is not effective if "[i]nduced by force, fraud, deception, duress or threat." K.S.A. § 47-1826(e)(1).

---

[10]    The full text of K.S.A. § 47-1827(c) is as follows:

No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility:

(1) Enter an animal facility, not then open to the public, with intent to commit an act prohibited by this section;

(2) remain concealed, with intent to commit an act prohibited by this section, in an animal facility;

(3) enter an animal facility and commit or attempt to commit an act prohibited by this section; or

(4) enter an animal facility to take pictures by photograph, video camera or by any other means.

K.S.A. § 47-1827(c).

Plaintiffs assert that ALDF has standing to challenge subsection (c) because an ALDF investigator will use deception to (1) enter an animal facility that is not open to the public with intent to commit a prohibited act (i.e. take pictures), in violation of subsection (c)(1); (2) remain concealed with intent to take pictures, in violation of subsection (c)(2); (3) enter an animal facility to commit or attempt to commit a prohibited act, in violation of subsection (c)(3); and (4) gain entry to an animal facility to take pictures, in violation of subsection (c)(4).

Defendants claim that ALDF's intent to violate subsection (c) is too speculative to confer standing, and that ALDF cannot show redressability because it does not challenge a separately enforceable obstacle – Kansas trespass law – which bars the conduct in which it wishes to engage.

### 1.    ALDF's Injury Is Not Too Speculative

Defendants assert that ALDF's theory of standing is speculative: its plans to engage in conduct that would violate subsection (c) are speculative, and its fear of prosecution thereunder is also.  Defendants assert that even based on ALDF's stated plan, it is not certain that an ALDF investigator will violate subsection (c), and that ALDF's fear of prosecution is "ethereal." Defendants' Memorandum In Support Of Summary Judgment (Doc. #47) at 6.

As noted, to have standing, plaintiffs must establish (1) injury, (2) causation and (3) redressability.  Lujan, 504 U.S. at 560-61.  To constitute injury-in-fact, a threatened injury must be sufficiently imminent, i.e. it must be real and immediate, not remote, speculative, conjectural or hypothetical.  Clapper v. Amnesty Int'l, 568 U.S. 398, 409 (2013).  The Supreme Court has noted that although imminence is a "somewhat elastic concept," it "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly* impending."  Lujan, 504 U.S at 566 n.2 (internal quotation marks omitted) (emphasis in original).  Thus, the Supreme Court has repeatedly held that

"[a]llegations of *possible* future injury" are not sufficient to establish an injury-in-fact.  <u>Clapper</u>, 568 U.S. at 409 (emphasis and alteration in original) (internal quotations omitted).  In addition, when an injury's occurrence depends on too many contingencies, it may be too speculative to qualify as imminent.  <u>Id.</u> at 410; <u>see</u> <u>Brady Campaign to Prevent Gun Violence v. Brownback</u>, 110 F. Supp. 3d 1086, 1093 (D. Kan. 2015).

Here, the Court rejects defendants' argument that ALDF's plans to violate subsection (c) are too speculative.  An ALDF investigator plans to use deception to gain access to an animal facility to take pictures, enter and remain at an animal facility and conceal himself or herself to covertly take pictures.  This conduct fits squarely within the scope of what subsection (c) criminalizes.  ALDF's fear of prosecution under subsection (c) is not ethereal and it has sufficiently alleged injury to support standing to challenge subsection (c).

### 2.    ALDF's Injury Is Redressable

Defendants argue that any injury to ALDF is not redressable because ALDF does not challenge Kansas trespass law, which is a separate obstacle to its intended conduct, and thus a decision in ALDF's favor will not alleviate the threat of criminal prosecution.   In response, ALDF asserts that an investigation will not violate trespass laws and that a favorable decision in this case will redress the chilling effect on its First Amendment right to conduct an investigation based on a credible threat of prosecution.  ALDF further asserts that even if trespass law prohibits its investigations, the Act also contributes to its injury.

In addition to injury and causation, to have standing, plaintiffs must demonstrate redressability – that it is "likely, as opposed to merely speculative, that [their] injury will be redressed by a favorable decision."  <u>Lujan</u>, 504 U.S. at 561 (internal quotations marks omitted).  A favorable decision may not redress plaintiffs' injury if another statute which plaintiffs do not

challenge separately prohibits the conduct in which they wish to engage.  See Bishop v. Smith, 760 F.3d 1070, 1078 (10th Cir. 2014) (plaintiffs fail to establish redressability when unchallenged legal obstacle is enforceable separately and distinctly from challenged provision); see also Maverick Media Grp., Inc. v. Hillsborough Cnty., Fla., 528 F.3d 817, 820 (11th Cir. 2008); cf. Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga., 940 F.3d 1254, 1266 (11th Cir. 2019).  Plaintiffs, however, do not have to show that a favorable decision in this case would completely redress their injury; they only need to show that a favorable decision would reduce their injury to some extent. See Mass. v. EPA, 549 U.S. 497, 525-26 (2007); see also Chamber of Commerce of U.S. v. Edmonson, 594 F.3d 742, 757 (10th Cir. 2010).  Furthermore, the Tenth Circuit has held as follows:

> [F]ederal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement.  Doe v. Bolton, 410 U.S. 179, 188 (1973).  So long as the plaintiff faces a credible threat of enforcement, redressability is generally not an obstacle, see Edmondson, 594 F.3d at 757[.]

Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 905 (10th Cir. 2012).

Here, the Court rejects defendants' argument that a decision in ALDF's favor would not redress its injury because ALDF has not separately challenged Kansas trespass law.  Regardless whether ALDF faces a threat of prosecution under trespass law, removing the threat of prosecution under subsection (c) addresses the chilling effect of the Act.  Put another way, if ALDF knew that it only risked violation of one law (trespass) rather than two (trespass and the Act), it would reasonably be less afraid to exercise its rights.[11]  This is sufficient to establish causation and

---

[11]     In Kansas, criminal trespass is a class B nonperson misdemeanor which carries a sentence of not less than 48 consecutive hours of imprisonment to be served either before or as a

(Continued . . .)

redressability. In addition, as noted, the Tenth Circuit has held that "as long as the plaintiff faces a credible threat of enforcement, redressability is generally not an obstacle." <u>Consumer Data Indus. Ass'n</u>, 678 F.3d at 905. Subsection (c) proscribes ALDF's intended conduct and a decision from this Court in its favor would sufficiently redress its injury to permit Article III standing.

### D. ALDF's Standing To Challenge K.S.A. § 47-1827(d)

Subsection (d) makes it a crime to without effective consent and with intent to damage the enterprise conducted there, enter or remain on an animal facility with notice that entry was forbidden or to receive notice to depart but fail to do so.[12] K.S.A. § 47-1827(d). Consent is not effective if "[i]nduced by force, fraud, deception, duress or threat." K.S.A. § 47-1826(e)(1).

---

[11]     (. . . Continued)

condition of any grant of probation or suspension, reduction of sentence or parole. K.S.A. § 21-5808. Under K.S.A. § 47-1827(g), a violation of K.S.A. § 47-1827(b) is a severity level 10 nonperson felony, a violation of K.S.A. § 47-1827(c) is a class A nonperson misdemeanor and a violation of K.S.A. § 47-1827(d) is a class B nonperson misdemeanor. K.S.A. § 47-1827(g)(2)-(4).

[12]     The full text of K.S.A. § 47-1827(d) is as follows:

(1) No person shall, without the effective consent of the owner and with the intent to damage the enterprise conducted at the animal facility, enter or remain on an animal facility if the person:

    (A) Had notice that the entry was forbidden; or

    (B) received notice to depart but failed to do so.

(2) For purposes of this subsection (d), "notice" means:

    (A) Oral or written communication by the owner or someone with apparent authority to act for the owner;

(Continued . . .)

ALDF asserts that subsection (d) prohibits the conduct in which it wishes to engage, and that it has a reasonable fear of prosecution under subsection (d). Specifically, an ALDF investigator will violate subsection (d) when he or she uses deception to gain access to an animal facility and ignores posted notices to keep investigators out or prohibit photography. Defendants assert that ALDF cannot demonstrate injury because its plans to violate subsection (d) are speculative and it does not demonstrate redressability because it does not challenge Kansas trespass law.

With regard to subsection (c), ALDF has alleged more than a speculative intent to violate subsection (d) and it faces a credible threat of prosecution under that subsection. ALDF asserts that its investigators will use deception to gain entry to animal facilities and will ignore signs that prohibit unauthorized entry or photography. For purposes of K.S.A. § 47-1827(d)(2)(C), the investigator will thus have "notice" that his or her presence is forbidden. Because such conduct violates the plain language of K.S.A. § 47-1827(d)(1)(A), ALDF has alleged injury sufficient to challenge subsection (d).

In addition, for reasons stated above, the Court rejects defendants' argument that ALDF lacks standing because it does not also challenge Kansas trespass law. Removing the threat of

---

[12]     (. . . Continued)

(B) fencing or other enclosure obviously designed to exclude intruders or to contain animals; or

(C) a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden.

K.S.A. § 47-1827(d).

prosecution under subsection (d) reduces ALDF's fear of consequences flowing from the Act, so that favorable decision from this Court would sufficiently redress its injury for purposes of Article III standing.

### E. Standing of CFS, Hope Sanctuary And Shy 38

To recap, ALDF has standing to challenge K.S.A. §47-1827(b), (c) and (d) because those provisions arguably proscribe ALDF's intended conduct and it faces a credible threat of prosecution under each section. ALDF lacks standing to challenge K.S.A. §47-1827(a), which prohibits physical damage to an animal, animal facility or animal facility property, because ALDF does not intend to violate that subsection and does not face a credible threat of prosecution thereunder. The Court now turns to whether CFS, Hope Sanctuary and Shy 38 have standing to challenge some or all the Act.

#### 1. K.S.A. §47-1827(b), (c) And (d)

CFS, Shy 38 and Hope Sanctuary do not wish to engage in conduct that violates the Act, and they do not allege a credible threat of prosecution. Rather, they claim standing based on their First Amendment right to listen to or to receive information that ALDF would obtain in an undercover investigation. Defendants assert that because ALDF lacks standing, CFS, Hope Sanctuary and Shy 38 cannot establish standing based on a right to receive information from ALDF.

The First Amendment protects both speakers and listeners, and listeners have a right to receive information. Kansas Judicial Review v. Stout, 519 F.3d 1107, 1115 (10th Cir. 2008) (citing Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756-57 (1976)); see Doe v. City of Albuquerque, 667 F.3d 1111, 1118-19 (10th Cir. 2012). To establish standing based on violation of the right to receive information – or "right to listen" – plaintiffs

must first show existence of a willing speaker.   See Pa. Family Inst., Inc. v. Black, 489 F.3d 156, 165-66 (3d Cir. 2007).   A willing speaker is one that states that the challenged law infringes upon or chills its exercise of rights and that but for the law in question, the speaker would be more willing to speak.   Id. at 166-67.   The right to receive information is entirely derivative of – and cannot enlarge – the willing speaker's rights.   Application of Dow Jones & Co., Inc., 842 F.2d 603, 608 (2d Cir. 1988).   The right to receive information depends entirely on whether a willing speaker has established an injury.   See Pa. Family Inst., 489 F.3d at 166; see also United States v. Wecht, 484 F.3d 194, 203 (3d Cir. 2007), as amended (July 2, 2007) (purpose of willing speaker requirement not to tie third party's interests to those of speaker but to ensure injury in fact that favorable decision would redress).

Here, ALDF is a willing speaker because it has alleged that the Act has chilled exercise of its First Amendment rights.   CFS, Shy 38 and Hope Sanctuary, therefore, have a right to receive information from ALDF and have standing to challenge the provisions that ALDF has standing to challenge.   Accordingly, CFS, Shy 38 and Hope Sanctuary have standing to challenge subsections (b), (c) and (d).

### 2.      K.S.A. § 47-1827(a)

Because ALDF lacks standing to challenge K.S.A. § 47-1827(a), CFS, Shy 38 and Hope Sanctuary cannot piggyback on ALDF standing to challenge that provision under a "right to listen" theory.   As an alternative theory, CFS argues that as an organization that has diverted resources

to challenge the Act, it has sustained injury which is sufficient to support standing under Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982).[13]

To establish organizational standing under Havens, an organization must show that it has suffered a concrete and demonstrable interest to its activities which goes beyond a mere setback to abstract social interests. Havens, 455 U.S. at 379; People for the Ethical Treatment Of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1093 (D.C. Cir. 2015); Colo. Taxpayers Union, Inc. v. Romer, 963 F.2d 1394, 1397 (10th Cir. 1992). It must also show a direct conflict between defendants' conduct and the organization's mission. Amer. Soc. For Prevention of Cruelty to Animals v. Feld Entm't, Inc., 659 F.3d 13, 25 (D.C. Cir. 2011). An organization cannot "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C. Cir. 1990). Diversion of organizational resources to litigation is a self-inflicted budgetary decision which does not qualify as an injury in fact for standing purposes. Feld Entm't, 659 F.3d at 25; BMC Mktg., 28 F.3d at 1276-77.

---

[13]     In Havens, a fair housing organization claimed that discriminatory housing practices had impaired its ability to provide services to low and moderate-income home seekers and had forced it to devote significant resources to identify and combat discriminatory practices. Id. at 379. The Supreme Court held that in an action for damages, the organization had demonstrated a "concrete and demonstrable injury to [its] activities – with the consequent drain on the organization's resources – [that] constitute[d] far more than simply a setback to the organization's abstract social interests." Id. Courts of Appeals disagree about the proper scope and application of Havens. See, e.g., Village of Bellwood v. Dwivedi, 895 F.3d 1521 (7th Cir. 1990); Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C. Cir. 1994) (disagreeing with Seventh Circuit on Havens); Central Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc., 236 F.3d 629, 641 (11th Cir. 2000) (rejecting D.C. Circuit reasoning in BMC Mktg.).

Here, CFS alleges that the Act has frustrated its mission by criminalizing the undercover investigations on which it relies and has caused it to divert resources away from core educational and outreach programs.   Plaintiffs' Memorandum In Support Of Summary Judgment (Doc. #54) at 14.   CFS further asserts that as a result of this diversion of resources, it has "less money and time to devote to outreach topics that are central to [its] mission[ ], such as animal rescues, educating the public about the harms of industrial farming, and other forms of abuse, neglect, and cruelty to animals."   Id.

To support these assertions, CFS cites the affidavit of Rebecca Spector, West Coast Director of CFS.   Spector asserts that "CFS has spent significant resources to stop the unconstitutional Ag-Gag law, and laws like it, and promote transparency in animal agriculture. But for these unconstitutional Ag-Gag laws, CFS would utilize its limited resources promoting alternatives to the industrial animal production system."   Affidavit of Rebecca Spector (Doc. #54-1) at 2.

CFS has failed to set forth specific facts which demonstrate injury in fact under Havens. As an initial matter, the purported injury to CFS is not sufficiently distinct from its general mission. In relevant part, the mission of CFS is to "use legal . . . action to protect and promote the public's right to safe food and the environment."   Plaintiffs' Memorandum In Support Of Summary Judgment (Doc. #54) at vi, Plaintiffs' Undisputed Fact #16.   In other words, CFS cannot show that the Act has forced it to divert its resources away from its mission when legal action is part of its mission.   See CFS v. Price, No. 17-3833-VSB, 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (purported injuries not sufficiently distinct from organizations' general mission).   Indeed, the limits which Article III places on federal jurisdiction would be meaningless if organizations whose purpose is to fight laws with which they disagree could establish injury by doing just that.

See Fair Elections Ohio v. Husted, 770 F.3d 456, 460 (6th Cir. 2014) (Article III limits eviscerated if organization has standing based on efforts and expense to change law).

In addition, CFS has not set forth specific facts which demonstrate that the Act has injured its activities in regard to legal action. Spector asserts generally that CFS has spent significant resources to fight "Ag-Gag" laws and that they could have spent those resources elsewhere. But CFS's decision to channel money from certain programs into others, in response to the Act, is a "self-inflicted budgetary choice." Feld Entm't, 659 F.3d at 25 (internal quotation marks omitted). Such diversion of resources is not injury that is sufficient to support standing. See BMC Mktg., 28 F.3d at 1277 (standing in Havens not based on diversion of resources from one program to another); Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1162 (D.C. Cir. 2005) (no Havens standing for impairment of pure issue advocacy). CFS has not established that it has organizational standing based on diversion of resources.

**F.      Plaintiffs' Standing To Challenge K.S.A. § 47-1828**

Section 47-1828 provides a private right of action for "[a]ny person who has been damaged by reason of a violation of K.S.A. § 47-1827 against the person who caused the damage." Defendants assert that plaintiffs cannot satisfy the required element of causation because defendants are not responsible for enforcing Section 47-1828. Plaintiffs do not respond.

As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing standing. Lujan, 504 U.S. at 561; Bush, 455 F.3d at 1100. To meet their burden, plaintiffs must set forth specific facts, by affidavit or other evidence, which demonstrate a genuine issue of material fact concerning standing. Lujan, 504 U.S. at 590 (Blackmun, J., dissenting); Pierce, 711 F.2d at 425. Plaintiffs do not allege any facts to support standing as to K.S.A. § 47-1828 and have thus failed to meet their burden. Plaintiffs therefore lack standing to challenge K.S.A. § 47-1828.

In sum, all plaintiffs lack standing to challenge K.S.A. § 47-1827(a) and K.S.A. § 47-1828, but they do have standing to challenge K.S.A. § 47-1827 (b), (c) and (d).

## II.     Merits

The Court next considers the merits of plaintiffs' claim that K.S.A. § 47-1827(b), (c) and (d) are unconstitutional.   Plaintiffs specifically claim that K.S.A. § 47-1827(b), (c) and (d) violate their First Amendment right to freedom of speech because they impose a viewpoint-based and content-based restriction on their ability to engage in speech and speech-producing conduct on a matter of public concern, which defendants cannot justify under either strict or intermediate scrutiny.   Plaintiffs further assert that K.S.A. § 47-1827(b), (c) and (d) are unconstitutionally overbroad because they prohibit a substantial amount of protected speech.   Pretrial Order (Doc. #49) at 15.

Defendants assert that K.S.A. § 47-1827(b), (c) and (d) do not regulate expressive activity and that even if they regulate *some* expressive activity, the First Amendment does not protect it. Stated otherwise, defendants argue that plaintiffs do not have a First Amendment right to engage in false speech made with intent to damage an enterprise conducted at an animal facility. Defendants further assert that the First Amendment does not prevent the government from imposing reasonable regulations on photographing nonpublic government and private property, and that K.S.A. § 47-1827(b), (c) and (d) are viewpoint-neutral, content-neutral and not overbroad. Pretrial Order (Doc. #49) at 16.

### A.     The First Amendment In General

The First Amendment provides that Congress, and through the Fourteenth Amendment, the states, "shall make no law . . . abridging the freedom of speech," and prevents the government from proscribing speech and expressive conduct because it disapproves of their subject-matter or

message.  U.S. Const. amend. I; <u>R.A.V. v. City of St. Paul, Minn.</u>, 505 U.S. 377, 382 (1992); <u>Gitlow v. New York</u>, 268 U.S. 652, 666 (1925) (First Amendment applies to states).  Content-based regulations of speech "target speech based on its communicative content" and are presumptively invalid.  <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218, 2226 (2015); <u>R.A.V.</u>, 505 U.S. at 382.  To survive a challenge to a content-based speech regulation, the government must prove that the regulation is narrowly tailored to serve compelling state interests.  <u>Nat'l Inst. of Family & Life Advocates v. Becerra</u>, 138 S. Ct. 2361, 2371 (2018) (stringent standard reflects fundamental principle that governments have no power to restrict expression because of message, ideas, subject matter or content).

At the same time, it is a "long established" and "fundamental principle" that "the freedom of speech . . . does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language."  <u>Gitlow</u>, 268 U.S. at 666-67 (collecting cases).  Accordingly, "our society . . . has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."  <u>R.A.V.</u>, 505 U.S. at 382-83 (internal citations and quotation marks omitted); <u>United States v. Alvarez</u>, 567 U.S. 709, 717 (2012) (categories of unprotected speech include incitement to lawless action, obscenity, defamation, child pornography, fraud, true threats and speech integral to criminal conduct).  The freedom of speech that the First Amendment protects "does not include a freedom to disregard these traditional limitations."  <u>R.A.V.</u>, 505 U.S. at 383.

Thus, in a few limited categories, government may regulate speech consistently with the First Amendment.  Importantly, however, the government may not use such categories as

"vehicles for content discrimination unrelated to their distinctively proscribable content." R.A.V., 505 U.S. at 383. For example, "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." Id. at 384 (emphasis in original).

**B.      Determining The Appropriate Standard Of Review**

Before applying the appropriate standard of review, the Court must address three preliminary issues. First, the Court must determine whether K.S.A. § 47-1827 (b), (c) and (d) regulate speech or merely regulate conduct. The First Amendment will only apply if K.S.A. § 47-1827 (b), (c) and (d) regulate speech. Second, if K.S.A. § 47-1827 (b), (c) and (d) regulate speech, the Court must determine if they do so in a manner that is content-based or content-neutral. Finally, if K.S.A. § 47-1827 (b), (c) and (d) are content-based restrictions, the Court must determine whether they fall into a category of speech that the government may proscribe based on content.

**1.      Speech Or Conduct**

Plaintiffs assert that K.S.A. § 47-1827 (b), (c) and (d) regulate pure speech and that they cannot violate the law without speaking – i.e. lying to an animal facility owner. Defendants assert that these provisions regulate conduct – not speech – because unconsented *entry* onto property with intent to cause damage is what triggers liability. In other words, lying to an animal facility owner or taking pictures at an animal facility do not, by themselves, violate K.S.A. § 47-1827 (b), (c) and (d). Stated otherwise, defendants assert that this is a trespass statute, not a limitation on free speech.

"[D]rawing the line between speech and conduct can be difficult," and not every use of language is "speech" for First Amendment purposes. NIFLA, 138 S. Ct. at 2373 (internal

citations and quotation marks omitted); see Otto v. City of Boca Raton, Fla., 353 F. Supp. 3d 1237, 1249 (S.D. Fla. 2019) (difference between speech and conduct not easy to discern). Here, however, K.S.A. § 47-1827 (b), (c) and (d) plainly regulate speech in two ways.

First, the prohibition on deception limits what plaintiffs may or may not say. Plaintiffs intend for an ALDF investigator to speak to an animal facility owner to gain access to an animal facility, and whether the investigator violates the deception provision in K.S.A. § 47-1827 (b), (c) and (d) depends on what he or she says. See Humanitarian Law Project, 561 U.S. at 27 (rejecting argument that what parties say involves conduct rather than speech). They restrict the communication an investigator may have with an animal facility owner. This is a regulation of speech in its most basic form. See Reed, 135 S. Ct. at 2226.

Second, the prohibition on taking pictures at an animal facility regulates speech for First Amendment purposes. The Supreme Court has held that creation and dissemination of information are speech, and this includes videos, photographs and recordings. Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502 (1952). In addition, the Tenth Circuit recently held in W. Watersheds Proj. v. Michael, 869 F.3d 1189, 1195-96 (10th Cir. 2017), that "collection of resource data," which the statute defined to include the taking of photographs, "constituted the protected creation of speech." The Tenth Circuit further stated that "[a]n individual who photographs animals or takes notes about habitat conditions is creating speech in the same manner as an individual who records a police encounter." Id. at 1196. Thus, the prohibition in K.S.A. § 47-1827 (b), (c) and (d) on using deception to enter an animal facility with the intent to take pictures regulates speech and speech-creating activity that are within the ambit of the First Amendment.

## 2.    Content-Based Or Content-Neutral

Plaintiffs assert that K.S.A. § 47-1827(b), (c) and (d) are content-based regulations because they criminalize speech based on whether it is true or false.   Plaintiffs further assert that K.S.A. § 47-1827(b), (c) and (d) are viewpoint-discriminatory because they prohibit speech only if it is made with "intent to damage the enterprise conducted at the animal facility."

Defendants appear to concede that subsections (b) and (d) discriminate based on content. See Defendants' Response To Plaintiffs' Motion For Summary Judgment (Doc. #60) at 25 n.24. Subsection (b) implicates the First Amendment because it criminalizes the exercise of control over an animal facility, animal or property of an animal facility without the effective consent of the owner, that is, with consent that is induced by speech that is fraudulent, deceptive or threatening under K.S.A. § 47-1826(e).   The regulation of such speech is not viewpoint-neutral because it only applies to speech that is made with intent to damage the enterprise conducted at an animal facility.   Similarly, subsection (d) implicates the First Amendment because it criminalizes entering or remaining on an animal facility without the effective consent of the owner (i.e., with consent that is obtained by fraudulent, deceptive or threatening speech) if a person has notice that his or her entry is forbidden or is directed to leave and fails to do so.   See K.S.A. § 47-1827(d)(1). The regulation of speech in subsection (d) is not viewpoint-neutral because it only applies to speech that is made with intent to damage the enterprise conducted at an animal facility.

Defendants argue that subsection (c) is content-neutral because prohibition on unconsented entry to photograph, film or otherwise record does not regulate a specific topic, idea or message. They appear to further assert that the prohibition is viewpoint-neutral because the requisite intent – i.e., intent to damage the enterprise conducted at the animal facility – does not require that the damage arise from the publication of pictures or videos.

Government regulation of speech is content-based if it restricts speech based on the topic it discusses or the idea or message it expresses. Reed, 135 S. Ct. at 2227. A content-based regulation requires enforcement authorities to examine the content of the message to determine whether plaintiffs have violated the law. McCullen v. Coakley, 573 U.S. 464, 479 (2014). In addition, even if a law is content-neutral on its face, the Court considers it content-based if it cannot be justified without reference to the content of the regulated speech, or if the government adopted it because of disagreement with the message it conveys. Id. Viewpoint discrimination is a particularly egregious subset of content-based discrimination. Pahls v. Thomas, 718 F.3d 1210, 1229 (10th Cir. 2013) (citing Rosenberger v. Rectors & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)). Instead of targeting the subject-matter, a viewpoint-discriminatory regulation targets the particular views of a speaker on a subject and regulates speech based on the speaker's specific motivating ideology, opinion or perspective. Rosenberger, 515 U.S. at 829. Both content-based and viewpoint-discriminatory restrictions on speech are presumptively invalid and subject to strict scrutiny. Pahls, 718 F.3d at 1229.

Here, K.S.A. § 47-1827 (b), (c) and (d) are content-based and viewpoint-discriminatory restrictions on speech. To determine whether an individual deceived an animal facility owner in violation of K.S.A. § 47-1827 (b), (c) and (d), defendants would have to review what the individual communicated to the animal facility owner. In other words, defendants would have to examine the content of speech to determine if the individual had failed to obtain effective consent to enter the animal facility, "remain concealed there," "acquire or exercise control" over it or take pictures there. The prohibition on deception in K.S.A. § 47-1827 (b), (c) and (d) is plainly a content-based restriction on speech.

In addition, subsections (b), (c) and (d) are viewpoint-discriminatory because they only

prohibit deceiving an animal facility owner, acquiring control over a facility, taking pictures at an animal facility, etc., if a person does so with "intent to damage the enterprise conducted at the animal facility."   The law does not prohibit such conduct if the person has the intent to *benefit* the enterprise conducted at the animal facility, and in this respect it impermissibly discriminates based on the speaker's views about animal facilities.   For example, if a journalist ignored posted keep-out notices and lied to an animal facility owner to gain access and exercise control over the animal facility with the intent to write a *positive* article about the enterprise, he or she would not violate subsections (b) or (d).   Similarly, an undercover photographer would not violate subsection (c) if he or she lied to gain access to a Borden Dairy farm to covertly film a tribute to Elsie the cow.   As long as the photographer did so with intent to benefit Borden Dairy, he or she would not violate subsection (c).   In other words, a person cannot violate the law unless he or she has the intent to damage the enterprise conducted at an animal facility.   The law plainly targets negative views about animal facilities and therefore discriminates based on viewpoint.

### 3.     Unprotected Speech

Defendants assert that under <u>Alvarez</u>, the First Amendment does not protect the speech which K.S.A. § 47-1827(b), (c) and (d) restricts, that is, false speech associated with the legally cognizable harms of trespass and "damage to the enterprise conducted at the animal facility."   In other words, defendants assert that K.S.A. § 47-1827(b), (c) and (d) are exempt from First Amendment scrutiny.   Plaintiffs respond that lying to an animal facility owner to gain access to an animal facility has no corresponding legally cognizable harm and that even if it does, K.S.A. § 47-1827 (b), (c) and (d) impermissibly target the viewpoint of those who are critical of animal facilities.

As noted, generally, government may not prohibit speech based on content.   <u>Reed</u>, 135 S.

-35-

Ct. at 2226. But content-based restrictions are permissible in a few historic and traditional categories of expression. Alvarez, 567 U.S. at 717 (categories of unprotected speech include incitement to lawless action, obscenity, defamation, child pornography, fraud, true threats and speech integral to criminal conduct). In Alvarez, the Supreme Court addressed whether false speech was one such category of unprotected speech. At issue was the Stolen Valor Act, 18 U.S.C. § 704, which criminalized false claims of receiving the Congressional Medal of Honor. Id. at 713. In a plurality opinion, the Supreme Court declined to add false speech to the list of categorically unprotected speech but determined that the government may prohibit false speech when it is associated with a legally cognizable harm. Id. at 719-22.

For reasons stated above, the Court does not accept the argument that the First Amendment does not protect the false speech that K.S.A. § 47-1827 (b), (c) and (d) prohibit. Even so, defendants' reliance on Alvarez would be misplaced. The Supreme Court has noted that even when a law bans unprotected speech, the government cannot discriminate by targeting only a subset of speech within the unprotected category. R.A.V., 505 U.S. at 391-92. For example, in R.A.V., the Supreme Court held unconstitutional a city ordinance that prohibited fighting words that insult or provoke violence on the basis of race, color, creed, religion or gender but did not prohibit fighting words based on other subjects. 505 U.S. at 391. The Supreme Court held that even though the First Amendment does not protect fighting words in general, the prohibition of fighting words on selected topics was impermissible content-based discrimination. Id. at 393-394. As an illustration, the Supreme Court stated that "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." Id. at 384 (emphasis in original).

Here, defendants cannot regulate only false speech that is intended to damage enterprises

conducted at animal facilities (i.e. made with intent to damage animal facilities). Accordingly, K.S.A. § 47-1827(b), (c) and (d) are not exempt from First Amendment scrutiny.

## C. Strict Scrutiny Applies

Because K.S.A. § 47-1827(b), (c) and (d) restrict speech based on its content, the Court must apply strict scrutiny. See United States v. Playboy, 592 U.S. 803, 814 (2000); see also Reed, 135 S. Ct. at 2228 (facially content-based law subject to strict scrutiny regardless of government's benign motive, content-neutral justification or lack of animus toward ideas contained in regulated speech); Reed, 135 S. Ct. at 2231. Under strict scrutiny, the Court will only uphold a content-based speech restriction if it is necessary to serve a compelling interest and narrowly tailored to achieve that end. See Reed, 135 S. Ct. at 2231. To be narrowly tailored, the speech restriction must be the least restrictive means available to achieve the compelling interest and must not be underinclusive. Playboy, 529 U.S. at 813; McCullen, 573 U.S. at 486 (narrow tailoring requires close means-end fit); Brown v. Entm't Merchants Ass'n, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."); Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002) (woefully underinclusive content-based speech restriction fails strict scrutiny). Strict scrutiny is a demanding standard and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." Playboy, 529 U.S. at 818; Entm't Merchants Ass'n, 564 U.S. at 799.

Defendants do not attempt to justify K.S.A. § 47-1827(b), (c) and (d) under strict scrutiny. They assert that subsections (b), (c) and (d) are a *reasonable* way to protect animal facility owners' privacy and property rights, but they do not assert a *compelling* interest in protecting those rights. In any event, even assuming that protection of privacy and property rights of animal facility owners

-37-

is a compelling interest, K.S.A. § 47-1827(b), (c) and (d) would not survive strict scrutiny because they are not narrowly drawn to achieve that end.   K.S.A. § 47-1827(b), (c) and (d) do not prevent *everyone* from violating the property and privacy rights of animal facility owners – only those who violate said rights with intent to damage the enterprise conducted at animal facilities.   As a result, K.S.A. § 47-1827(b), (c) and (d) are "hopelessly underinclusive."   <u>Reed</u>, 135 S. Ct. at 2231; <u>see</u> <u>Rep. Party of Minn.</u>, 536 U.S. at 780.   Defendants have not met their burden to prove that the content-based restrictions on free speech in K.S.A. § 47-1827(b), (c) and (d) serve a compelling interest and are narrowly tailored to further that interest.   Accordingly, K.S.A. § 47-1827(b), (c) and (d) fail strict scrutiny and the Court must declare them unconstitutional.

## III.      Governor Is A Proper Party

Defendants assert that the Governor is not a proper defendant because she has no specific statutory or constitutional duty to enforce the Act.   In <u>Petrella v. Brownback</u>, 697 F.3d 1285, 1293-94 (10th Cir. 2012), however, the Tenth Circuit held that in suits for prospective relief under Kansas law, the Governor is a proper party.   Specifically, the Tenth Circuit stated as follows:

> It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute.   <u>See</u> <u>Ex parte Young</u>, 209 U.S. 123, 161 (1908).   Nor can it be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state.   <u>See</u> Kan. Const. Art. I § 3; Kan. Stat. Ann. § 75-702.

<u>Petrella</u>, 697 F.3d at 1293-94.   The Court therefore finds that the Governor is a proper defendant in this case.

## Conclusion

Defendants are entitled to summary judgment on their claim that plaintiffs lack standing to challenge K.S.A. § 47-1827(a) and K.S.A. § 47-1828.   Plaintiffs are entitled to summary

judgment on the issue of standing as to K.S.A. § 47-1827 (b), (c) and (d), and on their claim that those provisions violate the First Amendment.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment</u> (Doc. #46) filed July 25, 2019 is **SUSTAINED in part.**

**IT IS FURTHER ORDERED** that <u>Plaintiffs' Motion For Summary Judgment</u> (Doc. #53) filed September 16, 2019 is **SUSTAINED in part.**

Dated this 22nd day of January, 2020 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge